Scott A. Brody (SB4148)
BRODY, O'CONNOR, & O'CONNOR, ESQS.
Attorneys for the Plaintiffs
111 John Street, Suite 900
New York, NY 10038
(212) 233-2505

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### (Manhattan)

-----------------------------------------------------------------------------------X

SCOTT CHARNEY, DIVA GOODFRIEND-KOVEN, ROBERT REACH, ELLEN REACH, TONI ALLEN, SCOTT EDVABSKY, ANTHONY AND BARBARA CORSARO, GARY ZUCCARO, BRUCE LICHTENSTEIN, ROBERT ANARUMO, KAREN FUSCO, BONNIE AND WAYNE VARTABEDIAN, GEORGE YU, CONNIE SIMONS, LAURA FLAX, JAY COON, NEIL BLITZ, MARNI BLITZ, JOSEPH LEVINE, NINA CHAIFETZ, ED HARAN, ANNE HARAN, KATHY PASHUCK, BRUCE FULLER, TRACEY PECK, JEFF PECK, ELIZABETH TYMCZYSZYN, and GATA REALTY, LLC,

**JURY TRIAL DEMANDED**

**Case No.: 07 CV 6272 (AKH)**

**COMPLAINT**

**ECF CASE**

Plaintiffs,

V.

CARLA ZIMBALIST, PAM CHANLA, JENNIFER S. WILKOV, EVOLUTIONARY STRATEGIC PLANNING, INC., and AMERIPRISE FINANCIAL, INC.,

Defendants.

-----------------------------------------------------------------------------------X

Plaintiffs Scott Charney, Diva Goodfriend-Koven, Robert Reach, Ellen Reach,

Toni Allen, Scott Edvabsky, Anthony and Barbara Corsaro, Gary Zaccaro, Bruce

Lichtenstein, Robert Anarumo, Karen Fusco, Bonnie and Wayne Vartabedian, George

Yu, Connie Simons, Laura Flax, Jay Coon, Neil Blitz, Marni Blitz, Joseph Levine, Nina

Chaifetz, Ed Haran, Anne Haran, Kathy Pashuck, Bruce Fuller, Tracey Peck, Jeff Peck,

Elizabeth Tymczyszyn, and Gata Realty, LLC, by their attorneys, Brody, O'Connor, and

O'Connor, Esqs., as and for their Complaint against defendants Carla Zimbalist

("Zimbalist"), Pam Chanla ("Chanla"), Jennifer S. Wilkov ("Wilkov"), Evolutionary

Strategic Planning, Inc. ("ESP"), and Ameriprise Financial, Inc. ("Ameriprise"), allege as

follows:

## FACTUAL BACKGROUND

1.    This action is one for damages arising out of violations of § 10(b) of the

Securities Exchange Act of 1934, common law fraud, breach of fiduciary duty, negligent

misrepresentation, violations of §§ 1961, et seq., of the RICO Act, violations of New

York General Business Law § 349, and for rescission of certain investment advising

contracts for violations of § 80b-6 of the Investment Advisors Act.

2.    The defendants, Carla Zimbalist and Pam Chanla, engaged in a scheme to

defraud investors by promoting alleged investments in real estate located in and around

Los Angeles County, California.

3.    The investments were purported to require that the investors invest in a

limited liability company, which, in turn, would purchase residential properties,

rehabilitate the properties, and then sell them at a profit.

4.    The investors were to invest a portion of the cash needed to complete the

process, and when the process was completed, the investors would receive a share of the

profits in proportion to the amount they had invested.

5.    In furtherance of this investment promotion, Zimbalist and Chanla utilized the

services of the defendant, Jennifer S. Wilkov.

6.    Zimbalist and Chanla generated and distributed fraudulent documents that

purported to disclose the costs of the investment and the expected rate of return. Zimbalist and Chanla even caused the distribution of "updates" regarding the progress made in flipping the properties.

7.    Zimbalist, Chanla and Wilkov used the mail, wire service, fax and internet to accomplish the transmission of the false information and the transfer of the funds.

8.    At the time Wilkov was promoting, and selling, the alleged investments being put together by Zimbalist and Chanla, and during the period when most of the investments occurred, Wilkov was a financial advisor with American Express Financial Advisors ("AEFA"), predecessor-in-interest to defendant Ameriprise.

9.    Upon information and belief, Wilkov was paid a commission by Zimbalist and Chanla for referring individuals to these purported California investments. This belief is based upon statements later made by Wilkov

10.    Many of the plaintiffs referred to the investments were clients of AEFA, with Wilkov assigned as their financial advisor.

11.    With AEFA knowledge, Wilkov also used her position as a financial advisor to solicit investments from friends of her AEFA clients. Wilkov initially failed to disclose to several clients the commission Zimbalist and Chanla were paying her.

12.    Upon information and belief, Zimbalist and Chanla also paid Wilkov to generate and distribute fraudulent "updates" regarding the progress made in flipping the properties, which she again initially failed to disclose to her clients. This belief is based upon statements later made by Wilkov.

13.    In fulfilling her role, and despite failing to exercise reasonable due diligence, Wilkov repeatedly assured her clients that the investments in California were sound. In

fulfilling her role and, despite a complete lack of evidence, Wilkov made repeated representations regarding Zimbalist and Chanla's past performance, and Wilkov specifically assured her clients that she had conducted an investigation of Zimbalist and Chanla. Zimbalist, Chanla and Wilkov prepared documents purporting to disclose the costs of the investment, but which neglected to include the costs of several critical elements of any real estate purchase or the cost of the fees Wilkov was being paid. Despite a reasonable opportunity to learn the contrary, Wilkov continued to advise and encourage her clients with reassurances that the investments would return profits in excess of 100% and that Zimbalist and Chanla were legitimate, experienced, and reliable real estate developers.

14.     In reality, the entire process was nothing more than an elaborate fraud in which Zimbalist and Chanla never purchased most of the properties, and the properties that were actually purchased were never rehabilitated and sold.

15.     Upon information and belief, Wilkov never conducted a reasonable investigation of Zimbalist and Chanla before making the recommendation to invest with them to the plaintiffs. This belief is based upon a review of statements later made by Wilkov. In reliance upon the fraudulent statements of Zimbalist and Chanla, and the misrepresentations of Wilkov in her dual role as promoter of the investments and financial advisor to the plaintiffs, the plaintiffs each invested amounts in excess of $25,000 in the various property offerings. In total, the plaintiffs invested more than $1.5 million. A schedule of the investments is annexed hereto as Exhibit 1.

## JURISDICTION

16.     This action arises out of violations of §10(b) of the Securities Exchange Act

of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 enacted there under [17 C.F.R. 240.10b-5], violations of the Investment Advisors Act [15 U.S.C. § 80b-6], and violations of the RICO Act [18 U.S.C. § 1964]. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 78aa, 15 U.S.C. § 80b-14, and 18 U.S.C. § 1964(c).

17.     The Court has supplemental jurisdiction over the state law claims for relief pursuant to 28 U.S.C. § 1367(a), since these claims arise from a common nucleus of operative facts and are so intertwined with the federal claims for relief as to make an exercise of the Court's jurisdiction appropriate.

## VENUE

18.     Venue is proper pursuant to 18 U.S.C. § 1965(a), 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

## THE PLAINTIFFS

19.     At all times material herein, the Plaintiff, **Scott Charney ("Charney")**, was, and still is, a resident of Merrick, New York.

20.     At all times material herein Charney was a client of AEFA.

21.     Charney invested in the Orion Avenue and S. Lotus Avenue properties.

22.     At all times material herein, the Plaintiff, **Diva Goodfriend-Koven ("Goodfriend-Koven")**, was, and still is, a resident of New York, New York.

23.     At all times material herein, Goodfriend-Koven was a client of AEFA, and Wilkov served as her financial advisor.

24.     When Defendant Wilkov formed Evolutionary Strategic Planning, Inc., Goodfriend-Koven became a client of Evolutionary Strategic Planning, Inc.

25.     Goodfriend-Koven invested in the N. Plymouth Boulevard and Grandview Boulevard properties.

26.     At all times material herein, the Plaintiffs, **Robert and Ellen Reach (collectively, "Reach")** were, and still are, husband and wife, and residents of Greenwood Lake, New York.

27.     Reach invested in the N. Plymouth Boulevard property.

28.     At all times material herein, the Plaintiff, **Toni Allen ("Allen")** was, and still is, a resident of Bayside, New York.

29.     Allen invested in the N. Plymouth Boulevard property.

30.     At all times material herein, the Plaintiff, **Elizabeth Tymczyszyn, ("Tymczyszyn**") was, and still is, a resident of Hoboken, New Jersey.

31.     At all times material herein, the Plaintiff, **Gata Realty, LLC**, was, and still is, a limited liability company formed under the laws of the State of New Jersey. It was formed for the purpose of making real estate investments.

32.     Tymczyszyn was, and still is, the sole member of Gata Realty, LLC.

33.     Prior to August of 2005, Tymczyszyn was a client of AEFA and Wilkov served as her financial advisor.

34.     After August of 2005, Tymczyszyn was a client of ESP and Wilkov served as her financial advisor.

35.     In her individual capacity and through the use of the limited liability company Gata Realty, LLC, Tymczyszyn invested in the S. Lotus Avenue, Martelo Avenue, Bronholly Drive, Greenwood Avenue, and Worcester Avenue properties.

36.     At all times material herein, the Plaintiff, **Scott Edvabsky ("Edvabsky")**

was, and still is, a resident of Levittown, New York.

37.    Edvabsky invested in the Grandview Boulevard property.

38.    At all times material herein, the Plaintiffs **Anthony and Barbara Corsaro (collectively, "Corsaro")** were, and still are, husband and wife, and residents of Baldwin, New York.

39.    Corsaro invested in the N. Plymouth Avenue property.

40.    At all times material herein, the Plaintiff, **Gary Zaccaro ("Zaccaro")** was, and still is, a resident of Massapequa, New York.

41.    Zaccaro invested in the Grandview Boulevard and S. Lotus Avenue properties.

42.    At all times material herein, the Plaintiff, **Bruce Lichtenstein ("Lichtenstein")** was, and still is, a resident of Elkins Park, Pennsylvania.

43.    Lichtenstein invested in the Worcester Avenue property.

44.    At all times material herein, the Plaintiff, **Robert Anarumo ("Anarumo")** was, and still is, a resident of Winterhaven, Florida.

45.    Anarumo invested in the Greenwood Avenue property.

46.    At all times material herein, the Plaintiff, **Karen Fusco ("Fusco")** was, and still is, a resident of Massapequa Park, New York.

47.    At all times material herein, Fusco was a client of AEFA.

48.    At certain times, Wilkov served as Fusco's financial advisor at AEFA.

49.    Fusco subsequently became a client of ESP

50.    Fusco invested in the Stratford Avenue, Martelo Avenue, Greenwood Avenue, and N. Plymouth Avenue properties.

51.    At all times material herein, the Plaintiffs, **Wayne and Bonnie Vartabedian (collectively, "Vartabedian")** were, and still are, husband and wife, and residents of Long Beach, New York.

52.    At all times material herein, Vartabedian were clients of AEFA.

53.    At all times material herein, Wilkov served as Fusco's financial advisor at AEFA.

54.    Vartabedian invested in the Martelo Avenue property.

55.    At all times material herein, the Plaintiff, **George Yu ("Yu")**, was, and still is, a resident of Flushing, New York.

