**EXHIBIT E**

# American Express Financial Advisory Service Agreement



American Express, through American Express Financial Advisors Inc. (the "Company"), agrees to perform financial advisory services for you based on the following terms and conditions. The American Express Financial Advisory Service brochure (Form 94003) and any current supplement to this brochure contain important information regarding the Financial Advisory Service Engagement Options you (the "Client(s)") selected and are part of this Service Agreement ("Agreement"). No assignment of this Agreement by the Company will be effective without the Client's consent.

☑ Check here if a client check or money order is attached
☐ An approved Client Profile Form 200152 for each client must be submitted prior to establishing this Account.

**Corporate Office Use**
0 1 9 1  4386108-6-013  FP

Advisor Use for Existing Financial Advisory Service Account Only
Enter existing account number:
0 1 9 1 _ _ _ _ _ _ _ 0 1 3

☐ Check if changing an existing Engagement due to a change in terms.
☐ GTCC: Check if this Agreement creates a new anniversary date.

## Section 1 — Client Information

**First Client**
New Client for this Financial Advisory Service Account?  Yes ☑  No ☐
New AEFA Client?  Yes ☐  No ☑

Name (Entire or full legal name): NEIL BLITZ
Birthdate (mm/dd/yyyy): 09/13/1969
Social Security Number: 054 66 6258

**Second Client**
New Client for this Financial Advisory Service Account?  Yes ☑  No ☐
New AEFA Client?  Yes ☐  No ☑
Married to First Client?  Yes ☑  No ☐
Domestic Partner of First Client?  Yes ☐  No ☑

Name (Entire or full legal name): MARNI BLITZ
Birthdate (mm/dd/yyyy): 08/28/1970
Social Security Number: 212 92 8761

Resident or Home Street Address (For change of address, submit Form 518):
17 FLORENCE STREET
City: GREAT NECK    State: NY    ZIP Code: 11023

## Section 2 — Advisor Information

**Advisor 1 — Servicing Advisor**
Name: Jennifer G Willkom
Advisor Number: 47005    Team ID: _____    Comp. %: 100    Office Number: 629

**Advisor 2**
Name: _____
Advisor Number: _____    Team ID: _____    Comp. %: _____    Office Number: _____

## Section 3 — Customer Privacy

The Company's privacy policy is set forth in "It's a Matter of Privacy" (the "Privacy Notice"), which is provided to Client along with the Agreement. The Privacy Notice explains the categories of personally identifiable information collected by the Company to provide the Financial Advisory Service, disclosures that may be made to affiliates and non-affiliates of the Company, and choices that Clients have to opt out of certain disclosures and uses of the personally identifiable information. To select one or both of the opt-out choices described in the Privacy Notice, Clients must follow the instructions provided in the Privacy Notice.

The Company and the Client agree that all of the above-mentioned information and data furnished to the financial advisor, pursuant to Section 1, shall be disclosed and used by the company in accordance with the Privacy Notice. In addition, Client agrees that by purchasing the American Express Financial Advisory Service, Client is authorizing the Client's financial advisor and American Express Financial Advisors to use the information collected and provided as part of the service, to identify and recommend investment, insurance or other financial products the financial advisor and American Express Financial Advisors sell.

94003 D (Valid 4/03 to 3/04)    Page 1 of 4

Corporate Office Use        FP
0 1 9 1                     0 1 3

**Section 4 — Engagement services to be provided** (see Form 94003 for further explanation)

Engagement Period (check one):  ☐ Annual (80)    **Authorized advisors only:** ☐ Good Until Changed or Cancelled (26)

| | Services in the first year | Services in each subsequent year |
|---|---|---|

**Services:**

1. **Comprehensive Financial Planning (030)**  ☐  ☐
   Covers topics 1A through 1H described below (1D and 1E may not always apply).   (If selected, skip to line 2)

   1A. **Financial Position (009)** May include net worth, cash flow, cash reserve, budget, debt   ☑  ☐

   1B. **Income Tax (015)** May include federal income tax estimates, tax management strategies and techniques   ☐  ☐

   1C. **Investment (010)** May include asset allocation, model portfolio, periodic rebalancing, funding vehicles   ☐  ☐

   1D. **Education (011)** May include savings analysis, funding vehicles, financial aid advice   ☐  ☐

   1E. **Future Savings Goal (016)** May include savings analysis, funding vehicles for planned purchases or expenditures   ☐  ☐

   1F. **Retirement (020)** May include savings analysis, accumulation, distribution, income need, funding vehicles   ☐  ☐

   1G. **Protection/Family Security (005)** Included at no charge; may include survivor, disability, long term care needs   ☐  ☐

   1H. **Estate (024)** May include federal/state tax estimates, settlement costs, charity, will and trust strategies   ☐  ☐

2. **Small Business (Authorized advisors only) (060)**   ☐  ☐
   May include entity, benefits and/or succession planning, risk management, valuation

3. **Advanced Needs (Complete Form 71024 A) (018)**   ☐
   Includes guidance on complex topics such as tax, estate, business

4. **Divorce Financial Service (Authorized advisors only) (056)**   ☐

5. **Consultation (For Short-Term and Interim Needs) (Authorized advisors only) (017)**   ☐
   Includes advice on one or more short term, specific decisions or financial topics not covered in 1A – 1H; describe here:

---

**ADVISOR USE ONLY: ENTER ALL ANTICIPATED DELIVERY METHODS** (Used for internal research only — not material to this Agreement)

**Primary Deliverable**            **Supporting Documentation / Calculators**
✓ (check at least one)             Check all that may apply, but do not use as stand-alone deliverables

| Primary Deliverable | | Supporting Documentation / Calculators | | | |
|---|---|---|---|---|---|
| FASware — FAP/PEF | (070) ☑ | Principia (Morningstar) | (101) ☑ | Retirement Success Planner (americanexpress.com) | (161) ☐ |
| FASware — FAR/PER | (065) ☐ | InvestmentView (Thomson Finance) | (102) ☑ | Pension Dist. Planner (Brentmark) | (162) ☐ |
| Apex Select — FAP/PEF | (066) ☑ | Personal Portfolio Assistant (americanexpress.com) | (103) ☐ | NumberCruncher (Leimberg) | (181) ☐ |
| FASware SBO | (063) ☐ | StockOpter (Authorized advisors only) | (105) ☐ | Advanced Markets Online (AdvisorLink) | (182) ☐ |
| Advisor Created — Proposal | (067) ☐ | Portfolio Service Tool (Use only if client also has SPS account) | (106) ☐ | Microsoft Office Suite (Word, Excel, PowerPoint) | (199) ☐ |
| Advisor Created — Letter | (072) ☐ | Foundation Tools (AdvisorLink) | (107) ☑ | Divorce Financial Analysis | (156) ☐ |
| AEFA AllocationMaster | (040) ☐ | IRA Analyst (AdvisorLink) | (121) ☐ | Expert Witness Service | (159) ☐ |
| Lumen FPP | (073) ☐ | Sales Illustrations (AdvisorLink USA, Disability, Annuity, LTC, Certs) | (141) ☑ | — approved | ☐ |
| | | | | — approved | ☐ |

(authorized advisors only — bracket covering Apex Select through Lumen FPP)