56.    At all times material herein Yu was a client of AEFA with Jennifer S. Wilkov serving as his financial advisor.

57.    Yu invested in the Martelo Avenue property.

58.    At all times material herein, the Plaintiff, **Constance F. Simons ("Simons")** was, and still is, a resident of Westbury, New York.

59.    At all times material herein, Simons was a client of AEFA.

60.    At all times material herein, Wilkov served as Simons financial advisor at AEFA.

61.    Simons invested in the Greenwood Avenue property.

62.    At all times material herein, the Plaintiff, **Laura Flax ("Flax")** was, and still is, a resident of New York, New York.

63.    Flax invested in the Worcester Avenue property.

64.    At all times material herein, the Plaintiff, **Jay Coon ("Coon")** was, and still is, a resident of Sturbridge, Massachusetts.

65.     Coon invested in the Bronholly Drive property.

66.     At all times material herein, the Plaintiffs, **Neil and Marni Blitz (collectively, "Blitz")** were, and still are, husband and wife, and residents of Great Neck New York.

67.     At all times material herein Blitz were clients of AEFA and Wilkov served as their financial advisor. Blitz invested in the S. Lotus Avenue property.

68.     At all times material herein, the Plaintiffs, **Joseph Levine ("Levine") and Nina Chaifetz ("Chaifetz")** were, and still are, husband and wife, and residents of Blauvelt, New York

69.     At all times material herein, Levine and Chaifetz were clients of AEFA and Wilkov served as their financial advisor.

70.     In August of 2005, when Wilkov departed AEFA, Levine and Chaifetz discontinued their relationship with AEFA.

71.     Levine and Chaifetz invested in the Greenwood Avenue and Grandview Boulevard properties.

72.     At all times material herein, the Plaintiffs, **Ed and Anne Haran (collectively, "Haran")** were, and still are, husband and wife, and residents of Point Lookout, New York.

73.     At all times material herein, Haran were clients of AEFA in May of 2002, and Wilkov served as their financial advisor.

74.     Haran invested in the Greenwood Avenue and N. Plymouth Boulevard properties.

75.     At all times material herein, the Plaintiff, **Kathy Pashuck ("Pashuck")** was, and still is, a resident of Cherry Hill, New Jersey.

76.     At all times material herein, Pashuck was a client of AEFA and Wilkov served as Pashuck's financial advisor and/or investment broker.

77.     Pashuck invested in the Martelo Avenue and Stratford Avenue properties.

78.     At all times material herein, the Plaintiff, **Bruce Fuller ("Fuller")** was, and still is, a resident of Yonkers, New York.

79.     At all times material herein, Fuller was a client of AEFA and Wilkov served as one of his financial advisors.

80.     Fuller subsequently became a client of ESP.

81.     Fuller invested in the N. Plymouth Boulevard and Grandview Boulevard properties.

82.     At all times material herein, the Plaintiffs, **Jeff and Tracey Peck (collectively, "Peck")** were, and still are, husband and wife and residents of Syosset, New York.

83.     At all times material herein, Peck were a clients of AEFA and Wilkov served as Peck's financial advisor and/or investment broker.

84.     Jeff and Tracey Peck invested in the Stratford Avenue property.


**THE DEFENDANTS**

85.     At all times material herein, the Defendant, **Carla Zimbalist ("Zimbalist")** was, and still is, a resident of California

86.     Upon information and belief, Zimbalist was a managing member of Scott Avenue Development, LLC, CPM Holdings, LLC, and PMC Interests, LLC, all of which entities are limited liability companies formed under the laws of the State of California.

87.　　At all times herein relevant, Zimbalist represented that these entities were engaged in the purchase, rehabilitation, and resale of properties in and around Los Angeles County, California, for profit.

88.　　At all times material herein, the Defendant, **Pam Chanla ("Chanla")** was, and still is, a resident of California.

89.　　Upon information and belief, Chanla was  a managing member of Scott Avenue Development, LLC, CPM Holdings, LLC, and PMC Interests, LLC, all of which entities are limited liability companies formed under the laws of the State of California.

90.　　At all times material herein Chanla represented that these entities were engaged in the purchase, rehabilitation, and resale of properties in and around Los Angeles County, California, for profit.

91.　　At all times material herein, the Defendant, **Jennifer S. Wilkov ("Wilkov")** was, and still is, a resident of the State of New York.

92.　　At all times material herein, Defendant Wilkov was and still is a Certified Financial Planner.

93.　　At all times material herein, Defendant Wilkov was a licensed securities broker.

94.　　At all times material herein and until on or about August 15, 2005, Wilkov was employed by AEFA as a financial advisor.

95.　　Defendant Wilkov has served as president of ESP and as a financial advisor from August of 2005 time until the present.

96.　　At all times material herein, the Defendant, **Evolutionary Strategic Planning, Inc.**, **("ESP")** was, and still is, a financial advising company formed under the

laws of the State of New York, found by Jennifer S. Wilkov.

97.    At all times material herein, the Defendant, **Ameriprise Financial, Inc.**, **("Ameriprise")** is a financial advising corporation formed under the laws of the state of Delaware.

98.    Ameriprise was, and is, the successor-in-interest to **American Express Financial Advisors ("AEFA")**.

99.    AEFA was a financial advising corporation formed under the laws of the State of Delaware.

100.    At all times material herein, and until August 15, 2005, Defendant Wilkov was employed by AEFA as a financial advisor.

## 162 SOUTH LOTUS AVENUE, PASADENA, CA 91107

101.    Prior to March 11, 2005, Wilkov contacted Coon, a referral from Charney, informing him of an opportunity to invest in real estate in Southern California, and specifically with regards to premises known as 162 South Lotus Avenue, Pasadena, CA 91107, ("Property 1"), and transmitting to him a "deal sheet" purporting to reflect an investment in Property 1.

102.    On or about March 3, 2005, Wilkov contacted Tymczyszyn, regarding Property 1 and assured Tymczyszyn of the competence of Zimbalist and Chanla.

103.    On or about March 9, 2005, Scott Avenue Development, LLC, purchased Property 1.

104.    On or about March 11, 2005, Coon wired $25,000 to Zimbalist and Chanla for investment in Property 1.

105.    At some point prior to April 7, 2005, Wilkov contacted Blitz and informed

them of an investment opportunity in Property 1.

106.    On or about April 7, 2005, Wilkov contacted Tymczyszyn, Blitz, and Coon, (collectively, "The Property 1 Investors"), individually, and informed each of them that a "Membership Certificate" for Scott Avenue Development, LLC, would be mailed to them along with a countersigned "deal sheet."

107.    On or about April 8, 2005, Tymczyszyn wired $25,000 to Zimbalist and Chanla for investment in Property 1.

108.    Additionally, Wilkov assured The Property 1 Investors that the property was "in the construction and renovation stage of this process" and was "on schedule."

109.    On or about May 4, 2005, Zimbalist and Chanla contacted The Property 1 Investors and informed them that the property was in the "demolition phase."

110.    In this communication, Zimbalist and Chanla told The Property 1 Investors that certain framing work was in progress and that the "rough plumbing" was "80%" complete.

111.    On or about July 14, 2005, Wilkov contacted The Property 1 Investors and informed them the renovation of Property 1 was "just about 100% complete," with landscaping scheduled to be completed by the end of that week. Wilkov further indicated that Property 1 was scheduled to go on the market the following week.

112.    On or about August 5, 2005, Wilkov contacted Blitz and informed them that she had requested "a direct status" on Property 1 from Chanla and Zimbalist, and that she would give Blitz an updated status when she received it.

113.    On or about August 8, 2005, Wilkov contacted The Property 1 Investors and informed them that Property 1 was "going through final preparations this week and next

in order to be offered on the market shortly." Wilkov further stated that the property was scheduled to go on the market on August 19, 2005, "right in line with the expectations" of Zimbalist and Chanla.

114.     On or about August 31, 2005, Zimbalist and Chanla contacted Blitz and informed them that Property will be placed on the market on September 6, 2005.

115.     On or about December 8, 2005, Zimbalist and Chanla contacted The Property 1 Investors and informed them that Property 1 was being removed from the market, and would be returned to the market on January 15, 2006.

116.     On or about January 16, 2006, Blitz contacted Zimbalist and Chanla and requested an update regarding Property 1.

117.     On or about January 19, 2006, Wilkov contacted Zimbalist and Chanla and The Property 1 Investors, requesting that Zimbalist and Chanla confirm that Property 1 had been returned to the market.

118.     Subsequently, Wilkov assured Blitz that Zimbalist and Chanla "are constantly out in the field with the contractors right now getting the properties completed and up and out on the market, so their time in the office is somewhat limited right now."

119.     Wilkov further assured Blitz that an investment of this type "does come with the ebb and flow of the process of rehabbing individual houses," and again emphasized Chanla's and Zimbalist's knowledge in this type of investment.

120.     On or about January 30, 2006, Zimbalist and Chanla contacted The Property 1 Investors and informed them that they would place Property 1 back on the market in mid-February, based upon the advice of their brokers.

121.     On or about March 13, 2006, Chanla and Zimbalist contacted The Property 1

Investors and informed them that they had received an offer for Property 1 in the amount of $635,000, with an escrow period of forty days. Chanla and Zimbalist asked The Property 1 Investors for their views on accepting the offer.

122.    On or about March 28, 2006, Wilkov contacted Chanla and Zimbalist, and The Property 1 Investors, requesting that Zimbalist and Chanla provide certain tax information regarding the investment in Property 1.

123.    On or about April 3, 2006, Chanla and Zimbalist contacted The Property 1 Investors and Wilkov, stating that their accountant had filed an extension of Scott Avenue Development, LLC's taxes, and accordingly, certain tax information would not be available to The Property 1 Investors until after the accountant had completed Scott Avenue Development, LLC's taxes. Zimbalist and Chanla provided a tax ID number for Scott Avenue Development, LLC.

124.    On or about April 4, 2006, Wilkov notified Chanla and Zimbalist that the tax ID number they had provided was missing a digit.

125.    On or about April 7, 2006, Wilkov contacted The Property 1 Investors with a corrected tax ID number from Zimbalist and Chanla.

126.    On or about April 10, 2006, Zimbalist and Chanla contacted The Property 1 Investors, stating that they had received a "full price offer" for Property 1, from a buyer that has been pre-approved for an $800,000.00 loan. Zimbalist and Chanla stated that the buyer was requesting a 45 day escrow period. Zimbalist and Chanla asked The Property 1 Investors how they felt about accepting the offer.

127.    On or about April 18, 2006, Zimbalist and Chanla contacted Blitz, stating that they have accepted the offer on Property 1 and that the closing is scheduled for the first

week of June.

128.    On or about May 25, 2006, Western Fidelity Trustees, the mortgage trustees for Property 1, transferred Property 1 upon foreclosure to Danco, Inc.

129.    On or about May 30, 2006, Wilkov contacted The Property 1 Investors and Chanla and Zimbalist, requesting that Zimbalist and Chanla confirm the sale of Property 1 and provide information regarding the timing and distribution of the profits from the sale, and a complete accounting statement for the investments.