**Reminder:** All advisor created deliverables must comply with Bulletin 4342A.

| Corporate Office Use | FP |
|---|---|
| 0 1 9 1 | 0 1 3 |

### Section 5 — Fees

|  |  |  | authorized advisors only | For the Engagement Period (Maximum One Year) |
|---|---|---|---|---|
| 1. Advisor fee | ☑ Flat $ 1000.00 | ☐ Hourly – at a rate of $ | /hour $ | $ 1000.00 |
| 2. Add: Assoc. Financial Advisor fee | ☐ Flat $ | ☐ Hourly – at a rate of $ | /hour $ | |
| 3. Add: Paraplanner fee | ☐ Flat $ | ☐ Hourly – at a rate of $ | /hour $ | |
| 4. Add: Advanced Needs Service fee (attach Form 71024 A) | | ☐ Hourly – at a rate of $ | /hour $ | |
| 5. Add: Iowa clients add 5% sales tax | | | | $ |
| 6. Subtotal | If over $10,000, attach RP Approval Form 94160 | For GTCC, also enter estimate of maximum annual fees here: $ | | $ 1000.00 |

7. Less: Promotions (check one)    Enter Promotion ID _____

☐ FEPS   ☐ AEFA Employee   ☐ Other AXP Employee   ☐ Marketing Coupon   ☐ Alliances (e.g., Costco)         ($ _____ )

8. Net fee due from client                                                                                     $ _____

9. Less: Initial payment from client

☑ Check            ☐ American Express® Card                    Expires        ($ 1/00/00 )
☐ Payroll deduction
(available to some FEPS clients)

Redemption: ☐ Form F119  ☐ Form 33442  ☐ Phone/Fax    Systematic payment: ☐ Form F137  ☐ Phone/Fax

10. Amount still due

☐ Check            ☐ Recurring American Express Card Payment (attach Form 6106)             $ _____ .00
☐ Payroll deduction
(available to some FEPS clients)

Redemption: ☐ Form F119  ☐ Form 33442  ☐ Phone/Fax    Systematic payment: ☐ Form F137  ☐ Phone/Fax

### Section 6 — Disclosure or interest and capacity

The financial advisor will or may recommend that Client purchase or sell investments and enter into other financial transactions. Client will have no obligation hereunder or otherwise to follow any such recommendations. If the Client does enter into one or more transaction(s) recommended by financial advisor, then, in addition to the compensation provided for above, financial advisor will or may receive a commission or other financial benefit as a consequence of the transaction.

No assignment of the Agreement by the Company will be effective without Client's consent.

After looking at all of Client's financial data, the financial advisor may find it necessary to recommend further assessment in a specific area that has not already been designated. If Client agrees, Client will be asked to sign a new Agreement and pay the additional fee. Under those circumstances this Agreement will be null and void.

Client's service will address Client's financial concerns based on Client's current financial situation and Client's future needs and objectives. The service will be based on the personal financial information that financial advisor obtains from Client. It also will be based on assumptions that Client selects and certain other planning assumptions determined by the Company. For the service, the overall rate of return used in determining net worth and cash flow beyond the current year will be calculated based on Client's risk tolerance toward achieving each goal selected, Client's assumed average tax rates and global inflation rates specific to each goal that financial advisor helps you select.

Client recognizes that the value and usefulness of the Financial Advisory Service will be dependent upon information that he/she provides and upon his/her active participation in the formulation of financial planning objectives and in the implementation of plans to attain those objectives. If required, Client will be asked to complete a detailed questionnaire provided by the financial advisor. Client will also provide copies of financial documents as the advisor may reasonably request in order to permit complete evaluation and preparation of recommendations for Client.

Client agrees to discuss his/her requirements, objectives and projected future needs candidly with the financial advisor and to promptly inform financial advisor of material changes in circumstances, needs, objectives and other information Client previously provided to the financial advisor. Client further agrees that neither the financial advisor or the Company shall have any liability for Client's failure to promptly inform the financial advisor of material changes in Client's financial circumstances which may affect the manner in which Client's assets are allocated.

The financial advisor shall have no obligation to make any recommendation or give any financial advice to Client, which in the sole judgment of the financial advisor, would be impracticable, unsuitable, unattainable or undesirable. It is understood that the financial advisor provides financial services of the type contemplated hereunder, as well as other financial services for a number of clients.

Concurrently with receipt by Client of the agreed upon services, Client may receive, without charge, if previously requested, a life insurance analysis provided by a licensed life and disability agent. The financial advisor will receive no compensation on account of any life insurance analysis and/or recommendations provided to Client, but may receive compensation for insurance products actually purchased. The Company does not provide insurance consulting, legal advice or document preparation as part of this service. The Company does not monitor the day-to-day performance of the Client's specific investments.

Corporate Office Use  
0 1 9 1

FP  
0 1 3

### Section 6 — Disclosure or interest and capacity (continued)

Company is required by law to obtain certain personal information from Client which will be used by Company to verify Client's identity. If Client does not provide the required information to Company, Company may be unable to open Client's account. If Company is unable to verify Client's identity, Company reserves the right to close Client's account or take such other steps as Company deems reasonable.

**Retirement Accounts**

**Client agrees that neither the financial advisor nor the Company is acting as a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA) or Internal Revenue Code of 1986, including with respect to asset allocation services provided Client, and that financial advisor and the Company are not providing investment advice for a fee that will be the primary basis for Client's investment decisions on IRA, TSA, government plan or ERISA (e.g., 401(k)) assets. To the extent an asset allocation service identifies any specific investment alternative, Client understands that other investment alternatives having similar risk and return characteristics may be available, and that Client's plan sponsor, for government or ERISA plans, or the financial advisor can assist Client in obtaining information on other potential investment alternatives.**

### Section 7 — Arbitration

Any controversy or claim arising out of or relating to this contract or the breach thereof, shall be settled solely by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Unless otherwise agreed to by the Company and the Client, the American Arbitration Association shall be the sole venue for resolving claims arising out of or relating to this Agreement, and the Client and the Company irrevocably waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity. This paragraph does not constitute a waiver of any right of private claim or cause of action provided by the Investment Advisers Act of 1940.

### Section 8 — Signature and Taxpayer Identification Number Certification

By signing below, I acknowledge that I have received and read the brochure (Form 94003), including the terms and conditions and I hereby consent to these terms and conditions with full knowledge and understanding of the information contained in the brochure.
**Under penalties of perjury, I certify that:**

1. The number shown on page one of this form is my correct taxpayer identification number, and
2. I am not subject to backup withholding because (a) I am exempt from backup withholding, (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

Client's Name: NEIL L. BLITZ  
Client's Signature: X /s/ Neil L. Blitz  
Date: 11 02 2004

Client's Name: MARNI B BLITZ  
Client's Signature: X /s/ Marni B Blitz  
Date: 11 02 2004

Signed at:  
City: GREAT NECK  
State: NY

Barry Murphy, Executive Vice President for American Express Financial Advisors Inc.  
/s/ Barry Murphy

Financial Advisor Signature: X Jennifer S. Wilkov  
Advisor's Phone Number: 212 719 0099

## Customer Privacy Notice

As described in the Notice, American Express Financial Services companies may disclose or use Customer Information to provide you with offers for products and services that we think may complement your financial goals, needs and circumstances. You may choose to opt out of certain disclosures and uses of Customer Information by completing and returning this card. You may choose either, both or neither of the options below by placing an "X" in the appropriate box. Note: You do not need to return this card if you do not choose either option. Please see the descriptions in the Notice for a full explanation of your choices. You may make only one set of opt-out choices for all of your accounts with the companies providing this Notice. Mail completed opt-out cards to: American Express Financial Advisors Inc., 70180 AXP Financial Center, Minneapolis, MN 55474. If you have questions about your opt-out choices, contact your financial advisor or call us at (800) 297-8018.