130.    On or about June 8, 2006, Zimbalist and Chanla informed Blitz that Property 1 was expected to close "in the next 7 to 10 business days." Chanla and Zimbalist further state that the buyers had expressed concerns because of rising interest rates, but were prepared to close on the house.

131.    On or about June 12, 2006, Wilkov contacted The Property 1 Investors and informed them that Zimbalist and Chanla report Property 1 will close between June 7, 2006, and June 15, 2006. Wilkov further informed The Property 1 Investors that the profits will be disbursed after the completion of a closing statement. Wilkov stated that preparing such statements "typically take anywhere from 2-4 weeks."

132.    On or about July 11, 2006, Zimbalist and Chanla contacted Wilkov and The Property 1 Investors, stating that Property 1 has been sold for $635,000.00, and that on or about July 25, 2006, Chanla and Zimbalist will send The Property 1 Investors documents reflecting final accountings. Zimbalist and Chanla instructed The Property 1 Investors to sign the documents and return them, and stated that the checks will be mailed upon receipt of the signed documents.

133.    On or about August 27, 2006, Wilkov contacted The Property 1 Investors.

Wilkov stated that she had been "following up" with Zimbalist and Chanla, and had been repeatedly reassured that "all paperwork" would be out by the end of the week. Wilkov stated that deadlines for sending out the paperwork were repeatedly missed. Wilkov further stated that she has "been working hands-on with this situation to get it resolved as quickly as possible."

134.    On or about August 28, 2006, Wilkov contacted The Property 1 Investors, advising them that she had spoken to Zimbalist on the phone, and stating that "the resolution of these investments is now imminent." Wilkov reported that Zimbalist and Chanla would be sending the necessary documents throughout the coming week.

135.    On or about August 29, 2006, Wilkov contacted The Property 1 Investors with detailed instructions for receiving their profit from Zimbalist and Chanla.  In truth and in fact,  Plaintiffs were never going to receive the return of their "investment" or any profits from Property 1

## 2464 BRONHOLLY DRIVE, LOS ANGELES, CA 90068

136.    Prior to March 4, 2005, Wilkov informed Tymczyszyn of an opportunity to invest in real estate in Southern California. This property was 2464 Bronholly Drive, Los Angeles, CA 90068 ("Property 2").

137.    Prior to April 29, 2005, Wilkov sent Coon a "deal sheet" purporting to reflect an investment in Property 2.

138.    On or about March 8, 2005, Wilkov sent Tymczyszyn a "deal sheet" for an investment in Property 2. Wilkov informed Tymczyszyn that she would send Tymczyszyn a wire transfer instruction letter to be sent to AEFA.

139.    On or about March 31, 2005, Wilkov contacted Tymczyszyn in order to

determine if Tymczyszyn wanted to invest $25,000 in Property 2. Tymczyszyn responded that she wished to invest a larger amount. Tymczyszyn proposed an investment of $50,000.

140.    On or about April 1, 2005, Wilkov contacted Tymczyszyn. Wilkov stated, in reference to Property 2, "I think $50,000 would be an appropriate investment in this property." Wilkov advised Tymczyszyn that it would be appropriate to use money from a Home Equity Line of Credit to invest in Property 2. Wilkov went on to say that the investment could "potentially double by the end of the year." Wilkov stated, "I believe this will be a great diversification technique for your portfolio and to your real estate investment strategy."

141.    On or about April 5, 2005, Wilkov sent Tymczyszyn a "deal sheet" which purported to reflect the proposed investment of $50,000 in Property 2. Wilkov asked Tymczyszyn to clarify whence the funds would be transferred. Wilkov stated, "Once I know how you would prefer to succeed, I will send you either a wire transfer letter for the American Express account OR wire instruction for you to use with your bank and the home equity line of credit."

142.    On or about April 6, 2005, Tymczyszyn informed Wilkov that the investment would be paid for by taking $25,000 from the HELOC and $25,000 from the American Express account.

143.    On or about April 7, 2005, Wilkov sent wire instructions to Tymczyszyn, and informed Tymczyszyn that there weren't enough liquid funds in her American Express account. Wilkov sent Tymczyszyn instructions for placing stocks held in the American Express account on margin.

144.    On or about April 21, 2005, Wilkov sent Tymczyszyn a new "deal sheet," indicating that Gata Realty, LLC, a limited liability company solely owned by Tymczyszyn and established for the purpose of making real estate investments, is the entity investing in Property 2.

145.    On or about April 22, 2005, Tymczyszyn wired $50,000 to Zimbalist and Chanla for investment in Property 2 on behalf of Gata Realty, LLC.

146.    On or about April 29, 2005, Coon wired $50,000 to Zimbalist and Chanla for investment in Property 2.

147.    On or about May 4, 2005, Wilkov informed Tymczyszyn that the wire transfer to PMC for an investment of $50,000 had been successfully received.

148.    On or about April 11, 2006, Karlyn Hawke and Richard Walker purchased Property 2 from Mark Guggenheim. They have held the property since then.

149.    On or about July 11, 2006, Zimbalist and Chanla contacted Coon and Tymczyszyn and Coon (collectively, "The Property 2 Investors") and informed them that Property 2 had closed for $975,000.00. Zimbalist and Chanla estimated that they would complete the paperwork reflecting the final accounting and their profits on or about July 25, 2006.

150.    On or about August 29, 2006, Wilkov sent to The Property 2 Investors what was called "the documented process for paperwork and payouts for the properties invested in through Scott Avenue Development LLC and CPM Holdings LLC as confirmed by Carla and Pam today."

151.    Upon information and belief, none of the defendants ever actually purchased or owned any interest in Property 2.  This belief is based upon a search of the property

records of Los Angeles County, California.

## 1132 STRATFORD AVENUE, SOUTH PASADENA, CA 91030

152.    On or about March 25, 2005, Fusco invested $50,000 in 1132 Stratford Avenue, South Pasadena, CA 91030 ("Property 3"), upon the advice and assurances of Wilkov, including representations that Wilkov had investigated Zimbalist and Chanla, and that Zimbalist and Chanla had the ability to purchase, rehabilitate, and sell residential property for tremendous profit.

153.    Prior to April 4, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 3 to Peck.

154.    On or about April 4, 2005, Peck wired $25,000 to Zimbalist and Chanla for investment in Property 3.

155.    On or about April 21, 2005, Wilkov informed Fusco that Zimbalist had stated Property 3 was scheduled to close escrow on April, 22, 2005, and was to begin the rehabilitation process.

156.    On or about April 28, 2005, Michele L. Dougherty, who had been the owner of Property 3 since 2004, sold the property to Enrique Adolfo Ramirez, who continues to own the property.

157.    On or about May 4, 2005, Zimbalist and Chanla contacted Fusco and Peck, (collectively, "The Property 3 Investors") and Wilkov and state that the demolition phase of the Property 3 project had begun. Zimbalist and Chanla claimed to have removed flooring, ceilings, light fixtures, kitchen cabinets and equipment, amongst other things. Zimbalist and Chanla stated that the roof had been demolished and that structural work on a second-floor addition would begin the next week.

158.    On or about June 27, 2005, Zimbalist and Chanla contacted The Property 3 Investors and Wilkov and stated that the removal of the roof at Property 3 was complete, that all new electrical and plumbing has been installed in the first floor, and that additional construction had been completed or was underway at Property 3. Zimbalist and Chanla further stated that "Phase 2" would begin when the building inspector approved reinforcements to the existing foundation and the addition of support columns. Zimbalist and Chanla claimed that this was scheduled for the end of the following week. Zimbalist and Chanla proceeded to describe the next steps that had to be taken, which included electrical work, installing rough plumbing, and framing of the bedrooms and bathrooms. Zimbalist and Chanla stated that the next update would be sent "as this project begins to approach 50% completion."

159.    On or about September 7, 2005, Wilkov contacted The Property 3 Investors, and gave them what Wilkov claimed was an update on the status of the work at Property 3. Wilkov stated "we are pleased to inform you of the current status of this project," and proceeded to say that certain electrical and plumbing was complete, that work on the walls had begun, and that new windows and bathroom fixtures are being installed. Wilkov claimed that other work was ongoing. Wilkov stated, "This project is now 40% complete. We appreciate the opportunity to work with you on this project. Thank you for your trust and confidence in our life's work." Wilkov then asked that The Property 3 Investors provide contact information for any other people that may be interested in this type of investment.

160.    On or about December 8, 2005, Zimbalist and Chanla contacted The Property 3 Investors and Wilkov, claiming that the work at Property 3 was nearly completed, and

that "we anticipate that we will be putting it up for sale on/or about January 25, 2006. We appreciate that the construction took longer then anticipated, but when it is at 100% we will send you photos and we hope you will agree it was worth it."

161.    On or about January 18, 2006, Wilkov contacted Zimbalist and Chanla and The Property 3 Investors, and requested that Zimbalist and Chanla confirm that Property 3 would be going on the market on January 25, 2006. Additionally, Wilkov requested that Zimbalist and Chanla provide the photographs that were mentioned in Zimbalist's and Chanla's communication of December 8, 2006.

162.    On or about January 30, 2006, Zimbalist and Chanla contacted The Property 3 Investors and Wilkov, and stated that they were "working with the comntractor [sic] to finish the last few details on the property." Further, Zimbalist and Chanla claimed to be three weeks behind schedule, and announced that they expected to place Property 3 on the market by Valentine's Day. Zimbalist and Chanla went on to say, "At that time we will e-mail a copy of the MLS listing complete with photos."

163.    On or about March 13, 2006, Zimbalist and Chanla contacted The Property 3 Investors and Wilkov and claimed to have received the final certificate of occupancy for Property 3. Additionally, Zimbalist and Chanla claimed that "a Broker is delivering an offer to our Broker tonight in the amount of $1,110,000.00." Zimbalist and Chanla asked The Property 3 Investors for their views on accepting the offer.

164.    On or about March 13, 2006, Fusco informed Zimbalist and Chanla that she felt the price was too low, and that they should not accept.

165.    On or about March 14, 2006, Zimbalist and Chanla contacted Fusco and stated that they intended to counter offer at full price.

166.    On or about April 10, 2006, Zimbalist and Chanla contacted The Property 3 Investors and Wilkov, claiming that they had a $1,300,000 offer for the property. Zimbalist and Chanla claimed that the buyer was pre-approved for a $1,000,000.00 loan, and was seeking a 40 day escrow period. Zimbalist and Chanla asked The Property 3 Investors for their views on accepting the offer.

167.    On or about May 30, 2006, Wilkov contacted Zimbalist and Chanla and The Property 3 Investors, asking Zimbalist and Chanla to confirm that Property 3 had been sold in accordance with Zimbalist's and Chanla's communication of April 10, 2006. Additionally, Wilkov asked for information regarding the distribution of profits and a complete accounting statement of Property 3.

168.    On or about June 12, 2006, Wilkov contacted The Property 3 Investors, stating, "As per an email I received from Carla last week, this property is scheduled to close between June 7th and 15th." And stating that it would be at least 2-4 weeks from the date of closing until the accounting statements could be sent to investors.

169.    On or about July 11, 2006, Zimbalist and Chanla contacted The Property 3 Investors and Wilkov, stating that Property 3 had been sold for $1,289,500.00. Zimbalist and Chanla went on to claim that their accountant was doing a closing accounting, and that they estimated that on or about July 25th, they would be sending documents reflecting profit and final accounting for the properties.