**OPTION A — DISCLOSURE OF CREDIT-RELATED AND FINANCIAL PLANNING INFORMATION AMONG AMERICAN EXPRESS FINANCIAL SERVICES COMPANIES AND AFFILIATES** [X]

Please do not disclose:

- Credit-related information that is collected by an American Express Financial Services company to other American Express Financial Services companies or American Express affiliates, other than as permitted by law, and
- Financial planning information (Customer Information American Express Financial Advisors collects to provide your financial plan, consulting or investment advisory service) to other American Express Financial Services companies or affiliates for marketing mailings for these affiliates' products and services.

*If you opt out, it may make it more difficult to provide you with offers for insurance and other product alternatives consistent with your financial goals and circumstances, as well as offers for credit or charge card products, lines of credit, extended payment options and margin lending accounts.*

Name (please print): Neil & Marni Blitz

Address: 12 Florence Street Great Neck NY

**OPTION B — DISCLOSURE OF CUSTOMER INFORMATION TO PROVIDE MARKETING OFFERS FOR PRODUCTS AND SERVICES SOLD BY OTHER COMPANIES** [X]

Please do not use or disclose:

- Customer Information to non-affiliated companies to provide me with offers for products and services sold by non-affiliated companies.

*If you opt out, it may make it more difficult to provide you with offers for discounts or promotional offers from other companies with whom we do business.*

**E-MAIL MARKETING OFFERS:** If you prefer not to receive E-mail offers, you may opt out by logging on to the "Set E-Mail Preference" page of our Customer Internet Privacy Statement at www.americanexpress.com/cust_serv/privacy/emailprivacy.asp and entering your preferences.

Customer Signature: [signature]

Client ID/Account Number: 1940-4478-0-0018  1940-4481-4-0001

© 2002 American Express Financial Advisors

# American Express Financial Advisory Service Agreement



American Express, through American Express Financial Advisors Inc. (the "Company"), agrees to perform financial advisory services for you based on the following terms and conditions. The American Express Financial Advisory Service brochure (Form 94003) and any current supplement to this brochure contain important information regarding the Financial Advisory Service Engagement Options you (the "Client(s)") selected and are part of this Service Agreement ("Agreement"). No assignment of this Agreement by the Company will be effective without the Client's consent.

☐ Check here if a client check or money order is attached
☐ An approved Client Profile Form 200152 for each client must be submitted prior to establishing this Account.

**Corporate Office Use**          FP
`0 1 9 1` `|_|_|_|` `|_|_|_|` `|_|` `0 1 3`

Advisor Use for **Existing Financial Advisory Service Account** Only
Enter existing account number:
`0 1 9 1` `|_|_|_|` `|_|_|_|` `|_|` `0 1 3`

☐ Check if **changing** an existing **Engagement** due to a change in terms.
☐ **GTCC**: Check if this Agreement creates a new anniversary date.

## Section 1 — Client Information

**First Client**          Yes   No
New Client for this Financial
Advisory Service Account?   ☐   ☒
New AEFA Client?            ☐   ☒

Name (Entire or full legal name): **NEIL BLITZ**
Birthdate (mm/dd/yyyy): **09 / 13 / 1969**
Social Security Number: **054 66 6258**

**Second Client**         Yes   No
New Client for this Financial
Advisory Service Account?   ☐   ☒
New AEFA Client?            ☐   ☒
Married to First Client?    ☒   ☐
Domestic Partner of First Client? ☐ ☒

Name (Entire or full legal name): **MARNI BLITZ**
Birthdate (mm/dd/yyyy): **08 28 1970**
Social Security Number: **212 92 8761**

Resident or Home Street Address (For change of address, submit Form 518): **17 FLORENCE STREET**
City: **GREAT NECK**    State: **NY**    ZIP Code: **11023**

## Section 2 — Advisor Information

**Advisor 1 — Servicing Advisor**
Name: **Amie Molsh**
Advisor Number: ____    Team ID: **155914**    Comp. %: ____    Office Number: **629**

**Advisor 2**
Name: ____
Advisor Number: ____    Team ID: ____    Comp. %: ____    Office Number: ____

## Section 3 — Customer Privacy

The Company's privacy policy is set forth in "It's a Matter of Privacy" (the "Privacy Notice"), which is provided to Client along with the Agreement. The Privacy Notice explains the categories of personally identifiable information collected by the Company to provide the Financial Advisory Service, disclosures that may be made to affiliates and non-affiliates of the Company, and choices that Clients have to opt out of certain disclosures and uses of the personally identifiable information. To select one or both of the opt-out choices described in the Privacy Notice, Clients must follow the instructions provided in the Privacy Notice.

The Company and the Client agree that all of the above-mentioned information and data furnished to the financial advisor, pursuant to Section 1, shall be disclosed and used by the company in accordance with the Privacy Notice. In addition, Client agrees that by purchasing the American Express Financial Advisory Service, Client is authorizing the Client's financial advisor and American Express Financial Advisors to use the information collected and provided as part of the service, to identify and recommend investment, insurance or other financial products the financial advisor and American Express Financial Advisors sell.

94003 D (Valid 4/03 to 3/04)          Page 1 of 4

Corporate Office Use
0 1 9 1

FP
0 1 3

## Section 4 — Engagement services to be provided (see Form 94003 for further explanation)

Engagement Period (check one):  ☑ Annual (80)   Authorized advisors only: ☐ Good Until Changed or Cancelled (26)

**Services:**

|  | Services in the first year | Services in each subsequent year |
|---|---|---|
| **1. Comprehensive Financial Planning (030)** Covers topics 1A through 1H described below (1D and 1E may not always apply). | ☑ (If selected, skip to line 2) | ☐ |
| **1A. Financial Position (009)** May include net worth, cash flow, cash reserve, budget, debt | ☐ | ☐ |
| **1B. Income Tax (015)** May include federal income tax estimates, tax management strategies and techniques | ☐ | ☐ |
| **1C. Investment (010)** May include asset allocation, model portfolio, periodic rebalancing, funding vehicles | ☐ | ☐ |
| **1D. Education (011)** May include savings analysis, funding vehicles, financial aid advice | ☐ | ☐ |
| **1E. Future Savings Goal (016)** May include savings analysis, funding vehicles for planned purchases or expenditures | ☐ | ☐ |
| **1F. Retirement (020)** May include savings analysis, accumulation, distribution, income need, funding vehicles | ☐ | ☐ |
| **1G. Protection/Family Security (005)** Included at no charge; may include survivor, disability, long term care needs | ☐ | ☐ |
| **1H. Estate (024)** May include federal/state tax estimates, settlement costs, charity, will and trust strategies | ☐ | ☐ |
| **2. Small Business (Authorized advisors only) (060)** May include entity, benefits and/or succession planning, risk management, valuation | ☐ | ☐ |
| **3. Advanced Needs (Complete Form 71024 A) (018)** Includes guidance on complex topics such as tax, estate, business | ☐ | |
| **4. Divorce Financial Service (Authorized advisors only) (056)** | ☐ | |
| **5. Consultation (For Short-Term and Interim Needs) (Authorized advisors only) (017)** Includes advice on one or more short term, specific decisions or financial topics not covered in 1A – 1H; describe here: | ☐ | |