170.    On or about September 12, 2006, Wilkov sent documents purporting to be a statement of return on investment and receipt of funds for the investments in Property 3 to each of the individual investors in Property 3.

171.    Upon information and belief, none of the defendants ever actually purchased

or owned any interest in Property 3. This belief is based upon a search of the property

records of Los Angeles County, California.

### 295 MARTELO AVENUE, PASADENA, CA 91107

172.    On or about May 2, 2005, Wilkov contacted Tymczyszyn and Vartabedian,

regarding an investment opportunity in property in Southern California. This property

was 295 Martelo Avenue, Pasadena, CA 91107 ("Property 4").

173.    Prior to May 31, 2005, Wilkov sent a "deal sheet" purporting to reflect an

investment in Property 4 to Pashuck.

174.    On or about May 3, 2005, Tymczyszyn informed Wilkov that she was

interested in investing in Property 4. Tymczyszyn also informed Wilkov that Yu was

interested in investing in Property 4.

175.    On or about May 3, 2005, Wilkov sent Tymczyszyn a "cashflow worksheet"

purporting to reflect the investment in Property 4.

176.    On or about May 3, 2005, Tymczyszyn informed Wilkov that she is

considering investing $50,000 in Property 4.

177.    On or about May 3, 2005, Vartabedian informed Wilkov that they were

interested in investing in Property 4. Vartabedian stated "We're very excited and trust

your suggestions."

178.    On or about May 3, 2005, Wilkov contacted Fusco regarding an investment

opportunity in Property 4.

179.    On or about May 4, 2005, Ms. Fusco informed Wilkov that she would like to

proceed with an investment in Property 4.

180.    On or about May 4, 2005, Wilkov sent Fusco a "cashflow worksheet"

purporting to reflect an investment in Property 4.

181.    On or about May 4, 2005, Wilkov contacted Tymczyszyn to confirm her interest in investing $50,000 in Property 4, and to discuss funding options. Tymczyszyn confirmed her interest.

182.    On or about May 4, 2005, Vartabedian contacted Wilkov to confirm their interest in investing $50,000 in Property 4, and authorizing Wilkov to release certain information to PMC Interest, LLC, in order to prepare documents related to the investment.

183.    On or about May 4, 2005, Wilkov contacted Vartabedian and offered them guidance on the "next steps in investments of this type."

184.    On or about May 5, 2005, Scott Avenue Development, LLC, purchased Property 4 from Sarah A. Koester.

185.    On or about May 5, 2005, Wilkov sent a "deal sheet" purporting to reflect Tymczyszyn's investment in Property 4, and wire transfer instructions to Tymczyszyn.

186.    On or about May 5, 2005, Wilkov sent Yu a "deal sheet" purporting to reflect Yu's investment in Property 4, along with wire transfer instructions.

187.    On or about May 5, 2005, Wilkov sent Vartabedian a "deal sheet" purporting to reflect Vartabedian's investment in Property 4.

188.    On or about May 9, 2005, Fusco wired $50,000 to Zimbalist and Chanla for investment in Property 4.

189.    On or about May 6, 2005, Yu wired $25,000 to Zimbalist and Chanla for investment in Property 4.

190.    On or about May 10, 2005, Tymczyszyn wired $50,000 to Zimbalist and

Chanla for investment in Property 4 on behalf of Gata Realty, LLC.

191.    On or about May 12, 2005, Vartabedian wired $50,000 to Zimbalist and Chanla for investment in Property 4.

192.    On or about May 18, 2005, Zimbalist and Chanla contacted Vartabedian and confirmed receipt of a wire in the amount of $50,000 for investment in Property 4. Zimbalist and Chanla further stated that escrow on the purchase of Property 4 was scheduled to close on May 23, 2005.

193.    On or about May 31, 2005, Pashuck wired $25,000 to Zimbalist and Chanla for investment in Property 4.

194.    On or about June 27, 2005, Zimbalist and Chanla contacted Fusco, Vartabedian, Tymczyszyn, Pashuck, Yu and Wilkov. Zimbalist and Chanla state the rehabilitation of Property 4 is "now currently underway," and that demolition has begun. Zimbalist and Chanla state they will provide another update "as this project begins to approach 25% completion."

195.    On or about July 11, 2005, Fuller wired $50,000 to Zimbalist and Chanla for investment in Property 4.

196.    On or about August 23, 2005, Vartabedian contacted Zimbalist and Chanla and asked whether the rehabilitation of Property 4 was proceeding according to schedule.

197.    On or about August 24, 2005, Zimbalist and Chanla contacted Vartabedian and stated that "we are at 55% complete."

198.    On or about September 6, 2005, Wilkov contacted Fusco, Vartabedian Tymczyszyn, Pashuck, Yu, and Fuller (collectively, "The Property 4 Investors") and delivered an update on the progress of construction at Property 4, stating that the project

is 55% complete. This email is signed "Jennifer & Carla & Pam."

199.    On or about November 6, 2005, Vartabedian contacted Zimbalist and Chanla and requested an update on the progress of construction at Property 4.

200.    On or about November 7, 2005, Zimbalist and Chanla contacted Vartabedian and informed them that they were "50% completed with the renovation and anticipate that the property will be on the market in the first weeks of January 2006."

201.    On or about November 8, 2005, Zimbalist and Chanla contacted The Property 4 Investors and Wilkov, stating that the construction at Property 4 "is now 75% complete," and describing various aspects of construction underway. Zimbalist and Chanla further stated that they anticipated putting the property on the market by year's end.

202.    On or about December 9, 2005, Zimbalist and Chanla contacted The Property 4 Investors and Wilkov. Zimbalist and Chanla stated that Property 4 was nearly completed and that they anticipated putting it on the market on or about January 30, 3006. Zimbalist and Chanla stated that they would send photographs as soon as Property 4 reached completion.

203.    On or about January 18, 2006, Wilkov contacted Zimbalist and Chanla and The Property 4 Investors. Wilkov asked Zimbalist and Chanla to confirm that Property 4 would be on the market by January 20, 2006, and that Zimbalist and Chanla would send photographs.

204.    On or about January 30, 2006, Zimbalist and Chanla contacted The Property 4 Investors and Wilkov, and claimed that they were three weeks behind, and that Property 4 would be on the market for sale by Valentine's Day. Zimbalist and Chanla further stated

that they would provide a copy of the MLS listing complete with photographs when the property went on the market.

205.    On or about March 7, 2006, Tymczyszyn contacted Zimbalist requesting an update regarding the property and information needed for income tax reporting. This email was forwarded to Yu.

206.    On or about March 8, 2006, Zimbalist and Chanla contacted Yu, and claimed to be in the process of "staging" the property. Zimbalist and Chanla stated that the first open house was scheduled for March 18, 2006. Zimbalist and Chanla further claimed that they would send pictures the following week.

207.    On or about March 13, 2006, Zimbalist and Chanla contacted The Property 4 Investors and Wilkov. Zimbalist and Chanla stated that staging of Property 4 was completed and that the property would go on the Market for $1,000,000.00.

208.    On or about April 20, 2006, Vartabedian contacted Wilkov, and requested an update on Property 4.

209.    On or about April 20, 2006, Zimbalist and Chanla contacted Vartabedian. Zimbalist and Chanla claimed that there was a buyer interested in Property 4. Zimbalist and Chanla further claimed that they anticipated the buyer would make an offer shortly.

210.    On or about May 22, 2006, Fusco contacted Zimbalist and Chanla. Fusco requested information regarding the dates that Zimbalist and Chanla purchased Property 4 for tax purposes.

211.    On or about May 22, 2006, Zimbalist responded to Fusco's request by stating that she did not know the purchase dates of all the properties that Scott Avenue Development, LLC, had invested in, and that Zimbalist would "do the research

tomorrow." Further, Zimbalist stated that all of the escrows on the Scott Avenue

Development, LLC, properties were scheduled to close in the first ten days of June.

212.    On or about May 25, 2006, Western Fidelity Trustees, the mortgage trustees

for Property 4, transferred Property 4 upon foreclosure to Danco, Inc.

213.    On or about June 12, 2006, Wilkov contacted The Property 4 Investors

stating, "As per an email I received from Carla last week, this property is scheduled to

close between June 7th and 15th." Wilkov further stated that it would be at least 2-4 weeks

from the date of closing until the accounting statements could be sent to investors.

214.    On or about July 11, 2006, Zimbalist and Chanla contacted The Property 4

Investors and Wilkov, stating that Property 4 had been sold for $1,040,000.00. Zimbalist

and Chanla went on to claim that their accountant was doing a closing accounting, and

that they estimated that on or about July 25th, they would be sending documents reflecting

profit and final accounting for the properties.

215.    On or about August 27, 2006, Fusco contacted Wilkov with regard to

information Fusco had learned from the Tax Assessor's Office of Los Angeles County.

Fusco stated that she had been unable to link any of the properties to Zimbalist and

Chanla.

216.    On or about September 2, 2006, Wilkov sent paperwork purporting to be a

statement of return on investment and receipt of funds for the investments in Property 4

to Vartabedian, Tymczyszyn and Yu.

## 3493 GREENWOOD AVENUE, LOS ANGELES, CA 90066

217.    Prior to May 31, 2005, Wilkov contacted Fusco, informing her of an

opportunity to invest in real estate in Southern California. This property was 3493

Greenwood Avenue, Los Angeles, CA 90066 ("Property 5").

218.    Prior to June 10, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 5 to Anarumo.

219.    On or about May 27, 2005, Wilkov contacted Haran, informing them of an opportunity to invest in Property 5.

220.    On or about May 28, 2005, Mr. and Mrs. Haran contacted Wilkov and stated that they were interested in investing $25,000 in Property 5.

221.    On or about May 28, 2005, Wilkov informed Tymczyszyn about the opportunity to invest in Property 5.

222.    On or about May 28, 2005, Wilkov informed Levine and Chaifetz about the opportunity to invest in Property 5.

223.    On or about May 28, 2005, Levine and Chaifetz informed Wilkov that they were interested in investing in Property 5.

224.    On or about May 28, 2005, Wilkov sent a "deal sheet" purporting to reflect the gains from an investment of $50,000 in Property 5 to Levine and Chaifetz.

225.    On or about May 31, 2005, Wilkov sent a "deal sheet" purporting to reflect the gains from an investment in Property 5 to Haran.

226.    On or about May 31, 2005, Wilkov informed Simons about the opportunity to invest in Property 5.

227.    On or about May 31, 2005, Simons informed Wilkov that she was interested in investing in Property 5.

228.    On or about May 31, 2005, Wilkov sent a "deal sheet" purporting to reflect the gains from an investment in Property 5 to Simons. Wilkov also requested permission

to release certain information to PMC Interests, LLC, for the purposes of preparing the investment.

229.    On or about May 31, 2005, Wilkov sent a "cashflow worksheet" to Fusco, and Tymczyszyn purporting to reflect the gains from an investment in Property 5.

230.    On or about June 1, 2005, Levine and Chaifetz contacted Wilkov and announced their intention to invest $50,000 in Property 5.

231.    On or about June 1, 2005, Tymczyszyn contacted Wilkov and informed her that based on the "quick turnaround" of the investment, Tymczyszyn intended to invest $50,000 in Property 5.

232.    On or about June 1, 2005, Simons authorized Wilkov to release certain information to PMC Interests, LLC, for the purposes of preparing the investment.