---

### ADVISOR USE ONLY: ENTER ALL ANTICIPATED DELIVERY METHODS (Used for internal research only — not material to this Agreement)

**Primary Deliverable**
✓ (check at least one)

| | | | | | |
|---|---|---|---|---|---|
| FASware — FAP/PEF | (070) ☑ | Principia *Morningstar* | (101) ☑ | Retirement Success Planner *americanexpress.com* | (161) ☐ |
| FASware — FAR/PER | (065) | InvestmentView *Thomson Finance* | (102) ☑ | Pension Dist. Planner *Brentmark* | (162) |
| ⎡ Apex Select — FAP/PEF | (066) ☐ | Personal Portfolio Assistant *americanexpress.com* | (103) ☐ | NumberCruncher *Leimberg* | (181) ☐ |
| FASware SBO | (063) | StockOpter *Authorized advisors only* | (105) ☐ | Advanced Markets Online *AdvisorLink* | (182) ☐ |
| Advisor Created — Proposal | (067) | Portfolio Service Tool *Use only if client also has SPS account* | (106) ☐ | Microsoft Office Suite *Word, Excel, PowerPoint* | (199) |
| Advisor Created — Letter | (072) | Foundation Tools *AdvisorLink* | (107) ☑ | Divorce Financial Analysis | (156) ☐ |
| AEFA AllocationMaster | (040) | IRA Analyst *AdvisorLink* | (121) ☐ | Expert Witness Service | (159) |
| ⎣ Lumen FPP | (073) | Sales Illustrations *AdvisorLink: LISA, Disability, Annuity, LTC, Certs* | (141) ☑ | — approved | ☐ |
| | | | | — approved | ☐ |

*authorized advisors only*

**Supporting Documentation / Calculators**
Check all that may apply, but do not use as stand-alone deliverables

**Reminder:** All advisor created deliverables must comply with Bulletin 4342A.

Corporate Office Use

| 0 | 1 | 9 | 1 | | | | | |

FP

| 0 | 1 | 3 |

## Section 5 — Fees

— authorized advisors only —

For the Engagement Period
(Maximum One Year)

1. Advisor fee ☐ Flat $ 400.00   ☐ Hourly – at a rate of $ _____ /hour   $ 400.00

2. Add: Assoc. Financial Advisor fee ☐ Flat $   ☐ Hourly – at a rate of $ _____ /hour   $

3. Add: Paraplanner fee ☐ Flat $   ☐ Hourly – at a rate of $ _____ /hour   $

4. Add: Advanced Needs Service fee (attach Form 71024 A)   ☐ Hourly – at a rate of $ _____ /hour   $

5. Add: Iowa clients add 5% sales tax   $

6. Subtotal   If over $10,000, attach RP Approval Form 94160   For GTCC, also enter estimate of maximum annual fees here: $ _____   $

7. Less: Promotions (check one)   Enter Promotion ID _____
   ☐ FEPS  ☐ AEFA Employee  ☐ Other AXP Employee  ☐ Marketing Coupon  ☐ Alliances (e.g., Costco)   ( $ _____ )

8. Net fee due from client   $

9. Less: Initial payment from client
   ☒ Check (crossed out)
   ☐ Payroll deduction (available to some FEPS clients)
   ☒ American Express® Card  3715 698392 91007  0704   Expires
   ( $ 400.00 )

   Redemption: ☐ Form F119  ☐ Form 33442  ☐ Phone/Fax   Systematic payment: ☐ Form F137  ☐ Phone/Fax

10. Amount still due
    ☐ Check
    ☐ Payroll deduction (available to some FEPS clients)
    ☐ Recurring American Express Card Payment (attach Form 6106)   $ .00

    Redemption: ☐ Form F119  ☐ Form 33442  ☐ Phone/Fax   Systematic payment: ☐ Form F137  ☐ Phone/Fax

## Section 6 — Disclosure of interest and capacity

The financial advisor will or may recommend that Client purchase or sell investments and enter into other financial transactions. Client will have no obligation hereunder or otherwise to follow any such recommendations. If the Client does enter into one or more transaction(s) recommended by financial advisor, then, in addition to the compensation provided for above, financial advisor will or may receive a commission or other financial benefit as a consequence of the transaction.
No assignment of the Agreement by the Company will be effective without Client's consent.
After looking at all of Client's financial data, the financial advisor may find it necessary to recommend further assessment in a specific area that has not already been designated. If Client agrees, Client will be asked to sign a new Agreement and pay the additional fee. Under those circumstances this Agreement will be null and void.
Client's service will address Client's financial concerns based on Client's current financial situation and Client's future needs and objectives. The service will be based on the personal financial information that financial advisor obtains from Client. It also will be based on assumptions that Client selects and certain other planning assumptions determined by the Company. For the service, the overall rate of return used in determining net worth and cash flow beyond the current year will be calculated based on Client's risk tolerance toward achieving each goal selected, Client's assumed average tax rates and global inflation rates specific to each goal that financial advisor helps you select.
Client recognizes that the value and usefulness of the Financial Advisory Service will be dependent upon information that he/she provides and upon his/her active participation in the formulation of financial planning objectives and in the implementation of plans to attain those objectives. If required, Client will be asked to complete a detailed questionnaire provided by the financial advisor. Client will also provide copies of financial documents as the advisor may reasonably request in order to permit complete evaluation and preparation of recommendations for Client.
Client agrees to discuss his/her requirements, objectives and projected future needs candidly with the financial advisor and to promptly inform financial advisor of material changes in circumstances, needs, objectives and other information Client previously provided to the financial advisor. Client further agrees that neither the financial advisor or the Company shall have any liability for Client's failure to promptly inform the financial advisor of material changes in Client's financial circumstances which may affect the manner in which Client's assets are allocated.
The financial advisor shall have no obligation to make any recommendation or give any financial advice to Client, which in the sole judgment of the financial advisor, would be impracticable, unsuitable, unattainable or undesirable. It is understood that the financial advisor provides financial services of the type contemplated hereunder, as well as other financial services for a number of clients.
Concurrently with receipt by Client of the agreed upon services, Client may receive, without charge, if previously requested, a life insurance analysis provided by a licensed life and disability agent. The financial advisor will receive no compensation on account of any life insurance analysis and/or recommendations provided to Client, but may receive compensation for insurance products actually purchased. **The Company does not provide insurance consulting, legal advice or document preparation as part of this service. The Company does not monitor the day-to-day performance of the Client's specific investments.**

94003 D (Valid 4/03 to 3/04)   Page 3 of 4

Corporate Office Use

0 1 9 1

FP

0 1 3

### Section 6 — Disclosure or interest and capacity (continued)

Company is required by law to obtain certain personal information from Client which will be used by Company to verify Client's identity. If Client does not provide the required information to Company, Company may be unable to open Client's account. If Company is unable to verify Client's identity, Company reserves the right to close Client's account or take such other steps as Company deems reasonable.