233.    On or about June 2, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 5 and wire transfer instructions to Haran.

234.    On or about June 2, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 5 and wire transfer instructions to Levine and Chaifetz and Simons.

235.    On or about June 2, 2005, Tymczyszyn wired $50,000 to Zimbalist and Chanla for investment in Property 5 on behalf of Gata Realty, LLC.

236.    On or about June 3, 2005, Wilkov informed Haran that she had received the signed "deal sheet" and instructions for wiring funds from their American Express account.

237.    On or about June 3, 2005, Simons wired $25,000 to Zimbalist and Chanla for investment in Property 5.

238.    On or about June 6, 2005, Haran wired $25,000 to Zimbalist and Chanla for investment in Property 4.

239.    On or about June 8, 2005, Levine and Chaifetz wired $50,000 to Zimbalist and Chanla for investment in Property 5.

240.    On or about June 9, 2005, Fusco wired $30,000 to Zimbalist and Chanla for investment in Property 5.

241.    On or about June 10, 2005, Anarumo transferred $50,000 to Zimbalist and Chanla for investment in Property 5.

242.    On or about June 11, 2005, Wilkov contacted Haran, Levine and Chaifetz and informed them that Zimbalist and Chanla have received their wire transfer for Property 5. Wilkov thanked them "on behalf of CPM Holdings."

243.    On or about June 20, 2005, Tymczyszyn contacted Wilkov and requested an update regarding Property 5.

244.    On or about June 20, 2005, Wilkov informed Tymczyszyn that Property 5 "will be closing escrow this week or next week," and that, after the closing, Membership certificates for the relevant limited liability company would be sent to the investors.

245.    On or about June 22, 2005, Chris Atwood and Margaret Dominguez sold Property 5 to Michael R. Zimbalist and Ellen Zimbalist.

246.    On or about June 27, 2005, Zimbalist and Chanla contacted Tymczyszyn, Levine and Chaifetz, Haran, Fusco, and Simons (collectively, "The Property 5 Investors"), and stated that Property 5 was scheduled to close escrow on July 5th, at which time The Property 5 Investors would be notified. Further, Zimbalist and Chanla stated that The Property 5 Investors would receive counter-signed "deal sheets" and limited

32

liability company membership certificates after the closing.

247.    On or about July 26, 2005, Wilkov informed The Property 5 Investors that Property 5 had closed escrow and construction had begun.

248.    On or about July 27, 2005, Zimbalist and Chanla contacted The Property 5 Investors and Wilkov, and stated that Property 5 closed escrow on July 11th, and that construction would begin shortly.

249.    On or about August 8, 2005, Wilkov contacted The Property 5 Investors and apologized for a delay in sending out membership certificates for the relevant limited liability company.

250.    On or about September 7, 2005, Wilkov contacted The Property 5 Investors and gave them what she claimed was an update on the status of the construction at Property 5. In that update, Wilkov claimed that, "the floors have been floated and prepared for carpets. New electrical and plumbing are 45% complete. The window frames are being prepared for new windows. The kitchen is gutted for new cabinets, sinks, dishwashers, and floors. Walls will be skim coated next week. Bathrooms will be gutted upon finishing the plumbing and rebuild. This project is 30% complete." Wilkov signed this status update "Best regards, Jennifer & Carla & Pam."

251.    On or about November 7, 2005, Zimbalist and Chanla contacted The Property 5 Investors and Wilkov and gave them what Zimbalist and Chanla claimed was an update on the status of construction at Property 5. In that update, Zimbalist and Chanla claimed that work at Property 5 was "65% completed," and that they anticipated "that the house will be ready to go on the market before the end of the year."

252.    On or about December 9, 2005, Zimbalist and Chanla contacted The Property

5 Investors and Wilkov and gave them what Zimbalist and Chanla claimed was an update on the status of construction at Property 5. Zimbalist and Chanla claimed that the house was "nearly completed," and that they would be putting the house up for sale in mid-February. Zimbalist and Chanla further claimed that they would send photographs when the house was "100%."

253.    On or about January 19, 2006, Wilkov contacted Zimbalist and Chanla and The Property 5 Investors. Wilkov requested that Zimbalist and Chanla "provide a full status update," including a completion schedule, schedule for placing Property 5 on the market, and availability of photographs of the property.

254.    On or about January 30, 2006, Zimbalist and Chanla contacted The Property 5 Investors and Wilkov. Zimbalist and Chanla claimed to be "about three weeks behind schedule." Zimbalist and Chanla further stated that they believed the property would be on the market for sale by Valentine's Day. Zimbalist and Chanla stated that they would provide a copy of the listing, complete with photographs, when the property went on the market.

255.    On or about February 23, 2006, Michael R. Zimbalist and Ellen Zimbalist sold Property 5 to Christofer L. Olson and Dian E. Olson.

256.    On or about March 2, 2006, Haran contacted Wilkov and asked whether Zimbalist and Chanla had placed Property 5 on the market.

257.    On or about March 8, 2006, Wilkov contacted Haran and stated "the properties are done and the furniture vendor has been successfully changed in order to properly stage the house for the market." Wilkov stated that Property 5 was scheduled to be on the market by the 15th.

258.     On or about March 12, 2006, Fusco contacted Zimbalist and Chanla and expressed concern regarding incorrect information found in an internet property listing for Property 5.

259.     On or about March 13, 2006, Zimbalist and Chanla contacted The Property 5 Investors and Wilkov. Zimbalist and Chanla claimed that they had received an offer of $1,100,000.00 for Property 5, with a 45 day escrow period.

260.     On or about March 16, 2006, Zimbalist and Chanla contacted The Property 5 Investors and Wilkov. Zimbalist and Chanla stated that they had counter-offered "at full price," and that they expected an answer by that afternoon.

261.     On or about March 21, 2006, Zimbalist and Chanla contacted The Property 5 Investors and Wilkov. Zimbalist and Chanla claimed that the property had begun the escrow period of 45 days. Zimbalist and Chanla further stated that the sale price was $1,210,000.00.

262.     On or about May 11, 2006, Zimbalist and Chanla contacted Simons and informed her that the property was due to close on June 12.

263.     On or about June 12, 2006, Wilkov contacted The Property 5 Investors stating, "As per an email I received from Carla last week, this property is scheduled to close between June 7th and 15th." Wilkov further stated that it would be at least 2-4 weeks from the date of closing until the accounting statements could be sent to investors.

264.     On or about July 11, 2006, Zimbalist and Chanla contacted The Property 5 Investors and Wilkov stating that Property 5 had been sold for $1,100,000.00. Zimbalist and Chanla went on to claim that their accountant was doing a closing accounting, and that they estimated that on or about July 25th, they would be sending documents reflecting

profit and final accounting for the properties.

265.    On or about August 27, 2006, Fusco contacted Wilkov with regard to information Fusco had learned from the Tax Assessor's Office of Los Angeles County. Fusco stated that she had been unable to confirm the purchase or sale of the properties by Zimbalist and Chanla.

266.    Upon information and belief, none of the defendants ever actually purchased or owned any interest in Property 5. This belief is based upon a search of the property records of Los Angeles County, California.

### 3060 GRANDVIEW BOULEVARD, LOS ANGELES, CA 90066

267.    Prior to July 30, 2005, Wilkov contacted Edvabsky and sent him a "cashflow worksheet" that purported to represent the projected profit on an investment in 3060 Grandview Boulevard, Los Angeles, CA 90066 ("Property 6").

268.    Prior to July 30, 2005, Wilkov contacted Zaccaro and sent him a "cashflow worksheet" that purported to represent the projected profit on an investment in Property 6.

269.    On June 2, 2005, Wilkov contacted Levine and Chaifetz. Wilkov sent Levine and Chaifetz a "cashflow worksheet" that purported to represent the projected profit on an investment in Property 6.

270.    On or about June 2, 2005, Wilkov informed Fuller about the opportunity to invest in Property 6.

271.    On or about June 3, 2005, Fuller informed Wilkov that he was interested in investing in Property 6.

272.    On or about June 3, 2005, Wilkov sent Fuller a "cashflow worksheet" that

purported to represent the profit on an investment in Property 6.

273.    On or about June 3, 2005, Levine and Chaifetz informed Wilkov that they would like to invest $50,000 in Property 6.

274.    On or about June 6, 2005, Fuller informed Wilkov that he would invest $50,000 in Property 6.

275.    On or about June 6, 2005, Wilkov requested that Fuller give her permission to release certain information to PMC Interests, LLC, for the purposes of preparing the investment.

276.    On or about June 6, 2005, Tymczyszyn informed Wilkov that she would like to invest $25,000 in Property 6.

277.    On or about June 8, 2007, Fuller wired $50,000 to Zimbalist and Chanla for investment in Property 6.

278.    On or about June 9, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 5 and wire transfer instructions to Levine and Chaifetz.

279.    On or about June 14, 2005, Levine and Chaifetz wired $50,000 to Zimbalist and Chanla for investment in property 6.

280.    On or about June 15, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 5 and wire transfer instructions to Fuller.

281.    On or about June 27, 2005, Zimbalist and Chanla contacted Wilkov, Fuller, Tymczyszyn, Levine and Chaifetz, and stated that Property 6 was scheduled to close escrow on July 17th, at which time investors would be notified. Further, Zimbalist and Chanla stated that the investors would receive counter-signed "deal sheets" and limited liability company membership certificates after the closing.

282.    In July, 2005, Zaccaro wired $50,000 to Zimbalist and Chanla for investment in Property 6.

283.    In July, 2005, Edvabsky wired $50,000 to Zimbalist and Chanla for investment in Property 6.

284.    On or about July 7, 2005, Wilkov sent Goodfriend-Koven a "cashflow worksheet" that purported to represent the profit on an investment in Property 6.

285.    On or about July 13, 2005, Goodfriend-Koven wired $50,000 to Zimbalist and Chanla for investment in Property 6.

286.    On September 7, 2005, Wilkov contacted Fuller, Tymczyszyn, Levine and Chaifetz, Goodfriend-Koven, Zaccaro and Edvabsky (collectively, "The Property 6 Investors") and stated that Property 6 had closed escrow in July, that all demolition work had been done, and that the building department was expected to issue a permit by the middle of September. This email was signed "Jennifer & Carla & Pam"

287.    On or about October 14, 2005, Newland Presbyterian Church sold Property 6 to John Kim.

288.    On or about November 7, 2005, Zimbalist and Chanla contacted the Property 6 Investors and Wilkov. Zimbalist and Chanla stated that they had approval for a building permit. Zimbalist and Chanla solicited opinions regarding whether the property should be sold without further construction, but with the permit, or whether the construction should proceed as planned. Zimbalist and Chanla recommended putting the property up for sale without further construction.

289.    On or about November 7, 2005, Wilkov contacted Fuller and stated that she agreed with Zimbalist's and Chanla's recommendation.

290.    On or about November 7, 2005, Simons contacted Zimbalist and Chanla and stated that she supported their recommendation.

291.    On or about December 8, 2005, Zimbalist and Chanla contacted The Property 6 Investors and Wilkov. Zimbalist and Chanla stated that they had consulted with their "Brokers" and "advisors" and had decided to "tests the market and have put the property for sale with plans and permits until January 15, 2006, for $1.350 million." Zimbalist and Chanla further state that if they do not sell the property, they will commence construction in the first week of February.