**Retirement Accounts**

Client agrees that neither the financial advisor nor the Company is acting as a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA) or Internal Revenue Code of 1986, including with respect to asset allocation services provided Client, and that financial advisor and the Company are not providing investment advice for a fee that will be the primary basis for Client's investment decisions on IRA, TSA, government plan or ERISA (e.g., 401(k)) assets. To the extent an asset allocation service identifies any specific investment alternative, Client understands that other investment alternatives having similar risk and return characteristics may be available, and that Client's plan sponsor, for government or ERISA plans, or the financial advisor can assist Client in obtaining information on other potential investment alternatives.

### Section 7 — Arbitration

Any controversy or claim arising out of or relating to this contract or the breach thereof, shall be settled solely by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Unless otherwise agreed to by the Company and the Client, the American Arbitration Association shall be the sole venue for resolving claims arising out of or relating to this Agreement, and the Client and the Company irrevocably waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity. This paragraph does not constitute a waiver of any right of private claim or cause of action provided by the Investment Advisers Act of 1940.

### Section 8 — Signature and Taxpayer Identification Number Certification

By signing below, I acknowledge that I have received and read the brochure (Form 94003), including the terms and conditions and I hereby consent to these terms and conditions with full knowledge and understanding of the information contained in the brochure. Under penalties of perjury, I certify that:

1. The number shown on page one of this form is my correct taxpayer identification number, and
2. I am not subject to backup withholding because (a) I am exempt from backup withholding, (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

Client's Name

NEIL BLITZ

Client's Signature: *[signed]*

Date: 05 07 2003

Client's Name

MARNI BLITZ

Client's Signature: *[signed]*

Date: 05 07 2003

Signed at:
City

GREAT NECK

State

NY

Barry Murphy, Executive Vice President for American Express Financial Advisors Inc.

*[signed] Barry Murphy*

Financial Advisor Signature

*[signed]*

Advisor's Phone Number

212 719 0099

94003 D (Valid 4/03 to 3/04)

# Strategic Portfolio Service *Advantage*
# Client Service Agreement

The undersigned (Client) hereby retains and directs American Express Financial Advisors Inc. (Sponsor) to provide the American Express Strategic Portfolio Service *Advantage* (Service) under the terms and conditions set forth in the SPS *Advantage* New Account Application. Sponsor is a registered investment adviser under the Investment Advisers Act of 1940.

The Service is a wrap fee program in which Client is charged an annual asset-based fee (Wrap Fee) for investment advisory services and the execution of transactions in a brokerage account (Service Account). Eligible mutual funds, equities (stocks, rights, warrants), bonds (corporate, government, agency, municipal), Real Estate Investment Trusts (REITs) and options on indexes and equities can be held in the Service. Mutual funds made available through the Service include mutual funds participating in Sponsor's Select Group Program, which includes American Express Funds, and other non-proprietary mutual funds made available by Sponsor.

In addition to transaction execution, payment of the Wrap Fee also covers the following services:
- an asset allocation analysis and advice related to the proposed allocation as described in this Agreement
- financial information provided by your advisor
- custodial services
- regular reports (including quarterly performance reports)
- year-end tax information

1. **Client Acknowledgment Regarding the Service**
   Client understands and agrees that:

   a) Depending on how long you are a client of the Service, the Service may cost more or less than purchasing the underlying products and services separately (outside of the Service).

   b) The fee charged for the Service is an annual asset-based fee that is assessed monthly or quarterly. Many products and services offered by financial providers do require the payment of a commission or sales load; however, this may only be a one-time fee that is not paid every year.

   c) Your American Express financial advisor can provide you with advice or education with respect to your financial needs, including the provision of asset allocation services. Neither American Express Financial Advisors Inc., nor your financial advisor, is acting as a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA) or the Internal Revenue Code (Code), including with respect to asset allocation services provided to you. For purposes of ERISA and the Code, American Express Financial Advisors Inc. and your advisor are not providing investment advice for a fee that will be the primary basis for your investment decisions on IRA, TSCA, government plan or ERISA (e.g., 401(k)) assets. To the extent an asset allocation service identifies any specific investment alternative, please note that other investment alternatives having similar risk and return characteristics may be available to you. Your plan sponsor, for government or ERISA plan, or your advisor can assist you in obtaining information on other potential investment alternatives. In applying an asset allocation model to your situation, you should also consider your other assets, income and investments (e.g., equity in a home, savings accounts, and interests in other qualified and non-qualified plans).

   Your financial advisor may also offer you information and materials regarding:
   - general financial and investment concepts, such as risk/return, diversification, dollar-cost averaging, compounded return and tax-deferred investment;
   - historic differences in rates of return between different asset classes based on standard market indices;
   - effects of inflation;
   - estimating future retirement income needs;
   - determining investment time horizons;
   - assessing risk tolerance;
   - hypothetical portfolios; and
   - asset allocation analysis.

   d) The mutual funds in which your assets may be invested have their own fees and expenses, which may include small position and short-term redemption fees. These mutual funds could be purchased directly from their respective fund families without incurring the Wrap Fee for this Service, although you may incur a front- or back-end sales charge when purchasing them directly.

   e) The transfer of mutual funds purchased with a sales load within the past 18 months into the service is discouraged.

f) The products and services that are included in or made available in connection with the Service (collectively, they are referred to as the "Products") may have their own terms, conditions, and/or service agreements. In the event of a conflict between the terms of this Agreement and any other such agreement (relating to one of the underlying Products), this Agreement shall control with respect to the Service and such other agreement shall control with respect to Product-specific matters. Additionally, important information with respect to many of the Products is contained in their respective disclosure documents (including prospectuses) — please read those documents carefully before participating or investing in those Products and keep them for future reference. A prospectus for each mutual fund will be sent by Sponsor upon investment in the fund.

g) The Service is appropriate for long-term investors who are primarily interested in buying and holding a diversified portfolio of mutual funds and/or securities, not for market timing purposes. It is not for day trading or other extreme trading activity, including excessive options trading or trading in mutual funds based upon market timing. Sponsor reserves the right to impose a surcharge on transactions in excess of certain limits. The Sponsor may also bar further trading or terminate the Service Account at any time.

## 2. Investment Information and Execution Services Provided by Sponsor

a) Client Profile. Client has furnished or will furnish to Sponsor, information regarding Client's financial situation (including cash flow needs), investment objectives and risk tolerance. Client agrees to inform Sponsor promptly and in writing of any material change in such information. Such information, as it may be so updated from time to time, is referred to in this Agreement as the "Client Profile."

b) Investment Plan Recommendation. Unless otherwise deemed advisable by your American Express financial advisor; the advisor will submit to Client a proposed asset allocation plan (Investment Plan), based on the initial Client Profile, on asset allocation analysis, on prevailing market conditions and on other factors deemed appropriate by the advisor. Your advisor may amend the Investment Plan from time to time as he or she deems necessary in his or her sole discretion (but he or she is not obligated to do so).

c) Nondiscretionary Services. The services provided by Sponsor and Client's American Express financial advisor under the Service are "nondiscretionary." Sponsor will participate in and execute such transactions in the Products only as instructed by Client. Sponsor may reject any instructions given by Client if, in Sponsor's reasonable judgment, implementing those instructions would (i) violate any applicable federal or state law or any applicable rule or regulation of any regulatory agency or self-regulatory body or (ii) be inconsistent with any internal policy maintained by Sponsor from time to time relating to effecting transactions with or for customers. Sponsor will notify Client promptly of any decision to reject Client's instructions.