292.    On or about January 30, 2006, Zimbalist and Chanla contacted The Property 6 Investors and Wilkov and stated that they intended to take Property 6 off the market and "build it out and then put it back on the market." They asked The Property 6 Investors for their opinions regarding that plan.

293.    On or about February 3, 2006, Zimbalist and Chanla contacted Goodfriend-Koven and stated that construction was expected to take between four and six months.

294.    On or about February 7, 2006, Goodfriend-Koven contacted Zimbalist and Chanla and asked whether delays in construction at Property 6 would result in additional costs to the investors.

295.    On or about February 9, 2006, Zimbalist and Chanla contacted Goodfriend-Koven and stated that there would be no additional costs to "you or any of the other investors in this property."

296.    On or about June 12, 2006, Wilkov contacted The Property 6 Investors, and stated that the property was scheduled to be finished in August or September. Additionally, Wilkov informed The Property 6 Investors that she had asked Zimbalist and

Chanla to provide an update on this process. Wilkov asked the investors to direct any inquiries to Zimbalist and Chanla.

297.    On or about June 12, 2006, Wilkov contacted Zimbalist and Chanla and The Property 6 Investors. Wilkov requested that Zimbalist and Chanla to provide an update on the progress of the construction at Property 6.

298.    On or about August 29, 2006, Wilkov contacted Zimbalist and Chanla and asked that they provide an update on Property 6. Wilkov further asked that Zimbalist and Chanla clarify the process by which the investors would receive their return on investment.

299.    On or about September 1, 2006, Wilkov contacted The Property 6 Investors and advised them that she was going to contact Zimbalist and Chanla and request information regarding the "paperwork" needed for the investors to receive their return on investment.

300.    On or about September 5, 2006, Zimbalist stated that the documents needed for investors to receive their return on investment would be sent to The Property 6 Investors by the end of the week.

301.    On or about September 14, 2006, Wilkov sent documents purporting to be a statement of return on investment and receipt of funds for the investments in Property 6 to each of the individual investors in Property 6.

302.    On or about September 19, 2006, Wilkov contacted The Property 6 Investors. Wilkov stated that she had contacted Zimbalist, and that payments of returns on investments would be sent soon.

303.    Upon information and belief, none of the defendants ever actually purchased

or owned any interest in Property 6. This belief is based upon a search of the property records of Los Angeles County, California.

### 613-615 NORTH PLYMOUTH BOULEVARD, LOS ANGELES, CA 90004

304.     On or about June 28, 2005, Mark H. Hentemann and Lynne A. Hentemann, as trustees of the Hentemann Trust, sold the property known as 613-615 North Plymouth Boulevard, Los Angeles, CA 90004, to Mary Ann Biewener.

305.     Prior to July 6, 2005, Wilkov contacted Fusco, informing her of an opportunity to invest in real estate in Southern California. This property was 613-615 North Plymouth Boulevard, Los Angeles, CA 90004 ("Property 7").

306.     Prior to July 10, 2005, Wilkov contacted Pashuck, informing her of an opportunity to invest in real estate in Property 7.

307.     Prior to July 11, 2005, Wilkov contacted Haran, informing them of an opportunity to invest in Property 7.

308.     Prior to July 22, 2005, Wilkov contacted Allen, informing her of an opportunity to invest in Property 7.

309.     Prior to August 1, 2005, Wilkov contacted Reach, informing them of an opportunity to invest in Property 7.

310.     On or about June 28, 2005, Wilkov contacted Fuller, informing him of an opportunity to invest in Property 7.

311.     On or about July 6, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 7 and wire transfer instructions to Fusco.

312.     On or about July 7, 2005, Wilkov contacted Goodfriend-Koven, informing her of an opportunity to invest in Property 7.

313.    On or about July 10, 2005, Pashuck wired $25,000 to Zimbalist and Chanla for investment in Property 7.

314.    On or about July 11, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 7 and wire transfer instructions to Fusco.

315.    On or about July 11, 2005, Fusco wired $25,000 to Zimbalist and Chanla for investment in Property 7.

316.    On or about July 13, 2005, Goodfriend-Koven wired $50,000 to Zimbalist and Chanla for investment in Property 7.

317.    On or about July 14, 2005, Haran wired $25,000 to Zimbalist and Chanla for investment in Property 7.

318.    On or about July 15, 2005, Mary Ann Biewener conveyed Property 7 to Mary Ann Biewener, as Trustee for The Mary Ann Biewener Revocable Trust.

319.    On or about July 22, 2005, Wilkov sent a "deal sheet" purporting to reflect an investment in Property 7 and wire transfer instruction to Allen.

320.    On or about July 26, 2005, Allen wired $25,000 to Zimbalist and Chanla for investment in Property 7.

321.    On or about July 29, 2005, Wilkov contacted Haran and confirmed that CPM Holdings had received their wire transfer for Property 7.

322.    On or about July 29, 2005, Wilkov contacted Goodfriend-Koven and confirmed that CPM Holding had received her wire transfer for Property 7.

323.    On or about August 1, 2005, Reach contacted Wilkov and asked a series of questions, including whether the Property 7 rehabilitation could actually be completed in the projected time frame.

324.    On or about August 3, 2005, Corsaro wired $50,000 to Zimbalist and Chanla for investment in Property 7.

325.    On or about August 4, 2005, Reach wired $25,000 to Zimbalist and Chanla for investment in Property 7.

326.    On or about September 6, 2005, Wilkov contacted Fusco, Pashuck, Allen, Corsaro, Reach, Haran, and Goodfriend-Koven (collectively, "The Property 7 Investors"). Wilkov delivered an update on the progress of construction at Property 7, stating that the project is 30% complete.

327.    On or about September 7, 2005, Haran contacted Wilkov. Haran expressed concern that several of the updates they had recently received from Wilkov regarding construction in Southern California appeared to be "cut-and-paste" reports.

328.    On or about September 7, 2005, Wilkov contacted Haran and assured them that the reports were not "cut-and-paste." Wilkov assured Haran that, "There is a formal construction plan for each property, and the construction team rotates between properties in each stage. The particular properties that you are involved in are in similar stages at this time."

329.    On or about November 7, 2005, Zimbalist and Chanla contacted The Property 7 Investors and Wilkov, and gave them what Zimbalist and Chanla claimed was an update on the status of construction at Property 5. In that update, Zimbalist and Chanla claimed that work at Property 5 was "60% completed," and that they anticipated "that the house will be ready to go on the market before the end of the year."

330.    On or about November 8, 2005, Reach contacted Zimbalist and Chanla and asked whether they anticipate meeting the original six-month schedule for sale of

43

Property 7.

331.    On or about November 8, 2005, Zimbalist and Chanla informed Reach that they were not certain that Property 7 would be sold within the original six-month schedule. Zimbalist and Chanla stated that any additional carrying costs associated with Property 7 would be borne by "our company . . . at no cost to you and the other investors."

332.    On or about December 9, 2005, Zimbalist and Chanla contacted The Property 7 Investors and Wilkov and gave them what Zimbalist and Chanla claimed was an update on the status of construction at Property 7. Zimbalist and Chanla claimed that the house was "nearly completed," and that they would be putting the house up for sale in mid-February. Zimbalist and Chanla further claimed that they would send photographs when the house was "100%."

333.    On or about January 18, 2006, Wilkov contacted Zimbalist and Chanla and The Property 7 Investors. Wilkov requested that Zimbalist and Chanla "provide a full status update," including a completion schedule, schedule for placing Property 7 on the market, and availability of photographs of the property.

334.    On or about January 30, 2006, Zimbalist and Chanla contacted The Property 7 Investors and Wilkov. Zimbalist and Chanla claimed to be "about three weeks behind schedule." Zimbalist and Chanla further stated that they believed the property would be on the market for sale by Valentine's Day. Zimbalist and Chanla stated that they would provide a copy of the listing, complete with photographs, when the property went on the market.

335.    On or about March 13, 2006, Zimbalist and Chanla contacted the Property 7

Investors and Wilkov, stating that they had completed "staging" Property 7, and would be putting the property for sale on the market with an asking price of $1,710,000.00.

336.    On or about April 10, 2006, Zimbalist and Chanla contacted The Property 7 Investors and Wilkov, claiming that they had received a "full price offer" for Property 7. Additionally, Zimbalist and Chanla note that the buyer is asking for a 40 day escrow period.

337.    On or about June 12, 2006, Wilkov contacted The Property 7 Investors stating, "As per an email I received from Carla last week, this property is scheduled to close between June 7th and 15th." Wilkov further stated that it would be at least 2-4 weeks from the date of closing until the accounting statements could be sent to investors.

338.    On or about July 11, 2006, Zimbalist and Chanla contacted The Property 7 Investors and Wilkov stating that Property 7 had been sold for $1,800,000.00. Zimbalist and Chanla went on to claim that their accountant was doing a closing accounting, and that they estimated that on or about July 25th, they would be sending documents reflecting profit and final accounting for the properties.

339.    On or about September 12, 2006, Wilkov sent documents purporting to be a statement of return on investment and receipt of funds for the investments in Property 7 to each of the individual investors in Property 7.

340.    Upon information and belief, none of the defendants ever actually purchased or owned any interest in Property 7. This belief is based upon a search of the property records of Los Angeles County, California.

### 920 WORCESTER AVENUE, PASADENA, CA 91104

341.    On or about October 11, 2000, Juan F. Paz and Raquel J. Olivia convey

45

property known as 920 Worcester Avenue, Pasadena, CA 91104 ("Property 8") to themselves, as husband and wife.

342.    On or about August 18, 2005, Wilkov contacted Tymczyszyn. Wilkov sent Tymczyszyn a "cashflow worksheet" that purported to represent the profit on an investment in Property 8.

343.    On or about August 18, 2005, Tymczyszyn informed Wilkov that she would invest $50,000 in Property 8.

344.    On or about August 18, 2005, Wilkov contacted Fuller. Wilkov sent Fuller a "cashflow worksheet" that purported to represent the profit on an investment in Property 8.

345.    On or about September 26, 2005, Tymczyszyn wired $50,000 to Zimbalist and Chanla for investment in Property 8.

346.    Prior to October 23, 2005, Wilkov sent Lichtenstein a "cashflow worksheet" that purported to represent the profit on an investment in Property 8.

347.    Prior to October 21, 2005, Wilkov contacted Flax. Wilkov sent Flax a "cashflow worksheet" that purported to represent the profit on an investment in Property 8.

348.    On or about October 24, 2005, Flax wired $25,000 to Zimbalist and Chanla for investment in Property 8.

349.    On or about November 1, 2005, Wilkov contacted Flax and confirmed that the wire transfer for Ms. Flax's investment in Property 8 had been received by Zimbalist and Chanla.

350.    On or about November 4, 2005, Lichtenstein wired $75,000 to Zimbalist and

Chanla for investment in Property 8.

351.    On or about December 9, 2005, Zimbalist and Chanla contacted Lichtenstein, Flax, Tymczyszyn (collectively, "The Property 8 Investors") and Wilkov and gave them what Zimbalist and Chanla claimed was an update on the status of construction at Property 8. Zimbalist and Chanla claimed that the house was "nearly completed," and that they would be putting the house up for sale in mid-February. Zimbalist and Chanla further claimed that they would send photographs when the house was "100%."