In all such purchases, sales or trades, Sponsor is authorized to follow the instructions of Client in every respect concerning Client's account. Client agrees to give Sponsor prompt written notice if Client believes the Investment Plan or any transactions effected on behalf of Client to be inconsistent with the Client Profile.

## 3. Execution of Trades

Agency transactions will be effected by Sponsor through its clearing broker, American Enterprise Investment Services, Inc. Sponsor may, however, in its own discretion, use the services of other broker-dealers. Client specifically authorizes Sponsor to effect securities execution on behalf of Client's Service Account.

## 4. Dividends/Interest and Distributions

All dividends and distributions received from mutual funds, where allowed, will be reinvested unless Sponsor and Client agree to special arrangements to have such income deposited in the sweep account vehicle for sweeping available cash identified on Client's brokerage application (Sweep Account) to be held or distributed by Client. Where reinvestment is not allowed, such income will be deposited in the Sweep Account. Client may deposit any amount into the Sweep Account.

## 5. Records

Client will be furnished transaction confirmations, periodic statements, and other regular reports. In addition, "tax-advantaged" accounts will receive certain additional information, including such annual information as required by law.

## 6. Services for Sponsor and Other Accounts

Sponsor and its affiliates perform, among other things, asset management, research, brokerage and investment advisory services for clients other than those participating in the Service. Sponsor and its affiliates also may advise and take action in the performance of duties to other clients (including those who may be participants in the Service) that may differ from information given, or the timing and nature of action taken, with respect to Client's Service Account, and that Sponsor and their affiliates may trade and have positions in securities of issuers where Client may own equivalent or related securities of such issuers; and where Client action may or may not be taken or recommended. Nothing in this Agreement shall be deemed to impose upon Sponsor or its affiliates any obligation to purchase or sell, or recommend for purchase or sale for Client's Service Account, any security or any other property that Sponsor; or its affiliates may purchase, sell or hold for its own account or the account of any other client. By reason of their various activities, Sponsor, and its affiliates may from time to time acquire information about various corporations and their securities. Client recognizes that Sponsor and its affiliates may not always be free to divulge such information, or to act upon it.

## 7. Fees/Negotiability/Remuneration of Financial Advisor

a) **SPS *Advantage* Fee Schedule.**

Client will be charged an annual asset-based fee (Wrap Fee) for investment advisory services and the execution of transactions in the Service Account. Client's Wrap Fee is negotiable between Client and the financial advisor and assumes that a 1.00% credit amount has already been applied to reflect investment management and service fees that may potentially be received by Sponsor from underlying mutual funds held in the Service Account. Client's Wrap Fee is negotiable up to a maximum annual Net Wrap Fee of 2.00% as reflected below. Households will be assessed a minimum Wrap Fee of $100 per year. Depending on the billing cycle chosen, the minimum Wrap Fee assessed will be $25 per quarter or $8.33 per month.

**Gross Wrap Account Fee**
Total fees including Net Wrap Fee and investment management and service fees.

*Maximum Annual Gross Wrap Fee    3.00%*

**Net Wrap Fee Schedule**
Client fee charged within the Service Account.

*Maximum Annual Net Wrap Fee    2.00%*

**Gross vs. Net Fee**
The Gross Wrap Fee includes the Net Wrap Fee and a credit amount which reflects the investment management and service fees that may potentially be received by Sponsor from underlying mutual funds held in the Service Account.

The Client's Wrap Fee can be renegotiated at any time on an account, but it requires a new Service Agreement. The new negotiated fee becomes effective at the start of the next cycle (billing period) following the period the change request was received by the Service team. **The Wrap Fee is charged and deducted at the END of the billing period.** Client will have the option to select monthly or quarterly billing. If one is not selected, quarterly billing will be elected. The billing cycle is around the 25th day of the month in the current billing period. **The Wrap Fee is based on average daily balance of mutual fund and securities positions held in the Service Account for the period being billed. As described below, margin account balances are included in the calculation of average daily balance. However, assets in the Sweep Account are not included in the calculation of average daily balance.** Upon opening the Service Account, the first Wrap Fee payment is charged at the end of the current billing period is based on actual number of days the Service Account has been opened. If Client's Service Account is terminated in the middle of the billing cycle, Client will be assessed the final Wrap Fee payment. The final Wrap Fee payment will be calculated and assessed to the Service Account prior to the time the money is released from the Service Account. The final Wrap Fee payment is based on the average of the Service Account value (excluding Sweep Account value) from the previous billing cycle and the Service Account value (excluding Sweep Account value) at termination. In the event that the previous billing cycle is unavailable (i.e., new Service Account yet to have a billing cycle), the final Wrap Fee payment is based on the inception value of the Service Account and the Service Account value (excluding Sweep Account value) at termination. In the event of termination, Client will be assessed a $250 termination fee to cover certain expenses (Sponsor has the option to waive this fee in special situations). Other reasonable termination fees may be charged by Sponsor, in Sponsor's discretion. All fees are subject to change upon notice from Sponsor.

If Client acquires securities positions on margin, any margin account balance reinvested in SPS *Advantage* during a billing period will be included in the calculation of average daily balance for purposes of calculating Client's fee for that period. Any Wrap Fee paid by Client on a margin account balance would be in addition to interest charges that would be assessed to Client for the extension of credit in a margin account.

Client is required to maintain sufficient assets in the Sweep Account to meet monthly/quarterly Wrap Fee deductions. Therefore, Client's cash value in the Sweep Account must equal 1.5 times the annual Wrap Fee to ensure sufficient assets to cover the future Wrap Fee payments. If there is not sufficient cash in the Sweep Account to meet the Wrap Fee requirements, Client authorizes, and Sponsor reserves the right to, sell shares of mutual fund or securities holdings within Client's Service Account and to transfer this money into the Sweep Account to cover these requirements. Sponsor reserves the right to determine which mutual fund shares or securities will be sold. Generally, mutual funds considered to have the lowest volatility based on the stated annual standard deviation of the asset category will be the first selected to meet cash requirements. If Client acquires securities positions on margin, the cash value that Client will need to maintain in the Sweep Account (1.5 times the annual Wrap Fee) will be higher than would be the case in the absence of margin since margin account balances are included in the calculation of Client's Wrap Fee.

For purposes of computing the Wrap Fee payable to Sponsor hereunder, the value of the assets will be determined in good faith by Sponsor to reflect their estimated fair market value. In making valuation determinations, Client understands and acknowledges that Sponsor may rely on the services of a third-party pricing service.