352.    On or about December 9, 2005, Juan F. Paz and Raquel J. Oliva convey Property 8 to themselves as husband and wife, confirming a change in the spelling of Ms. Oliva's name.

353.    On or about January 18, 2006, Wilkov contacted Zimbalist and Chanla and The Property 8 Investors. Wilkov requested that Zimbalist and Chanla "provide a full status update," including a completion schedule, schedule for placing Property 8 on the market, and availability of photographs of the property.

354.    On or about January 30, 2006, Zimbalist and Chanla contacted The Property 8 Investors and Wilkov. Zimbalist and Chanla claimed to be "about three weeks behind schedule." Zimbalist and Chanla further stated that they believed the property would be on the market for sale by Valentine's Day. Zimbalist and Chanla stated that they would provide a copy of the listing, complete with photographs, when the property went on the market.

355.    On or about March 8, 2006, Zimbalist and Chanla contacted Ms. Flax and stated that Property 8 was "being 'staged' with furniture." Zimbalist and Chanla further stated that Property 8 would "officially go on the market the 15th and the first open house

will be on the 19th. We will send pictures, etc., next week."

356.    On or about April 10, 2006, Zimbalist and Chanla contacted The Property 8 Investors and Wilkov. Zimbalist and Chanla claimed that they had received an offer of $935,000.00 for Property 8, with a 45 day escrow period. Zimbalist and Chanla asked The Property 8 Investors for their opinions on accepting the offer.

357.    On or about April 17, 2006, Zimbalist and Chanla contacted The Property 8 Investors and Wilkov. Zimbalist and Chanla claimed that they had accepted a "full price offer of $950,000.00."

358.    On or about May 30, 2006, Wilkov contacted The Property 8 Investors and Chanla and Zimbalist, requesting that Zimbalist and Chanla confirm the sale of Property 8 and provide information regarding the timing and distribution of the profits from the sale, and a complete accounting statement from the investors.

359.    On or about June 12, 2006, Wilkov contacted The Property 8 Investors and informs them that Zimbalist and Chanla report Property 8 will close between June 7, 2006, and June 15, 2006. Wilkov further informed The Property 8 Investors that the profits will be disbursed after the completion of a closing statement. Wilkov states that preparing such statements "typically take anywhere from 2-4 weeks."

360.    Upon information and belief, none of the defendants ever actually purchased or owned any interest in Property 8. This belief is based upon a search of the property records of Los Angeles County, California.

## 4855 ORION AVENUE, LOS ANGELES, CA 91403

361.    Prior to February 24, 2005, Wilkov contacted Charney, informing him of an opportunity to invest in real estate in Southern California. This property was 4855 Orion

Avenue, Los Angeles, CA 91403 ("Property 9").

362.    Prior to February 24, 2005, Wilkov sent Charney a "cashflow worksheet" that purported to represent the profit on an investment in Property 9.

363.    On or about February 24, 2005, Charney, in reliance upon representations by Wilkov that Zimbalist and Chanla were competent and possessed a proven track-record of success, invested $50,000.00 in Property 9, by means of a wire transfer.

364.    On March 13, 2006, Zimbalist and Chanla contacted Charney and Wilkov, claiming to have received two offers for the purchase of Property 9, one for $980,000.00 and the other for 993,500.00. Zimbalist and Chanla further claimed that the buyers were willing to close in 40 days or less. Zimbalist and Chanla asked Charney for his opinion on accepting the offer.

365.    On or about July 11, 2006, Zimbalist and Chanla contacted Charney and Wilkov. Zimbalist and Chanla claimed that escrow had closed on Property 9, and that Property 9 had been sold for $968,000.00. Zimbalist and Chanla went on to claim that their accountant was doing a closing accounting, and that they estimated that on or about July 25th, they would be sending documents reflected profit and final accounting for the properties.

366.    On or about August 10, 2006, Zimbalist and Chanla contacted Charney. Zimbalist and Chanla stated, "We are down to the last crossing of the 't's' and dotting the 'i's'. Seriously, we are currently working on everyone's documents, and now that we have most of the accounting back from the accountant. We should have everything to everyone out by Tuesday."

367.    Prior to September 5, 2005, Zimbalist and Chanla sent Charney sent

documents purporting to be a statement of return on investment and receipt of funds for the investment in Property 9.

368.    On or about September 5, 2006, Charney executed and returned to Zimbalist and Chanla documents purporting to be a statement of return on investment and receipt of funds for the investment in Property 9 via overnight delivery.

369.    On or about September 14, 2006, Wilkov sent documents purporting to be a statement of return on investment and receipt of funds for the investment in Property 9 to Charney.

370.    On or about September 15, 2006, Charney informed Wilkov that he had previously sent executed documents purporting to be a statement of return on investment and receipt of funds for the investment in Property 9 to Zimbalist and Chanla. Charney further informed Wilkov that he had not received any payment from Zimbalist and Chanla.

371.    On or about September 16, 2006, Wilkov contacted Charney. Wilkov claimed that Zimbalist and Chanla had sent the documents purporting to be a statement of return on investment and receipt of funds for the investment in Property 9 to their accountant. Furthermore, Wilkov claimed "They have stated that checks will be cut and sent out by Wednesday . . . The expectation is you should receive a check by the end of next week."

372.    Upon information and belief, none of the defendants ever actually purchased or owned any interest in Property 9. This belief is based upon a search of the property records of Los Angeles County, California.

**FINDER'S FEES**

373.    Upon information and belief, Zimbalist and Chanla promised to pay a

"finder's fee" to Wilkov for each investor in the Properties that Wilkov secured

374.    Wilkov did not disclose this "finder's fee" arrangement to the plaintiffs prior to their investment in the Properties.

## THE PROMOTIONAL MATERIALS

375.    Wilkov provided to the plaintiffs, in connection with soliciting their respective investments in Properties 1-9, "deal sheets" and "cashflow worksheets" ("the materials"). The materials were provided to each and every plaintiff in connection with each and every investment made by the respective plaintiffs.

376.    The materials purported to represent "sample investments." The materials also purported to reflect the costs and projected returns on the investment.

377.    The materials did not include the "finder's fee" being paid to Wilkov as a cost of the investment.

378.    The materials did not explain or disclose how the projected return on investment was calculated, did not disclose reasonably anticipated costs and expenses, did not allow for reasonable contingencies, and did not disclose the tax consequences of the investments.

379.    The materials did not explain or disclose any risks associated with the investment.

380.    The materials did not disclose fees or commissions to Chanla and Zimbalist.

381.    Wilkov, as a professional financial advisor, knew or should have known that the materials were not sufficient for a bona fide investment.


## AS AND FOR A FIRST CAUSE OF ACTION AS AGAINST ZIMBALIST, CHANLA, WILKOV, ESP AND AMERIPRISE

382.    The plaintiffs, repeat and reiterate each and every allegation contained in paragraphs marked "1" through "381" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

383.    That defendants Zimbalist, Chanla, Wilkov, ESP, and Ameriprise solicited monies from the plaintiffs for the purpose of allegedly investing in specific real estate investments.

384.    That in so doing, defendants, and each of them, their agents, servants, and/or employees, made oral representations to and entered into certain agreements with the plaintiffs which were breached.

385.    That in so doing, defendants and each of them, their agents, servants, and/or employees, made written representations to and entered into certain agreements with the plaintiffs which were breached.

386.    That in so doing, defendants, and each of them, their agents, servants, and/or employees, were unjustly enriched.

387.    That as a direct result thereof, the plaintiffs, and each of them, have been financially harmed, and each seeks the return of all funds invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees.

## AS AND FOR A SECOND CAUSE OF ACTION AS AGAINST ZIMBALIST, CHANLA, WILKOV AND ESP

388.    The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "387" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

389.    That defendants Zimbalist, Chanla, Wilkov and ESP engaged in the aforesaid

course of conduct with the intent to deceive the plaintiffs and defraud them of their investment monies.

390.    That these defendants and each of them conspired to deprive plaintiffs of their investment monies.

391.    That these defendants received the investment monies of plaintiffs as part of their scheme.

392.    That these defendants did not in fact invest such monies.

393.    That by reason thereof, the plaintiffs and each of them, have been financially harmed, and each seeks the return of all funds invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses and attorneys fees.

## AS AND FOR A THIRD CAUSE OF ACTION AS AGAINST WILKOV, AMERIPRISE, AND ESP

394.    The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "393" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

395.    Defendant Wilkov formed a relationship of trust and confidence with each of the plaintiffs, in that, Defendant Wilkov agreed to provide them with objective financial and investment advice.

396.    In so doing, Defendant Wilkov became a fiduciary of each of the plaintiffs.

397.    Defendant Wilkov breached her fiduciary duty to each of the plaintiffs in that she either negligently or intentionally, knowingly, and recklessly advised each of them to invest in real estate in Southern California without investigating the viability of such investments; without investigating the directors, managers, or executives of the

investment vehicles; after making misleading statements regarding her investigation or lack thereof; after transmitting misleading promotional and financial data to the plaintiffs; and after failing to disclose that she was receiving "finder's fees" from the promoters of the investment vehicle for each investor she referred.

398.     That AEFA employed Wilkov to provide such advice to its clients.

399.     That ESP employed Wilkov to provide such advice to its clients.

400.     That such conduct was a breach of Wilkov's, Ameriprise's, successor-in-interest to AEFA, and ESP's fiduciary duties to each plaintiff.

401.     As a result of the foregoing intentional, knowing, and reckless breach of Defendant Wilkov's fiduciary duties, each of the plaintiffs invested money in a real estate investment scheme being promoted, with the intent to defraud, by Zimbalist and Chanla.

402.     As a direct result thereof, the plaintiffs, and each of them, have been financially harmed, and each seeks the return of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees.


### AS AND FOR A FOURTH CAUSE OF ACTION AS AGAINST, WILKOV, AMERIPRISE AND ESP

403.     The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "402" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

404.     That the defendants Ameriprise, successor-in-interest to AEFA, Wilkov, and ESP engaged in a deceptive course of conduct aimed at the general public in that they engaged in extensive marketing of themselves as impartial investment advisors, offering

individualized advice to clients, and claimed to exercise due diligence in the performance of the obligations of an investment advisor.

405.    That, by reason of this deceptive course of conduct, the plaintiffs, and each of them, paid defendants Ameriprise, successor-in-interest to AEFA, Wilkov, and ESP sums of money in exchange for the provision of investment advisor services.

406.    The course of conduct was deceptive in that it failed to disclose conflicts of interest and misrepresented the competence and diligence of Ameriprise, successor-in-interest to AEFA, Wilkov, and ESP, in that the aforementioned defendants did not provide impartial advice, but rather acted on the basis of undisclosed conflicts of interest, and did not intend to diligently perform the obligations of an investment advisor.

407.    That the actions of the defendants, and each of them, were willful and malicious, so as to entitle the plaintiffs to an award of treble damages and attorneys fees.

408.    As a direct result thereof, the plaintiffs, and each of them, have been financially harmed, and each seeks the return of all funds allegedly invested into the scheme, treble damages, together with interest, costs, expenses, and attorneys fees.