**b) Fees Received by Sponsor/Financial Advisor**

Sponsor receives several types of fees in connection with the Service in addition to the Wrap Fee. Client understands that certain Products available through or in connection with the Service are affiliated with Sponsor (Affiliated Products) and that Sponsor and affiliated companies receive fees for providing services to the Affiliated Products, including acting as investment adviser and administrator to affiliated mutual funds or collecting interest on credit extended in a margin account (as set forth in their respective prospectus or disclosure document). Client further understands that Sponsor will receive shareholder servicing and other fees (Servicing Fees) from both proprietary and non-proprietary mutual funds and/or their sponsors, investment advisers, or other services providers at annual rates ranging from 0.05% to 0.50% of the amount of Service Account assets invested in the mutual funds. In addition, Sponsor will receive a portion of the revenue generated from the sales of mutual funds participating in the Select Group Program. Client further authorizes Sponsor or its affiliates to invest, directly or indirectly, in deposits of itself or its affiliates that bear a reasonable rate of interest to facilitate cash sweep services. As a result, the aggregate fees to be received by Sponsor may vary depending on the Products in which Client participates or invests. For more information regarding Sponsor's receipt of revenue, please ask your advisor.

If Client was introduced to the Service by an American Express financial advisor or another employee of Sponsor, a portion of the first year's fee and subsequent fees will be paid by Sponsor to such person and to the appropriate field manager. Such payments may be made as long as this Agreement remains in effect. In addition, Client understands that American Express financial advisors and other employees of Sponsor may receive a portion of any Servicing Fees or other fees received by Sponsor in connection with proprietary and non-proprietary mutual funds, as described above. The compensation received pursuant to these arrangements will vary depending on production levels and other factors, and may be higher with respect to mutual funds participating in the Select Group Program. Your American Express financial advisor may offer comprehensive financial planning services, which may include a different type of asset allocation analysis than available through the Service, for additional fees. Comprehensive financial planning is not included in the Service.

**c) Other Fees**

The Wrap Fee will be charged to Client for transactions within the Service Account and specific services offered within the Service. Other fees may also be charged or passed through to Client by the Service as described below.

| Dealer Markups, Markdowns and Spreads | For principal transactions in fixed-income, over-the-counter and foreign securities, the market makers' mark-up or mark-down is borne by the client. Because Sponsor is not a market maker, a better security price might be available from a broker-dealer other than Sponsor. |
|---|---|
| Termination Fee | Clients who terminate their SPSA Account will be assessed a $250 termination fee to cover certain expenses. Sponsor has the option to waive this fee in special situations. |
| Other Fees | Brokerage service fees, trade-related fees, American Express ONE Financial Account Maintenance fees, banking fees and American Express Card fees may also apply depending upon the particular Products in which Client participates or invests. Please see the brokerage fee schedule provided in the SPS *Advantage* application for current brokerage service fees. |

## 8. Relationship With American Enterprise Investment Services Inc. (AEIS)

**a) Custody of Securities**

Sponsor shall not act as custodian for Client's Service Account and shall not take possession of any assets. AEIS provides custody and safekeeping services for Service Account assets.

**b) Transaction Procedures**

Sponsor will effect all securities transactions as agent for customers. AEIS provides execution and clearing capabilities as clearing broker for Sponsor. When Sponsor acts as agent for you, a confirmation is sent to you after each transaction. This confirmation discloses that Sponsor acted as agent for you, and provides other information required by law. Sponsor and AEIS have an agreement in which Sponsor introduces customer accounts to AEIS on a fully disclosed basis. Sponsor opens, approves, and monitors accounts and accepts securities orders. AEIS provides execution, recordkeeping, and all other clearing functions for Service Accounts. Sponsor, on behalf of the Service, also has an arrangement with AEIS whereby it may receive certain directed/reciprocal commissions that have been directed to Sponsor by nonproprietary mutual fund families.

## 9. Assignment

No assignment, as defined by Section 202 of the Investment Advisers Act of 1940, of this Agreement by Sponsor shall be effective without the consent of Client.

## 10. ERISA Accounts

Client acknowledges sole responsibility for determining whether to and to what extent the Service is appropriate for Client's ERISA account including, without limitation, that the Service and underlying investments are consistent with applicable plan documents and investment guidelines.

### 11. Modifications

From time to time, Sponsor may modify various aspects of the Service (including fees). Sponsor will notify Clients of those modifications as required by law. Such modifications shall become effective upon notification unless otherwise stated.

### 12. Law Governing This Agreement

Client agrees that this Agreement is to be governed by the State of Minnesota.

### 13. Deposits and Distributions on Partial Withdrawal and Terminations

All cash will be deposited to your Sweep Account if received and approved by 3 p.m., Central time. Additional mutual fund investments can be made in the client's Service Account at any time in amounts of $500 or more, or $100 if a systematic investment arrangement is made. However, client may deposit any amount into the Sweep Account. Client may withdraw part of the account in amounts of not less than $1,000 or $100 on a systematic basis upon notice to Sponsor, provided that no partial withdrawal shall be permitted if the market value of Client's Service Account would thereafter be less than the minimum set forth in the ADV disclosure brochure on the date the Client signed this Agreement. With respect to partial withdrawals or terminations, Clients may request that their assets be distributed in the form of cash or securities from their accounts. In most cases, cash distribution will be made by check within two weeks with liquidations of most securities occurring within three business days after receipt of your written request for a withdrawal or termination. For distributions of securities, Sponsor will request that the transfer agent forward the securities per the Client's written request within 30 days. However, the amount of time required to complete this kind of transaction varies, so Sponsor cannot be responsible for the period of time a securities transfer actually requires. A $50 transfer-out fee will also be assessed to accounts which are terminated in this manner. Clients who terminate their SPS *Advantage* account in the middle of the billing cycle will be assessed a final Wrap Fee, calculated as described in Paragraph 7(c), "Other Fees." Clients who terminate their account will be assessed a $250 termination fee to cover certain expenses. Sponsor has the option to waive the termination fee in special situations.

### 14. Effective and Termination Dates

This Agreement will take effect when it is accepted by Sponsor. Client has the right to terminate this Agreement without penalty within five (5) business days from the date Client receives written notice that the Agreement has been accepted by Sponsor. Written notice of Client's election to terminate without penalty shall be sent to Sponsor at the address set forth below. In the event Client elects to terminate pursuant to this paragraph, any securities and cash deposited by Client with Sponsor pursuant to this Agreement will be returned to Client; provided, however, if any such securities have already been liquidated by Sponsor as directed by Client, Sponsor will refund an amount of cash equal to the value of such liquidated securities on the date of termination. Client bears the risk of any market declines during this period.

Sponsor is required by law to obtain certain personal information from Client for purposes of verifying Client's identity. If Client does not provide Sponsor with the necessary information, Sponsor may not be able to open a Service Account on behalf of Client. In addition, to the extent Client's Service Account has already been opened, Sponsor reserves the right to close the Service Account at any time, or take such other steps as Sponsor deems reasonable, if Sponsor is unable to verify Client's identity.

Either Sponsor or Client may elect to terminate this Agreement at any time without cause. If Sponsor decides to terminate the account, Client will be given 30 days' notice. The Sponsor reserves the right to halt trading at any time and among other things to terminate SPSA or impose a surcharge on trading exceeding certain limits. In the event Client elects to terminate this Agreement, pursuant to this paragraph, any assets in Client's Service Account will be distributed to Client as described in Paragraph 13, "Deposits and Distributions on Partial Withdrawal and Terminations," after deduction of any fee payable by Client pursuant to Paragraph 7(c), "Other Fees." Termination will result in the cancellation of Client's Service Account and all other features and privileges, but Client shall remain responsible for its obligations under this Agreement.