**AS AND FOR A FIFTH CAUSE OF ACTION AS AGAINST WILKOV AND AMERIPRISE**

409.    The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "408" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

410.    Pursuant to 15 USC § 80b-6, defendant Wilkov owed a duty to the plaintiffs, and each of them, to disclose all material facts necessary for them to make appropriate and fully-informed financial decisions. Wilkov breached her duty by, as stated above,

claiming that she had conducted "due diligence" investigations; making assertions

regarding the reliability and skill of Zimbalist and Chanla that were not based in fact;

transmitting false promotional materials, which she knew were false or the falsity of

which she recklessly disregarded; failing to disclose the "finder's fee" paid to her by

Zimbalist and Chanla, and otherwise failing to disclose material facts in connection with

the investments in Properties 1-9.

411.     Accordingly, the plaintiffs, and each of them, are entitled to rescission of their

agreements with Ameriprise and its predecessor-in-interest, AEFA, and restitution of any

money paid therefore.

412.     Pursuant to 15 USC § 80b-6, defendant Ameriprise owed a duty to the

plaintiffs, and each of them, to act with reasonable care in training its agents, in

supervising its agents, and ensuring that full, honest and adequate disclosure was made to

each client. Ameriprise breached this duty by turning a blind eye to defendant Wilkov's

repeated failure to make full disclosures to the plaintiffs, and each of them, in connection

with Properties 1-9.

413.     Accordingly, the plaintiffs, and each of them, are entitled to rescission of their

agreements with Ameriprise and its predecessor-in-interest, AEFA, and restitution of any

money paid therefore.

## AS AND FOR A SIXTH CAUSE OF ACTION AS AGAINST ESP

414.     The plaintiffs repeat and reiterate each and every allegation contained in

paragraphs marked "1" through "413" of this Complaint, all with the same force and

effect as if herein set forth fully and at length.

415.    Pursuant to 15 U.S.C. § 80b-6, defendant ESP owed a duty to the plaintiffs, and each of them, to act with reasonable care in training its agents, in supervising its agents, and ensuring the full, honest and adequate disclosure was made to each client. ESP breached this duty by turning a blind eye to defendant Wilkov's repeated failure to make full disclosures to the plaintiffs, and each of them, in connection with Properties 1-9.

416.    Accordingly, the plaintiffs, and each of them, are entitled to rescission of their agreements with ESP, and restitution of any money paid therefore.

### AS AND FOR A SEVENTH CAUSE OF ACTION AS AGAINST AMERIPRISE

417.    The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "416" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

418.    Wilkov's actions in soliciting her clients to make investments were within the scope of her employment as an investment advisor with AEFA, predecessor-in-interest to defendant Ameriprise, in that the investment advice was given to clients of AEFA to whom Wilkov was assigned by AEFA; the representations were made during meetings held at AEFA offices, and/or during appointments arranged with AEFA staff.

419.    That the conduct of Wilkov was within the scope of her employment in that investment advice is the type of conduct Wilkov was hired to perform.

420.    It was reasonably foreseeable that Wilkov would sell products other than investment products which were specifically endorsed by AEFA, predecessor-in-interest to Ameriprise.

421.    It was reasonably foreseeable that Wilkov would sell real estate investments to AEFA clients.

422.    That as part of its custom and practice AEFA monitored the activities of its financial advisors.

423.    That employees of AEFA knew of the conduct of Wilkov.

424.    That AEFA, through the use of due diligence, knew or should have known of the conduct of Wilkov.

425.    It was and is reasonably foreseeable that an investment advisor would fail to adequately disclose material information, and would transmit information she knows to be false, or the falsity of which she recklessly disregards; and Wilkov engaged in the conduct with the apparent authority of AEFA.

426.    By reason of the foregoing, Ameriprise, successor-in-interest to AEFA, is responsible for the actions of its employee, Jennifer Wilkov.

427.    As a direct result thereof, the plaintiffs, and each of them, have been financially harmed, and each seeks the return of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees.


## AS AND FOR AN EIGHTH CAUSE OF ACTION AS AGAINT WILKOV, AMERPRISE, AND ESP

428.    The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "427" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

429.    The interests in the properties in California constitute "securities" within the

meaning of 15 USC §78(a)(10).

430.     Wilkov transmitted to prospective investors statements and promotional materials she knew to be false, or whose falsity she recklessly disregarded, in that she provided prospective investors, and more specifically, the plaintiffs herein, with "cashflow worksheets" and "deal sheets" which Wilkov knew did not account for the cost of "finder's fees" she was to be paid for providing investors to Zimbalist and Chanla; which Wilkov knew made predictions and projections regarding returns on investment without disclosing the basis for those predictions and projections, and without disclosing the risks involved; and which Wilkov knew did not account for all the costs associated with purchasing real property.

431.     Wilkov made statements she knew to be false, or whose falsity she recklessly disregarded, in that Wilkov stated to prospective investors, and more specifically, the plaintiffs herein, that Zimbalist and Chanla were "talented" and "experienced," when Defendant Wilkov had no factual basis for those claims; Wilkov stated that Zimbalist and Chanla had a history of success when Wilkov had no factual basis for that claim; and Wilkov stated that she had conducted "due diligence" investigations before recommending the above investments to the plaintiffs, when, in fact she had conducted no investigation.

432.     Accordingly, the plaintiffs, and each of them, are entitled to rescission of their agreements with Wilkov, Ameriprise and ESP, and restitution of any money paid therefore.

433.     As a direct result thereof, the plaintiffs, and each of them, have been financially harmed, as set forth in Exhibit 1, and each seeks the return of all funds

allegedly invested into the scheme, together with interest, costs, expenses, and attorneys fees.

## AS AND FOR A NINTH CAUSE OF ACTION AS AGAINST WILKOV, AMERIPRISE, AND ESP

434.    The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "433" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

435.    The investments purchased by plaintiffs are securities within the meaning of Section 2(1) of the Securities act, 15 U.S.C. §77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. §78c(a)(10).

436.    Defendants knew or recklessly disregarded that the above representations to prospective investors about their track record, the nature of the investments, and the history and backgrounds of the persons putting the investments together were false and misleading, and they knew or recklessly disregarded the true facts with regard to same.

437.    The conduct of Wilkov is attributable to Ameriprise and to ESP.

438.    The true facts about Chanla and Zimbalist's track record and financial condition and about the due diligence performed by Wilkov, should have been disclosed to, and would have been important to, investors.

439.    During all of the time periods set forth herein above, Defendants directly and indirectly, in the offer or sale, and in connection with the purchase or sale, of securities, by the use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, and the mails, have: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of,

or otherwise made, untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and course of business which operated as a fraud or deceit upon purchasers of the real estate interests purportedly issued by defendants.

440.    By reason of the foregoing, Defendants, and each of them, have engaged in transactions, acts, practices and course of business which constitute violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5

441.    As a direct result thereof, the plaintiffs, and each of them, have been financially harmed, and each seeks the return of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees.

## AS AND FOR A TENTH CAUSE OF ACTION AS AGAINST ZIMBALIST, CHANLA, WILKOV

442.    The plaintiffs repeat and reiterate each and every allegation contained in paragraphs marked "1" through "441" of this Complaint, all with the same force and effect as if herein set forth fully and at length.

443.    The plaintiffs, and each of them, allege that the defendants, Zimbalist, Chanla, and Wilkov, and each of them, used the U.S. mail to transmit fraudulent statements in connection with the promotion of each of Properties 1-9, including, but not limited to, the materials, each of which constituted an independent act under 18 U.S.C. §§ 1961-1968a and which are more specifically identified above.

444.    The plaintiffs, and each of them, allege that the defendants, Zimbalist, Chanla, and Wilkov and each of them, used the telephone and fax to transmit fraudulent statements in connection with the promotion of each of Properties 1-9, including, but not limited to, the initial solicitations for investment, the materials, and the transfer of funds via wire, each of which constituted an independent act under 18 U.S.C. §§ 1961-1968a and which are more specifically identified above.

445.    The plaintiffs, and each of them, allege that the defendants, Zimbalist, Chanla, and Wilkov and each of them engaged, by way of mail fraud, wire fraud, common-law fraud, and breach of fiduciary duty, in a pattern of egregious and malicious racketeering in violation of the RICO Act, 18 U.S.C. §§ 1961-1968a.

446.    The plaintiffs, and each of them, allege that the pattern of racketeering commenced with the initial offering of investments in property in California and continued until 2006, and that the scheme was a unified, comprehensive effort to defraud the plaintiffs.

447.    The plaintiffs, and each of them, allege that the defendants, Zimbalist, Chanla, and Wilkov and each of them, engaged in a pattern in that each property was a separate and distinct investment.

448.    The plaintiffs, and each of them, allege that defendants used and re-invested plaintiff's money for their own benefit and not the benefit of plaintiffs.

449.    The conduct of the defendants affected interstate commerce.

450.    That the defendants, and each of them, engaged in a "Ponzi" scheme, defrauding multiple investors, one investment scheme at a time.

451.    That by reason of the foregoing, defendants Zimbalist, Chanla, and Wilkov possible together with others not named herein, engaged in a pattern of racketeering activity in t violation of 18 U.S.C. §§ 1961-1968a.

452.    That by reason of the foregoing, plaintiffs, and each of them, seek all compensatory damages, statutory damages, treble damages, costs and attorneys fees to which they may be entitled.

453.    As a direct result thereof, the plaintiffs, and each of them, have been financially harmed, and each seeks the return of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees.

**WHEREFORE**, the plaintiffs, and each of them, demand judgment on: The First Cause of Action, over and against defendants, and each of them, Zimbalist, Chanla, Wilkov, and Ameriprise in the amount of all funds invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees; The Second Cause of Action, over and against defendants, Zimbalist, Chanla, Wilkov, and ESP, and each of them, in the amount of all funds invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses and attorneys fees; The Third Cause of Action, over and against defendants Wilkov, Ameriprise, and ESP, and each of them, in the amount of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees; The Fourth Cause of Action, over and against defendants Wilkov, Ameriprise, and ESP, and each of them, in the amount of all funds allegedly invested into the scheme, as set forth in Exhibit 1, treble damages, together with interest, costs, expenses, and attorneys fees; The Fifth Cause of Action,

rescission of their agreements with Ameriprise and its predecessor-in-interest, AEFA, and restitution of any money paid therefore, and rescission of their agreements with Wilkov, and restitution of any money paid therefore; The Sixth Cause of Action, rescission of their agreements with ESP, and restitution of any money paid therefore; The Seventh Cause of Action, over and against defendant Ameriprise, in the amount of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees; The Eighth Cause of Action, over and against defendants Wilkov, Ameriprise, and ESP, and each of them, in the amount of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees; The Ninth Cause of Action, over and against the defendant Wilkov, Ameriprise, and ESP, and each of them, in the amount of all funds allegedly invested into the scheme, as set forth in Exhibit 1, together with interest, costs, expenses, and attorneys fees; The Tenth Cause of action, over and against the defendants Zimbalist, Chanla, and Wilkov, and each of them, in the amount of all compensatory damages, as set forth in Exhibit 1, statutory damages, treble damages, costs and attorneys fees to which they may be entitled.

Dated: New York, New York
        July 5, 2007

                Yours, etc.

                BRODY, O'CONNOR, O'CONNOR, ESQS.
                Attorneys for Plaintiffs


                By:_____
                    SCOTT A. BRODY (SB4148)
                    111 John Street, Suite 900
                    New York, New York 10038
                    (212) 233-2505