Notifications should be sent to:
American Express Financial Advisors Inc.
American Express Wrap Services
70100 AXP Financial Center
Minneapolis, MN 55474

### 15. Disclosure Statement

There are certain risks involved in investing or participating in the Products that are included in or made available in connection with the Service. The following is an abbreviated listing — please read each Product's respective prospectus or disclosure document for more details.

a)  Mutual funds and other securities are subject to risks, including market risk. Mutual fund shares and other securities fluctuate in price and may be sold at a price lower than the purchase price resulting in a loss of principal. There is no guarantee that a mutual fund or other security will meet its investment objectives.

b)  If your account has been approved for margin trading, you may be required to deposit additional securities or cash on short notice to maintain your position or to maintain sufficient assets in the Sweep Account to meet fee requirements (qualified accounts such as ERISA accounts, IRAs and TSCAs are not available for margin accounts). If you do not provide the required additional funds or securities within the prescribed time, all or a portion of your holdings may be liquidated. You will be liable for any resulting deficit in your account. Margin trading can work against you as well as for you, leading to larger losses as well as larger gains. Maintenance of a margin account balance will also magnify your Wrap Fee to the extent of the margin exposure.

c) Under certain "crisis" market conditions, mutual funds may be allowed to suspend redemptions. This may affect our ability to execute an order on your behalf.

d) All orders given to Sponsor are placed on a "best efforts" basis. Sponsor shall not accept any liability or responsibility for orders not executed or accepted because of failure of a communication system, including the mail or other methods of transmitting instructions through vehicles of interstate commerce.

e) Mutual funds and certain other securities are offered by prospectus only. Prospectuses are available upon request. Sponsor will provide a prospectus as required by law. It is your responsibility to read and understand the terms and conditions in the prospectus, including fees and charges that may apply, before investing. Sponsor shall not accept any liability for orders executed under the terms and conditions as stated in a prospectus.

f) One or more mutual funds may reserve the right to change its policies regarding exchanges, redemptions, or purchases. This may affect our ability to execute an order on your behalf.

g) Charges imposed by the Products, including redemption fees, are subject to change. It is your responsibility to understand such fees and expenses prior to making investment decisions or participating in a particular Product.

### 16. Market Data
Sponsor may provide market data relating to securities and securities markets. Sponsor does not guarantee the accuracy, completeness, or timeliness of such information nor does it imply any warranty of any kind regarding the market data.

### 17. Severability
If any term of this Agreement is found to be invalid or unenforceable, all other provisions will remain in force. The failure of Sponsor to insist on strict compliance with this Agreement is not considered a waiver of Sponsor's rights under this Agreement.

### 18. Client Authority
Client represents and warrants to Sponsor that Client has the requisite legal capacity and authority to execute, deliver and perform its obligations under this Agreement. If this Agreement is entered into by a trustee or other fiduciary, such trustee represents that he or she is authorized to enter into this Agreement and that the arrangement has been determined to be proper and permissible pursuant to any plan, trust and/or applicable law. If the Client is a corporation or partnership, the signatory or signatories represent that the execution of this Agreement has been duly authorized by any necessary corporate or partnership action, and that the arrangement has been determined to be proper and permissible pursuant to applicable documents and laws. Client represents and warrants to Sponsor that it is and will be the owner of all assets in its Service Account, and there are and will continue to be no restrictions on the pledge, hypothecation, transfer, sale or public distribution of such assets.

### 19. Multiple Ownerships
In order to allow for greater convenience for Clients, Clients are allowed to have more than one form of ownership within the Service; provided, however, that other than aggregating assets for purposes of meeting minimum balance requirements to participate in the Service, each such ownership and the Products owned in such capacity shall be separate and distinct from the other forms of ownership. Multiple owners are allowed for you and your primary household group (the primary household group consists of accounts in any ownership of spouses or domestic partners and their unmarried children under 21. Domestic partners are individuals who maintain a shared primary residence and have joint property or other insurable interests).

### 20. Proxies and Corporate Actions
Sponsor shall not be required to take any action or give any advice regarding the voting of proxies solicited by or with respect to the issuers of securities in which assets of the Service Account may be invested from time to time. In addition, Sponsor shall not be responsible for any other corporate actions relating to the Service Account, including administrative filings such as proofs of claims or claims in class actions.

### 21. Limitation on Liability
Except as may otherwise be provided by law, Sponsor and its directors, officers, employees, agents and affiliates will not be liable to Client for (a) any loss that Client may suffer by reason of any action taken or omitted in good faith by Sponsor with that degree of care, skill, prudence, and diligence under the circumstances that a prudent person would use, (b) any loss arising from Sponsor's adherence to Client's instructions, or (c) any act or failure to act by a broker-dealer to which Sponsor directs transactions for Client's account or by any other third party. Sponsor and its directors, officers, employees, agents and affiliates shall be entitled to rely, and shall be protected from liability in relying, upon any information or instructions furnished to it (or any of them as individuals) which is believed in good faith to be accurate and reliable. Client understands and acknowledges that Sponsor does not warrant any rate of return, market value or performance of any assets in the Service Account. The federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing in this Agreement will waive or limit any rights that Client may have under those laws.

### 22. Information About American Express Strategic Portfolio Service *Advantage* Service
Sponsor's investment and advisory procedures and activities for the Service described in the SPS *Advantage* ADV brochure, which is delivered with the Agreement. By signing below, Client acknowledges (1) having received and read the brochure and (2) that Client understands and agrees to all terms contained in the Agreement and brochure that apply to the service Client selected.

### 23. Arbitration

a)  Client understands and agrees that:

   i)   Arbitration is final and binding on the parties;

   ii)  The parties waive their right to seek remedies in court, including the right to jury trial;

   iii) Pre-arbitration discovery is generally more limited than, and different from, court proceedings;

   iv)  The arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited; and

   v)   The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

b)  Any controversy arising out of, or relating to Client's Service Account, to transactions with Sponsor or Sponsor's agents and/or employees, or to this Agreement or the breach thereof, shall be settled by arbitration and conducted pursuant to the Federal Arbitration Act before the American Arbitration Association or the National Association of Securities Dealers Inc., the Chicago Stock Exchange Inc., the New York Stock Exchange, the American Stock Exchange to the extent Sponsor may be a member of such exchange, the Municipal Securities Rulemaking Board or the independent non-industry arbitration forum as Client may elect. If Client does not make such election by registered mail addressed to Sponsor at Sponsor's main office within 10 days after demand by Sponsor that Client make such election, Sponsor may make such election. Judgement upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

c)  No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the client is excluded from the class by the court.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

This Agreement contains a predispute Arbitration clause in paragraph 23.

Client Signature(s)
X *Neil Blitz*

Client Signature(s)
X *Marni B Blitz*

Account Number

Annual Fee for Service: __1.25__ %   Billing: ☒ Monthly or ☐ Quarterly (check one)

Agreed to this __10th__ day of __November__, year __2004__, by

Print Client Name  Neil Blitz

Print Client Name  MARNI BLITZ

If the undersigned is signing on behalf of the Client, the undersigned represents that he or she has read this Agreement in its entirety and is duly authorized to enter into this Agreement on behalf of such Client.

Authorized Signature
X

Authorized Role

For Corporate Office Personnel Only
Accepted this _____ day of _____ by _____

American Express Financial Advisors Inc.
American Express Strategic Portfolio Service *Advantage*

23443                           Page 8 of 8              F (7/03)