UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SCOTT CHARNEY, et al.,                              :

                                                   :  REPORT AND RECOMMENDATION
                         Plaintiffs,                  07 Civ. 6272 (AKH) (GWG)
                                                   :

        -v.-                                        :

CARLA ZIMBALIST, et al.,                            :

                                                   :
                         Defendants.               :
-------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        The plaintiffs in this action have brought claims for federal securities fraud and common

law fraud under New York law, among other causes of action, against a number of defendants

including Jennifer Wilkov, who is the only remaining defendant not in default.  Wilkov is

proceeding pro se.  Before the Court are cross-motions for summary judgment.  For the reasons

that follow, plaintiffs' motion should be granted in part and denied in part, and Wilkov's motion

should be denied.

I.  BACKGROUND

        A.  Facts

        This case concerns financial losses allegedly sustained when plaintiffs invested in a

fraudulent real estate investment scheme that involved defendants Carla Zimbalist, Pam Chanla

and Wilkov.  While we discuss the facts in more detail in section IV.B below, the following

facts, except as otherwise noted, are based entirely on admissions from Wilkov.

        Carla Zimbalist and Pam Chanla engaged in a scheme to defraud investors by promoting

alleged investments in real estate located in and around Los Angeles County, California.  See

Rule 56.1 Statement, filed June 15, 2009 (Docket # 84), ¶ 1; Response to Rule 56.1 Statement

(annexed to Declaration of Jennifer S. Wilkov, filed July 1, 2009 (Docket # 88)), ¶ 1; Defendant

Jennifer S. Wilkov's Response to Plaintiffs' Rule 56.1 Statement, filed Aug. 26, 2010 (Docket

# 117), ¶ 1.  The investments contemplated that the investors would invest in a Limited Liability

Company, which in turn would purchase residential properties, rehabilitate the properties, and

then sell them at a profit.  Dkt. 117, ¶ 2.  In furtherance of this investment promotion, Zimbalist

and Chanla agreed to pay Wilkov a 10% commission for each referral transaction except for

those made by her and her family, though they ultimately failed to pay Wilkov the commissions

they owed her. Dkt. 84, ¶¶ 4, 9; Dkt. 88, ¶¶ 4,9; Dkt. 117, ¶ 9.

Zimbalist and Chanla generated and distributed "through Wilkov" fraudulent documents

that purported to disclose the costs of the investment and the expected rate of return.  Dkt. 84,

¶ 5; Dkt. 88, ¶ 5; Dkt. 117, ¶ 5.  Zimbalist and Chanla also caused the distribution through

Wilkov of "updates" regarding the progress made in flipping the properties.  Dkt. 84, ¶ 6; Dkt.

88, ¶ 6; Dkt. 117, ¶ 6.

At the time Wilkov began promoting and selling the alleged investments being put

together by Zimbalist and Chanla, Wilkov was a financial advisor with American Express

Financial Advisors ("AEFA" or "American Express").  Dkt. 84, ¶ 7; Dkt. 88, ¶ 7; Dkt. 117, ¶ 7.

Each of the plaintiffs was introduced to the investments by Wilkov.  Dkt. 84, ¶ 10; Dkt. 88, ¶ 10;

Dkt. 117, ¶ 10.  Wilkov told the plaintiffs that she would provide information to them that was

provided to her by Zimbalist and Chanla and would keep plaintiffs informed about the

investments.  Dkt. 117, ¶ 11.  Wilkov repeatedly assured her clients that the investments in

California were sound.  Dkt. 84, ¶ 12; Dkt. 88, ¶ 12; Dkt. 117, ¶ 12.  Wilkov made repeated

representations regarding Zimbalist and Chanla's past performance, and Wilkov specifically

assured her clients that she had conducted a due diligence investigation of Zimbalist and Chanla.

Dkt. 84, ¶ 12; Dkt. 88, ¶ 12; Dkt. 117, ¶ 12.  The details of each investment were laid out in a "deal sheet" that Zimbalist and Chanla supplied to Wilkov by email, and which Wilkov then distributed to the investor.  Dkt. 88, ¶ 13.  The deal sheets were Word documents prepared by Zimbalist and Chanla.  Id.

In reality, the entire process was nothing more than an elaborate fraud in which Zimbalist and Chanla never purchased most of the properties, and the one property that was actually purchased was never rehabilitated and sold.  Dkt. 84, ¶ 15; Dkt. 88, ¶ 15; Dkt. 117, ¶ 15. During the investment plan, all of the monies were lost, and the plaintiffs' sole recoveries have been through either civil litigation or through restitution in the Wilkov criminal proceeding. Dkt. 84, ¶ 17; Dkt. 88, ¶ 17; Dkt. 117, ¶ 17.

Wilkov contends she did not know the investments were fraudulent at the time she was promoting the investments.  Dkt. 88, ¶ 25.  In other words, Wilkov states that she "never knew of the larceny they planned."  Id. ¶ 26.  To the contrary, she "relied on the representations made by Zimbalist and Chanla about their past performance and did due diligence on the information they provided."  Dkt. 88, ¶ 12.  Wilkov also "believed that her brother and his financial advisor had also done due diligence before her brother invested a substantial amount of money."  Id.  Wilkov "used the Internet to confirm the statements [Chanla and Zimbalist] made about themselves and their past work experience."  Id. ¶ 14.  Every time something would "happen" with Chanla and Zimbalist or their company, Wilkov "would vet it with other real estate investors who had been doing this for several years."  Id.  These other real estate investors "would always objectively reassure her that each situation was viable in the flipping process and the real estate investing business.  These other real estate investment people didn't know Zimbalist and Chanla."  Id.

On January 22, 2008, Wilkov pleaded guilty in New York state court to one count of

3

violating N.Y. Penal Law § 190.65(1)(b), one count of violating N.Y. Gen. Business Law § 352-(c)(5), and twenty-two counts of violating N.Y. Gen. Business Law § 352-(c)(6). See Transcript of Guilty Plea Before the Hon. Bonnie Wittner, dated Jan. 22, 2008 (annexed as Ex. L to Notice of Motion, filed July 12, 2010) (Docket # 111) ("Plea Tr."). As relevant here, Wilkov stated the following during her plea allocution:

> I made material omissions and made representations in order to induce victims to purchase shares of residential real estate through Pam Chanla and Carla Zimbalist because they were paying me and because I thought this was a good investment initially. I met Zimbalist and Chanla in late 2004, early 2005. Chanla and Zimbalist told me that they had a business using companies called PMC Interests, CPM Holdings and Scott Avenue Development. They claimed to be equal and sole partners in their business. They told me that their business was purchasing residential real estate, fixing up the homes and selling them for a profit. They told me they would turn around the properties in six months. They said that each investor would be buying a share of a specific home. They claimed each investor would double his or her money [and] [t]hey also guaranteed that each investor would not lose his or her original investment.
>
> They told me that the minium investment was 25 thousand dollars. They also told me that they had success in the past with this particular type of investment, and all their investors had doubled their money. Zimbalist and Chanla said that they would keep each property in a separate LLC. They said the money that the investors put in would be used directly toward the purchase of the specific home and or the rehabilitation of that same specific home.
>
> [T]hey told me they would pay me a ten percent referral fee for each investment that I brought in. Later they hired me to be their consultant to help communicate with the investors. They promised me a separate fee for that work. I met with Zimbalist and Chanla on a few occasions . . . . In January 2005, I started soliciting investors for these investments. At the time I was working for American Express Financial Advisors as a certified financial planner. I solicited my American Express clients and others for these investments. I didn't tell some of the victims that I was getting commissions for soliciting them. I repeated all the things that Zimbalist and Chanla told me about [t]his investment to the investors. I also made my own representations to induce the investors to invest.
>
> Some of the false statements I said to the investors were as follows: That I had invested with Zimbalist and Chanla in the past and had been successful with them, that I would monitor the properties myself, and that I had done my due diligence on Zimbalist and Chanla and that they were a solid and reliable team. In fact, I knew little about Zimbalist

and Chanla and their companies.  I had no basis for recommending their company and their investments.  In the summer of 2005 Zimbalist and Chanla stopped paying me. They told me they were having financial problems.  I didn't tell any of the investors this information and continued to recommend the investment.

Id. at 9-13.  During the allocution, Wilkov also listed by name the individuals who were victims

of the scheme.  Id. at 6-7, 8.

    B.  Procedural History

    The original complaint in this matter was filed on July 9, 2007.  See Complaint, filed July

9, 2007 (Docket # 1).  The complaint named as defendants Chanla, Zimbalist, Wilkov,

Evolutionary Strategic Planning, Inc., and Ameriprise Financial, Inc.  See id.  Chanla and

Zimbalist are in default.  See Notice of Default as to Carla Zimbalist, dated Oct. 24, 2008

(Docket # 32); Notice of Default as to Pam Chanla, dated Oct. 24, 2008 (Docket # 33).

Ameriprise Financial was terminated as a party on September 25, 2009.[1]

    Plaintiffs filed a motion for summary judgment on June 15, 2009.  See Notice of Motion,

filed June 15, 2009 (Docket # 83).  Judge Hellerstein thereafter granted plaintiffs' motion to file

an amended complaint and denied their motion for summary judgment without prejudice to

renewal.  See Order Granting Motion to Amend and Regulating Further Proceedings, filed Aug.

27, 2009 (Docket # 101);  Order Regarding Filing of Amended Complaint, filed Sept. 23, 2009

(Docket # 103).

    Plaintiffs filed an amended complaint on September 25, 2009, see Amended Complaint,

filed Sept. 25, 2009 (Docket # 104), and a second amended complaint on March 19, 2014, see

Second Amended Complaint, filed March 19, 2014 (Docket # 304).

---

[1]  Evolutionary Strategic Planning, Inc., remains a party but is unrepresented by counsel, and thus is in default.  See generally Grace v. Bank Leumi Trust Co. of NY, 443 F.3d 180, 192 (2d Cir. 2006).

As will be explained more fully below, plaintiffs filed a motion for summary judgment in 2010, see Notice of Motion, filed July 12, 2010 (Docket # 111), which was denied by Judge Hellerstein, see Summary Order Denying Motion for Summary Judgment, filed Jan. 24, 2011 (Docket # 126).

Plaintiffs filed the instant motion for summary judgment against Wilkov on November 8, 2013.[2]  Shortly thereafter, plaintiffs also filed a motion for summary judgment "on the issue of the amount of Plaintiffs' compensatory damages."[3]  Wilkov filed papers opposing plaintiffs' motions and cross-moved for summary judgment in her favor.[4]  Plaintiffs then filed papers in further support of their summary judgment motions and in opposition to Wilkov's cross-motion, and Wilkov filed a reply on her own-cross motion.[5]  As permitted under a Court order, Wilkov

---

[2]  See Notice of Motion, filed Nov. 8, 2013 (Docket # 248); Affidavit of Scott A. Brody, dated Nov. 8, 2013 (Docket # 249) ("Brody Aff."); Plaintiffs' Memorandum of Law, filed Nov. 8, 2013 (Docket # 250) ("Pl. Mem."); Plaintiffs' Rule 56.1 Statement, filed Nov. 8, 2013 (Docket # 251).

[3]  See Notice of Motion, filed Dec. 13, 2013 (Docket # 267); Rule 56.1 Statement, filed Dec. 13, 2013 (Docket #270); Affidavit of Scott A. Brody, filed Dec. 13, 2013 (Docket # 271) ("Brody Damages Decl."); Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment on the Issue of Plaintiffs' Compensatory Damages, filed Dec. 13, 2013 (Docket # 272) ("Pl. Damages Mem.").

[4]  Defendant Wilkov's Opposition to Plaintiffs' Motion for Summary Judgment, Cross-Motion for Summary Judgment, and Request for Oral Hearing, filed Jan. 16, 2014 (Docket # 280) ("Def. Mem."); Defendant Wilkov's 56.1 Statement for her Cross-Motion for Summary Judgment, filed Jan. 16, 2014 (Docket # 281); Affidavit of Defendant Jennifer S. Wilkov, filed Jan. 16, 2014 (Docket # 282) ("Wilkov Decl."); Defendant Wilkov's Rule 56.1 Statement for her Cross-Motion for Summary Judgment, filed Jan. 31, 2014 (Docket # 287); Defendant Wilkov's Response to Plaintiffs' 56.1 Statement, filed Jan. 31, 2014 (Docket # 285); Defendant Wilkov's Opposition to Plaintiffs' Motion for Summary Judgment for Damages, filed Jan. 31, 2014 (Docket # 284) ("Def. Damages Opp.").

[5]  See Reply Memorandum of Law on the Motion for Summary Judgment on the Issue of Damages, filed Feb. 21, 2014 (Docket # 288) ("Pl. Damages Reply"); Affidavit of Scott A. Brody, filed Feb. 21, 2014 (Docket # 289) ("Brody Reply Decl.); Plaintiffs' Memorandum of

6

filed a supplemental memorandum of law pertaining to her affirmative defenses.[6]  At the

direction of the Court, plaintiffs made a supplemental submission clarifying their contentions on

the issues of reliance and materiality, and Wilkov filed a response.[7]

The parties have also filed a number of letters in which they seek to "strike" each others'

Rule 56.1 Statements.[8]  There is no need to rule on these applications, however, as to all

statements.  To the extent a particular statement or response is deficient, the Court will not rely

on such statement or response.[9]

---

Law in Opposition to Defendant Wilkov's Cross-Motion for Summary Judgment and in Reply to
Plaintiffs' Motion for Summary Judgment, filed Feb. 21, 2014 (Docket # 290) ("Pl. Opp.");
Plaintiffs' Response to the Wilkov Rule 56.1 Statement, filed Feb. 24, 2014 (Docket # 293);
Defendant Wilkov's Reply to Plaintiffs' Opposition to Defendant Wilkov's Cross-Motion for
Summary Judgment, filed March 24, 2014 (Docket # 305) ("Def. Reply"); Affidavit of
Defendant Jennifer S. Wilkov, filed March 24, 2014 (Docket # 306).  Exhibit E to Docket 289
has been filed separately as a CD-ROM as Docket # 297 and, in duplicate form, as Docket # 317.
The Exhibit has also been supplemented by Docket #314.  See Order dated June 28, 2014
(Docket # 312).

[6]  See Defendant Wilkov's Supplemental Memorandum of Law to Wilkov's Opposition
to Plaintiffs' Motion for Summary Judgment, filed March 31, 2014 (Docket # 308) ("Def. Supp.
Mem."); Affidavit of Defendant Jennifer S. Wilkov, filed March 31, 2014 (Docket # 307).

[7]  See Plaintiffs' Supplemental Memorandum of Law Regarding Reliance and
Materiality, filed June 17, 2014 (Docket # 311) ("Pl. Supp. Mem."); Defendant Wilkov's Reply
to Plaintiffs' Supplemental Memorandum of Law Regarding Reliance and Materiality (Docket
# 315) ("Def. Supp. Reply").

[8]  See Plaintiffs' Letter, dated Feb. 21, 2014 (Docket # 295); Plaintiffs' Letter, dated Feb.
21, 2014 (Docket # 296); Defendant's Letter, dated March 6, 2014 (Docket # 316); Plaintiffs'
Letter, dated March 13, 2014 (Docket # 299); Plaintiffs' Letter, dated March 13, 2014 (Docket
# 300).

[9]  We note that we have relied on Wilkov's two responses to the two Rule 56.1
statements submitted by plaintiffs in the two prior summary judgment motions.  See Response to
Rule 56.1 Statement (annexed to Declaration of Jennifer S. Wilkov, filed July 1, 2009) (Docket
# 88); Defendant Jennifer S. Wilkov's Response to Plaintiffs' Rule 56.1 Statement, filed Aug.
26, 2010 (Docket # 117).  One set of admissions were specifically cited by plaintiffs in their
current Rule 56.1 statement, see Plaintiffs' Rule 56.1 Statement, filed Nov. 8, 2013 (Docket

II.  REQUEST FOR SANCTIONS AND FOR ARBITRATION

Before reaching the merits of the parties' cross-motions for summary judgment, we address (1) plaintiffs' request for sanctions pursuant to Fed. R. Civ. P. 37, based on Wilkov's conduct at her deposition; and (2) Wilkov's assertion that some plaintiffs' claims are subject to arbitration.

A.  Plaintiffs' Request for Sanctions.

Plaintiffs seek to preclude Wilkov's testimony in its entirety or to be awarded summary judgment based on her "lack of memory of relevant facts," her "evasiveness over relevant issues," and other similar conduct at her deposition.  See Pl. Mem. at 4-31.  At her deposition, Wilkov exhibited a significant lack of memory and was arguably evasive at times.  See Deposition of Jennifer S. Wilkov, dated Aug. 6, 2013 (annexed as Ex. 1 to Brody Aff.).  But this hardly supports plaintiffs' request that the Court "preclude" her testimony for purposes of this summary judgment motion or at trial.  Pl. Mem. at 4.  Plaintiffs cite two cases in support of this request: Nike, Inc. v. Top Brand Co., Ltd., 216 F.R.D. 259 (S.D.N.Y. 2003) and Merrill v. Ruffo, 1996 U.S. Dist. LEXIS 10120 (N.D.N.Y. Jan. 10, 1996).  Both cases are easily distinguished. The plaintiff in Nike, Inc. sought a sanction for egregious and obviously wrongful conduct.  See 216 F.R.D. at 261 (alleging that defendants had "submitt[ed] false affidavits, testif[ied] falsely, and wrongfully den[ied] Plaintiffs the right to review any documentation relating to their

―――――――――――――――

# 251), and the Court does not in any event see any basis on which Wilkov can avoid her previous admissions.  Moreover, Wilkov's response to the current Rule 56.1 statement contained no admissible evidence contravening the statements in plaintiffs' current Rule 56.1 statement, which cited the previous admissions.  See Defendant Wilkov's Response to Plaintiffs' 56.1 Statement, filed Jan. 31, 2014 (Docket # 285).  Thus, the statements in plaintiffs' current Rule 56.1 statement were admitted by operation of Local Civil Rule 56.1(c) and this constitutes an additional basis for relying on the prior admissions.

counterfeiting enterprise"). In <u>Merrill</u>, testimony was precluded because the plaintiff had refused to make herself available for her continued deposition. 1996 U.S. Dist. LEXIS 10120, at *17. These cases are not even remotely similar to the situation plaintiffs allege here.

Additionally, plaintiffs' request is untimely. The Court previously ruled that it would "not entertain any requests for sanctions in this case" unless the request was made "within 14 days of the discovery deadline." <u>See</u> Order, filed April 1, 2013 (Docket # 205), at 9, 10. Plaintiffs' request was not made until nearly two months after the September 13, 2013 discovery deadline.[10]

B. <u>Wilkov's Request for Arbitration</u>

Wilkov argues that a number of the plaintiffs in this case are barred from pursuing this litigation by virtue of their having signed arbitration agreements covering any disputes arising out of their relationships with AEFA and/or Wilkov. <u>See</u> Def. Mem. at 198-201; Def. Supp. Mem. at 11. She requests summary judgment in her favor dismissing all claims brought by these plaintiffs on the ground that these claims must be pursued, if at all, in an arbitral forum in accordance with the terms of the arbitration agreements. Plaintiffs, on the other hand, assert that the arbitration agreements are not applicable to the claims at issue here. <u>See</u> Pl. Opp. at 6-8.

We need not reach the question of whether the agreements are applicable, however, because we agree with plaintiffs' alternative argument that Wilkov has waived her right to invoke arbitration. <u>See</u> Pl. Opp. at 8-11. Thus, construing Wilkov's argument as a motion to

---

[10]   Plaintiffs also complain that Wilkov should not have consulted with her attorney at certain times during the deposition. <u>See</u> Pl. Mem. at 28. They do not specify what relief they are seeking with respect to this alleged wrongdoing, however. To the extent they are seeking to preclude Wilkov from testifying as a consequence of these consultations, the request must be rejected both because it is untimely and because plaintiffs have cited to no precedent granting preclusion of testimony in such a circumstance.

compel arbitration of these plaintiffs' claims, it should be denied.

"Federal policy strongly favors arbitration as an alternative means of dispute resolution." PPG Indus., Inc. v. Webster Auto Parts, Inc., 128 F.3d 103, 107 (2d Cir. 1997) (citations omitted); accord Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers Union Local 812, 242 F.3d 52, 57 (2d Cir. 2001) ("[T]here is a strong presumption in favor of arbitration[, and] waiver of the right to arbitration is not to be lightly inferred.") (citation and internal quotation marks omitted).  Nonetheless, "[a] party is deemed to have waived its right to arbitration if it 'engages in protracted litigation that results in prejudice to the opposing party.'"  S&R Co. of Kingston v. Latona Trucking, Inc., 159 F.3d 80, 83 (2d Cir. 1998) (quoting Cotton v. Slone, 4 F.3d 176, 179 (2d Cir. 1993)).  "The waiver determination necessarily depends upon the facts of the particular case and is not susceptible to bright line rules."  Cotton, 4 F.3d at 179 (citation omitted).  Courts in this Circuit generally consider: "(1) the time elapsed from the commencement of litigation to the request for arbitration; (2) the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery); and (3) proof of prejudice, including taking advantage of pre-trial discovery not available in arbitration, delay, and expense."  S&R Co., 159 F.3d at 83; accord Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 229 (2d Cir. 2001).  "Generally, waiver is more likely to be found the longer the litigation goes on, the more a party avails itself of the opportunity to litigate, and the more that party's litigation results in prejudice to the opposing party."  Thyssen, Inc. v. Calypso Shipping Corp., S.A., 310 F.3d 102, 105 (2d Cir. 2002) (citation omitted).  In this case, plaintiffs note that Wilkov has "engaged in substantial discovery, including the conducting of more than 20 days of deposition which she would not have been entitled to [in] arbitration."  Pl. Opp. at 9.  Similarly, they note that she has "demanded thousands of pages of documents, served

interrogatories, [written] motions, and has fully engaged in these proceedings."  Id.

We conclude that Wilkov has waived any right to arbitrate.  This lawsuit was filed on

July 9, 2007.  See Complaint, filed July 9, 2007 (Docket # 1).  Wilkov filed her answer on April

10, 2009.  See Answer, filed April 10, 2009 (Docket # 42).  She never raised the issue of the

arbitrability of plaintiffs' claims until more than six years after the suit was filed, when she filed

her cross motion for summary judgment on January 16, 2014.  See Def. Mem. at 198-201.

Courts generally find that delays of less duration weigh heavily in favor of finding waiver.  See,

e.g., Tech. in P'ship v. Rudin, 538 F. App'x 38, 39 (2d Cir. 2013) (fifteen month delay supported

finding of waiver); Com-Tech Assocs. v. Computer Assocs. Int'l, Inc., 938 F.2d 1574, 1576 (2d

Cir. 1998) (eighteen month delay supported finding of waiver); S&R Co., 159 F.3d at 83 (fifteen

month delay supported finding of waiver); Manos v. Geissler, 321 F. Supp. 2d 588, 594

(S.D.N.Y. 2004) (seventeen month delay supported finding of waiver).  Thus, the six-year delay

weighs strongly in favor of finding waiver.

Delay alone does not establish waiver, however.  PPG Indus., 128 F.3d at 108.  Rather,

"[t]he key to a waiver analysis is prejudice," Thyssen, 310 F.3d at 105, and "there can be no

waiver unless that conduct resulted in prejudice to the other party," Leadertex, Inc. v. Morganton

Dyeing & Finishing Corp., 67 F.3d 20, 26 (2d Cir. 1995).  Thus, "any delay must be considered

in conjunction with the amount of litigation that occurred during that period and any proof of

prejudice suffered by the party seeking to avoid arbitration."  Murray v. UBS Sec., LLC, 2014

WL 285093, at *4 (S.D.N.Y. Jan. 27, 2014) (citation, internal quotation marks, and alteration

omitted).  The Second Circuit has recognized two types of prejudice: "substantive prejudice and

prejudice due to excessive cost and time delay."  Thyssen, 310 F.3d at 105.  As the Second

Circuit has put it, "[p]rejudice can be substantive, such as when a party loses a motion on the

11

merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." Kramer v. Hammond, 943 F.2d 176, 179 (2d Cir. 1991). "Sufficient prejudice to infer waiver has been found when a party seeking to compel arbitration engages in discovery procedures not available in arbitration . . . makes motions going to the merits of an adversary's claims . . . or delays invoking arbitration rights while the adversary incurs unnecessary delay or expense." Cotton, 4 F.3d at 179 (internal citations omitted).

Here, Wilkov's dilatory conduct caused plaintiffs to incur significant unnecessary delay and expense. As the Court knows from the efforts it has made to resolve discovery disputes, this case has involved lengthy and protracted motion practice prior to the current round of motions as well as voluminous document production and the taking of numerous depositions, including the depositions taken by Wilkov of the plaintiffs who remain in this litigation. That such delay and expense compels a finding of prejudice is supported by case law. For example, in S&R Co., the Second Circuit affirmed the district court's finding of waiver which was based, in substantial part, on the party asserting arbitration having previously sought "3 depositions, 19 detailed interrogatories, and the production of more than 2100 pages in documents." 159 F.3d at 84. Similarly, the court in Gov't Emps. Ins. Co. v. Five Boro Psych. Servs., P.C., 939 F. Supp. 2d 208 (E.D.N.Y. 2013), found waiver of the right to arbitration where the opponent of arbitration "was forced to engage in substantial motion practice and discovery" and had "incurred costs beyond the preliminary costs inherent in litigation." 939 F. Supp. 2d at 218.

Wilkov appears to argue that she could not have requested arbitration earlier because of plaintiffs' delay in producing documents to her. See Def. Reply at 19-23. Putting aside the fact

that the waiver doctrine asks courts to assess "the time elapsed from the commencement of litigation to the request for arbitration," S&R Co., 159 F.3d at 83, without reference to a party's knowledge of an agreement to arbitrate, here Wilkov herself signed the client agreements containing the arbitration clauses at issue and thus was obviously aware of these provisions. See, e.g., American Express Financial Advisory Service Agreement for Neil Blitz (annexed as Ex. B-J to Wilkov Decl.); American Express Financial Advisory Service Agreement for Diva Goodfriend-Koven (annexed as Ex. C-J to Wilkov Decl.). It is thus of no moment that Wilkov may have returned "all records to AEFA upon termination." Def. Reply at 21. And despite her knowledge of the agreements to arbitrate, she gives no explanation of what efforts she made to obtain copies of the client agreements promptly upon being sued from either American Express or plaintiffs. Moreover, she concedes that she was aware in May 2012 of apparently relevant documents relating to each plaintiff in plaintiffs' counsel's possession. See Def. Reply at 20. Additionally, it is apparent from documents that she herself submitted in support of her motion that she had a physical copy of at least one client agreement as early as February 5, 2013, when she took the deposition of plaintiff Constance Simons. See American Express Financial Advisory Service Agreement for Constance Simons, deposition exhibit dated Feb. 5, 2013 (annexed as Ex. M-C to Wilkov Decl.). The time and expense visited on plaintiffs in the period following February 2013 alone would be enough to support their waiver argument since Wilkov took numerous depositions during this period and made numerous applications to the Court regarding discovery disputes.

In sum, Wilkov has waived her right to arbitration assuming arguendo that she had any

such right to begin with.[11]

III.  APPLICABLE LAW

At the outset, we note that although plaintiffs' complaint lists multiple causes of action, their motion papers do not set forth in a clear fashion the causes of action on which they seek summary judgment.  Nonetheless, the substantive portion of plaintiffs' memorandum in support of summary judgment discusses exclusively the issues of "materiality of the representations" and "detrimental reliance."  See Pl. Mem. at 36, 38.  As these are matters that are common to their claims for securities fraud pursuant to § 10(b) of the Securities Exchange Act (the "Exchange Act") and S.E.C. Rule 10b-5 and for common law fraud under New York law, we view plaintiffs' motion papers as seeking summary judgment for these two causes of action, as did Wilkov.  Accordingly, we address their entitlement to summary judgment on these claims, and these claims only.

Wilkov's brief supporting her motion for summary judgment opposes plaintiffs' motion, but it seeks the affirmative relief of summary judgment only with respect to the federal securities law claims.  See Def. Mem. at 202.  However, we also consider her papers as asserting an opposition and cross-motion with respect to plaintiffs' common law fraud claims inasmuch as the elements of the claims are essentially identical.  See, e.g., Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009) ("Because the elements

---

[11]  Wilkov makes reference to the "unclean hands" doctrine and argues that plaintiffs may not assert waiver because they did not alert her to the existence of the arbitration provisions earlier and may have actually been "hiding" the existence of these agreements to arbitrate.  See Def. Reply at 18-19; Def. Supp. Mem. at 6, 12.  Notwithstanding Wilkov's failure to provide any evidence that plaintiffs purposely concealed the existence of the arbitration agreements, this doctrine would be inapplicable anyway because "[u]nclean hands is an equitable defense to equitable claims," Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 607 (2d Cir. 2005) (citations omitted), and thus does not apply here.

of common law fraud under New York law are substantially identical to those governing Section 10(b), an identical analysis applies.") (citations and internal quotation marks omitted).[12]

    A.  Law Applicable to Motion for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (citation omitted) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256, and "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by

---

[12] We also note that Wilkov's papers oppose plaintiffs' motion for summary judgment with respect to a number of claims that were seemingly not the subject of plaintiffs' motion. See, e.g., Def. Mem. at 201-02. We do not address these portions of her opposition papers.

making assertions that are conclusory," Major League Baseball Prop., Inc. v. Salvino, Inc., 542

F.3d 290, 310 (2d Cir. 2008) (citation omitted).  "Where it is clear that no rational finder of fact

"could find in favor of the nonmoving party because the evidence to support its case is so slight,

summary judgment should be granted."  FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir.

2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir.

1994) (internal quotation marks omitted)).

 We describe the law governing plaintiffs' claims next.

 B. Securities Exchange Act § 10(b) and S.E.C. Rule 10b-5

 Section 10(b) of the Exchange Act provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange . . . [t]o use or employ, in connection with the
> purchase or sale of any security . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as the [S.E.C.] may
> prescribe as necessary or appropriate in the public interest or for the protection of
> investors.

15 U.S.C. § 78j.  Rule 10b-5 provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange, (a) To employ any device, scheme, or artifice to
> defraud, (b) To make any untrue statement of a material fact or omit to state a
> material fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or (c) To engage in
> any act, practice, or course of business which operates or would operate as a fraud
> or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)."

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008) (citing United

States v. O'Hagan, 521 U.S. 642, 651 (1997)).

 "Although section 10(b) [of the Exchange Act] does not create an express private cause

16

of action, [the Supreme Court has] long recognized an implied private cause of action to enforce the provision and its implementing regulation." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730 (1975)). Section 10(b) "bars conduct involving manipulation or deception, manipulation being practices that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." Ganino v. Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000) (citation and ellipsis omitted).

To maintain a private action for securities fraud under § 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge, 552 U.S. at 157 (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)); accord CLIP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 122 (2d Cir. 2013). "The reliance element of the claim is sometimes referred to as 'transaction causation.'" Burke v. Jacoby, 981 F.2d 1372, 1378 (2d Cir. 1992); accord Mazuma Holding Corp. v. Bethke, 2014 WL 2048411, at *6 (E.D.N.Y. May 19, 2014) ("Transaction causation is a term that is used interchangeably with the word reliance.") (citation omitted). By contrast, "[l]oss causation is causation in the traditional 'proximate cause' sense—the allegedly unlawful conduct caused the economic harm." AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 209 (2d Cir. 2000). "It is long settled that a securities-fraud plaintiff must prove both transaction and loss causation." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (citations omitted).

17

C.  Common Law Fraud

"Under New York law, the elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999) (citation and internal quotation marks omitted); accord Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104-05 (2d Cir. 2001) ("A New York common law fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury."). A claim of fraud under New York law "also requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." Id. at 105 (citation and internal quotation marks omitted). "The elements of common law fraud thus are largely the same as those of a Rule 10b-5 claim except that there is no requirement that the fraud be 'in connection with the purchase or sale of securities.'" Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 407 (S.D.N.Y. 2005) (citation omitted); Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 592 (S.D.N.Y. 2008) (because the elements of common law fraud are "substantially identical to those governing § 10(b)," the "identical analysis applies").

IV.  THE MERITS OF PLAINTIFFS' CLAIMS

Several elements of plaintiffs' claims have already been established by virtue of prior rulings made by Judge Hellerstein.  As noted above, plaintiffs brought a motion for summary judgment with respect to their claims for federal securities fraud and common law fraud on July 12, 2010.  See Notice of Motion, dated July 12, 2010 (Docket # 111) ("First SJ Motion");

18

Plaintiffs' Memorandum of Law, dated July 12, 2010 (Docket # 112), at 10-23.  Plaintiffs sought summary judgment on the ground that defendant's guilty plea collaterally estopped her from contesting the facts alleged in plaintiffs' complaint.  See Dkt. 112, at 5-12.  At oral argument on this motion, Judge Hellerstein denied plaintiffs' motion for summary judgment.  See Transcript of Proceedings of Jan. 24, 2011 (annexed as Exhibit 25 to Brody Aff.), at 10-12.  He also issued a written ruling stating that "the fact that Wilkov knowingly made false statements to plaintiffs is established."  See Summary Order Denying Motion for Summary Judgment, dated Jan. 24, 2011 (Docket # 126) ("First SJ Ruling").  Additionally, prior to denying plaintiffs' first motion for summary judgment, Judge Hellerstein ruled that the investment products at issue are "securities."  See Order Granting Motion to Amend and Regulating Further Proceedings, dated Aug. 27, 2009 (Docket # 101), at 3.  Thus, it has already been established that there were misrepresentations by Wilkov, that the scienter element was met, and that the misrepresentations related to the purchase or sale of a security.

Accordingly, and as the parties' briefing essentially reflects, see Pl. Mem. at 36-41; Def. Mem. at 8, 202, the only disputed elements of plaintiffs' securities and common law fraud claims are: (1) reliance, (2) materiality, and (3) damages or loss causation.[13]

However, we must keep in mind the precise false statements Wilkov "knowingly" made. While Judge Hellerstein's ruling never specifically identified the statements, they are necessarily limited to the statements to which Wilkov allocuted, given that Judge Hellerstein's ruling was made as a result of a collateral estoppel argument based on Wilkov's plea to criminal charges.

---

[13] Plaintiffs' briefly reassert their previous contention that Wilkov's guilty plea entitles them to summary judgment on the issue of materiality.  See Pl. Mem. at 33-36.  Because the issue of the collateral estoppel effect of Wilkov's conviction has already been ruled on by Judge Hellerstein, we do not consider this argument now.

Wilkov's allocution as to the knowingly false statements, however, is not as broad as plaintiffs assume.  While Wilkov recites statements that she made to the investors that were false, Wilkov's admission that she knowingly made false statements refers only to the statements (1) that she "had invested with Zimbalist and Chanla in the past and had been successful with them"; (2) that she "would monitor the properties [her]self"; and (3) that she "done [her] due diligence on Zimbalist and Chanla and that they were a solid and reliable team."  Plea Tr. at 12-13.  These statements were knowingly false because, as Wilkov admitted in her allocution, she "knew little" about Chanla and Zimbalist and had "no basis" for recommending them.  Id. at 13.

Thus, Wilkov never admitted that she had knowledge that the housing investment scheme itself was fraudulent, and indeed allocuted to just the opposite.  See id. at 14 (Wilkov "found out later" that Zimbalist and Chanla had lied to her about "the fact that they were purchasing the properties").  Moreover, Wilkov has submitted a sworn statement that she had no knowledge that the investments were fraudulent.  See Def. Mem. at 11.[14]  Accordingly, while plaintiffs have premised portions of their argument on the premise that the "deal sheets" are "false documents," see, e.g., Pl. Supp. Mem. at 5, these arguments are irrelevant as they are based on the incorrect assumption that it is undisputed on this motion that Wilkov knowingly made misrepresentations to the plaintiffs about the nature of the underlying transactions.

We begin our discussion of the remaining elements of plaintiffs' claims by providing more detail on the law as it relates to each of them.

---

[14]  Each of Wilkov's memoranda of law states on the last page that it has been signed "under penalty of perjury," the phrasing contemplated by 28 U.S.C. § 1746.  We thus consider the factual statements contained in these memoranda to constitute sworn testimony for purposes of this summary judgment motion.

A.  Law Governing Materiality, Reliance, and Loss Causation/Damages

1.  Materiality

"[T]he determination of whether an alleged misrepresentation is material necessarily

depends on all relevant circumstances."  S.E.C. v. DiBella, 587 F.3d 553, 565 (2d Cir. 2009)

(citation omitted); accord Ganino, 228 F.3d at 162; see also ECA, Local 134 IBEW Joint

Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) ("In order

to determine whether a misleading statement is material, courts must engage in a fact-specific

inquiry.") (citing Basic Inc v. Levinson, 485 U.S. 224, 240 (1988)).  For a misstatement to be

material, there must be a "substantial likelihood" that a reasonable investor "would consider it

important in making an investment decision."  United States v. Bilzerian, 926 F.2d 1285, 1298

(2d Cir. 1991); Basic Inc., 485 U.S. at 231-32 ("[T]here must be a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the total mix of information made available.") (quoting TSC Indus. Inc. v.

Northway, Inc., 426 U.S. 438, 449 (1976) (quotation marks omitted)); accord In re Fannie Mae

2008 Sec. Litig., 891 F. Supp. 2d 458, 470 (S.D.N.Y. 2012).  Thus, a statement is material if "a

reasonable investor would have considered [it] significant in making investment decisions."

Ganino, 228 F.3d at 161 (citations omitted).

2.  Transaction Causation/Reliance

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of

the § 10(b) private cause of action."  Stoneridge, 552 U.S. at 159.  Satisfaction of this element

requires a showing that "but for" the defendant's deceptive conduct, "the plaintiff would not

have acted to his detriment."  Suez Equity Investors, 250 F.3d at 96.  In other words, a plaintiff

must demonstrate that "but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001) (emphasis omitted).  As the Supreme Court has explained, "[b]ut-for causation is a hypothetical construct.  In determining whether a particular factor was a but-for cause of a given event, we begin by assuming that that factor was present at the time of the event, and then ask whether, even if that factor had been absent, the event nevertheless would have transpired in the same way." Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a . . . statement and engaged in a relevant transaction . . . based on that specific misrepresentation." Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2185 (2011).

However, "[n]ot all reliance is sufficient to demonstrate liability under the Exchange Act." Mazuma, 2014 WL 2048411, at *6 (citation omitted).  Rather, reliance must also be "reasonable" or "justifiable." In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 542 F. Supp. 2d 266, 267 (S.D.N.Y. 2008).  "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003).  Although the Second Circuit has never established a list of all factors used to determine the reasonableness of reliance, many courts have been guided by the following factors:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the

22

transaction; and (8) the generality or specificity of the misrepresentations.

Ashland Inc. v. Morgan Stanley & Co., Inc., 652 F.3d 333, 338 (2d Cir. 2011) (citation omitted).

### 3.  Loss Causation/Damages

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  Lentell, 396 F.3d at 172 (citation and internal quotation marks omitted).  As noted above, loss causation is akin to the tort law concept of proximate cause, "meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission."  Castellano, 257 F.3d at 186 (citing Suez Equity Investors, 250 F.3d at 96).  That is, loss causation may be established by demonstrating that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 107 (2d Cir. 2007).

### B.  Relevant Facts as to Each Plaintiff

We next consider how the evidence relates to these elements on a plaintiff-by-plaintiff basis.  Wilkov has not directly contradicted the accuracy any of the following statements made by plaintiffs, although she has made legal arguments as to their effect.[15]

---

[15]  We note that our efforts to describe the evidence as to each plaintiff have been hampered by the fact that, in their opening brief, plaintiffs failed to cite evidence as to each plaintiff in support of their claims.  See Pl. Mem. at 36-41.  Indeed, they did not even submit affidavits from plaintiffs on these issues.  It was not until their reply brief was filed that plaintiffs cited to admissible evidence in support of these elements as to each plaintiff.  See Pl. Opp. at 19-59.  Normally, we would not permit a movant to wait until a reply brief to marshal its evidence on issues so critical to a summary judgment motion.  In this case, however, the Court ordered plaintiffs to submit a new brief that cited evidence as to each of the plaintiffs and Wilkov was permitted to respond to this brief.  See Pl. Supp. Mem.; Def. Supp. Reply.  Thus both sides have been given an opportunity to address the question of what evidence exists as to each plaintiff for the disputed elements of plaintiffs' claims.

1.  <u>Diva Goodfriend-Koven</u>

Plaintiff Diva Goodfriend-Koven first heard about the possibility of investing in the California properties from Wilkov.  Deposition of Diva Goodfriend-Koven, dated March 5, 2012 [sic] (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. C to Wilkov Decl.), at 128.  Wilkov was her financial advisor at the time and she spoke with Wilkov about this opportunity at a function while Wilkov was "still at American Express."  <u>Id.</u> at 71.  Koven believed that she had a "relationship" with both Wilkov and American Express because Wilkov "was their representative."  <u>Id.</u> at 54.  When Wilkov first told Koven about the California investments, Koven was in Wilkov's office at American Express.  <u>Id.</u> at 128-29.  Wilkov told her that Wilkov's brother had invested with Chanla and Zimbalist and "had done well," and Koven's impression was that Wilkov would "not make the recommendation . . . without having done due diligence."  <u>Id.</u> at 130-32.  Koven also testified that she did not think Wilkov "would have advised [her] brother without due diligence," <u>id.</u> at 135, and that she "trusted the information that [she] received from [Wilkov] . . . was accurate and correct," <u>id.</u> at 165.  Koven agreed that she could have "use[d] the contact information that [she] received to contact Zimbalist and Chanla" to "discuss the investment."  <u>Id.</u>  Before she decided to invest, she did not ask Wilkov, Zimbalist, or Chanla if she could speak to "prior investors" who had invested with Zimbalist and Chanla.  <u>Id.</u> at 183-84.  She decided to invest in the California properties based on Wilkov's "recommendation" that she do so.  <u>Id.</u> at 179.  She was willing to be "more adventurous" with this investment, compared with other investments she had made in the past, based upon Wilkov's "encouragement."  <u>Id.</u> at 182-83.

24

2.  Toni Allen

Plaintiff Toni Allen was introduced to defendant Wilkov in 2005, at which time Allen did

not consider herself a sophisticated investor.  See Deposition of Toni Allen, dated Feb. 19, 2013

(annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. T to Wilkov Decl.), at 57-58.

She was introduced to Wilkov by plaintiff Karen Fusco, who lauded Wilkov as a real estate

expert whom Fusco highly recommended.  Id. at 58, 60.  Fusco knew that Wilkov was working

at American Express in 2005, but Allen was not a "client of American Express Financial

Advisors."  Id. at 57-58.  Allen had "confidence" and "complete faith" in Wilkov.  Id. at 142.

She testified that when Wilkov discussed the California property investments with her, Wilkov

told her it would "be a very good investment for [her], that she knew these women very well,

that her brother knew them," and that "it was a really solid, safe investment."  Id. at 114.  She

also told Allen she had met Chanla and Zimbalist through her brother and that "she considered

them a really good team of house revampers."  Id. at 114-15.  Allen believed that "the

investments were prescreened and that due diligence was always being done."  Id. at 221.  She

believed "that is what a real estate expert does; due diligence on everything and going between

the clients and the sellers for everything."  Id.  Allen believed Wilkov was a real estate expert

based on Wilkov having told her "real estate was her primary field" as well as information she

received from Fusco and from another AEFA financial advisor.  Id.

3.  Scott Charney

Plaintiff Scott Charney testified at his deposition that "in 2005 or before," his financial

advisors were "Ameriprise" and Wilkov.  Deposition of Scott Charney, dated July 11, 2013

(annexed as part of Ex. E to Brody Reply Decl. and part of Ex. O to Wilkov Decl.), at 61.  While

he was a customer at AEFA, he made investment decisions "[o]n the guidance of [his] financial

advisor telling [him] what to do" and he "followed their lead." Id. at 67. He decided to make an investment because his "financial advisor recommended it and told [him] it was a good investment." Id. at 135. Charney testified that he "had a financial advisor that was trusted to do the due diligence and everything necessary." Id. Since the time he invested in the California properties, Charney learned that certain figures were omitted from the investment documents. When asked at his deposition to identify the "critical elements of any real estate investment" that were not identified in the document, he said "closing costs," "insurance costs" and attorney's fees, but he added that these were "off the top of [his] head" because he was "not a real estate expert." Id. at 144-46. However, at the time he invested, he believed that his financial advisor, who held herself out as a "real estate expert," should have been analyzing these costs and taking them into account. Id. at 147. He believed all due diligence had been performed at the time he executed a wire transfer of funds for the California property investments, including due diligence by Wilkov "on Zimbalist and Chanla." Id. at 191.

### 4. Scott Edvabsky

Plaintiff Scott Edvabsky testified at his deposition that he was introduced to Wilkov by plaintiff Gary Zaccaro. Deposition of Scott Edvabsky, dated Oct. 15, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. Q to Wilkov Decl.), at 65. Zaccaro told him that he had made numerous investments with Wilkov and that Edvabsky "should invest" with her. Id. at 68. Zaccaro first "found out" about the California property investments through Wilkov. Id. at 114. Zaccaro told Edvabsky that "he invested and he got returns." Id. at 115. Edvabsky testified further: "He told me there were investments that he was involved in and he thinks I should make an investment with him . . . . Did I rely on what he said to me? Absolutely, 100 percent. I met [Wilkov] one night in 2005." Id. at 73-74. The reference to meeting Wilkov in

2005 apparently refers to an event at the Garden City Hotel on July 19, 2005, which Edvabsky attended with Zaccaro (who had invited Edvabsky to the event), id. at 80, and during which Edvabsky was first introduced to Wilkov, id. at 122.  After that event, Edvabsky spoke with Wilkov about the California property investments, though Edvabsky could not recall what they spoke about other than "how [he] can get the money to [Wilkov]."  Id. at 94.  Edvabsky testified that he would not have invested in the California properties if he had believed that Wilkov had not investigated the "directors, managers, or executives of the investment vehicles." Id. at 196.  Prior to making an investment in the California properties, Edvabsky believed that Wilkov had a "professional relationship" with American Express, and he believed that Wilkov was a "representative" of American Express when he met her.  Id. at 74.  However, he testified that Wilkov never "form[ed] a relationship of trust and confidence" with him."  Id. at 190.

      5.  <u>Anthony Corsaro</u>

Plaintiff Anthony Corsaro testified at his deposition that plaintiff Bonnie Vartabedian referred him to Wilkov.  Deposition of Anthony Corsaro, dated Feb. 11, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. U to Wilkov Decl.), at 68.  He did not know anything about Wilkov prior to that time, which was in 2005.  Id. at 28.  The name "American Express" to him referred to a "[c]redit card."  Id.  The purpose of Bonnie Vartabedian's introduction was so that Corsaro could "inquire about a real estate investment."  Id.  Thereafter, Corsaro called Wilkov to introduce himself, to confirm the date and time of the event at the Garden City Hotel, and to get some "basic information" on the investments.  Id. at 69-70.  When Corsaro received the "worksheet document" for the investment and attended a meeting during which Zimbalist and Chanla appeared by videoconference, he believed Zimbalist and Chanla "just reiterated what [Wilkov] was stating, about purchasing, rehabbing, and flipping the

properties." Id. at 84-85.  Corsaro decided to invest "[b]ecause [he] thought it was a good

investment . . . [b]ecause [Wilkov] said it was." Id. at 94.  Corsaro did not "show [his]

investment" to anyone else because he was "going on [Wilkov's] recommendation as a financial

planner that it was a good investment." Id. at 115.  Thus, Corsaro ultimately decided to sign the

"deal sheet" to go forward with his investment because "it was communicated to [him] by

[Wilkov] that it was a sound investment." Id. at 130.

      6.  Gary Zaccaro

      Plaintiff Gary Zaccaro testified at his deposition that plaintiff Scott Charney

recommended him to AEFA, and because Charney had been "dealing with" Wilkov and "Amir

Most," AEFA "sent [Wilkov] and Amir Most to [his] home."  Deposition of Gary Zaccaro, dated

July 16, 2013 (annexed as part of Ex E. to Brody Reply Decl. and as part of Ex. P to Wilkov

Decl.), at 72.  Charney had told Zaccaro that he was "dealing with Jennifer Wilkov and Amir

Most" at AEFA and that he "would recommend them to [Zaccaro]" since Zaccaro did not have a

financial advisor. Id. at 89.  Zaccaro "would have never met [Wilkov] in the first place because

[he] would have only gone through a major company for [his] investments up front." Id. at 102.

He did "not see a difference" between American Express and non-American Express products.

Id. at 117.  He testified that "Scott Charney recommended [him] to [Wilkov] and [Wilkov]

became [his] financial advisor." Id. at 84.  Wilkov "referred" Zaccaro to the California property

investments. Id.  He believed that AEFA "would approve of everything that [Wilkov] would

talk to [him] about." Id. at 118.  Zaccaro attended the Garden City Hotel event and "didn't

believe anything [Wilkov said during the event] was false." Id. at 135.  At the time he made the

investment, Zaccaro "would have not invested if [he] thought there was false information." Id.

at 170.  He did not "question anything" in the investment documents because he "thought [his]

financial advisor would do that" for him, apparently referring to Wilkov.  Id.  Prior to making

the investment, he did not ask Wilkov about any due diligence she had done to scrutinize the

investments because he "didn't think [his] financial advisor would make a decision without due

diligence." Id. at 151-52.  Zaccaro possessed contact information for Chanla and Zimbalist, but

he never contacted them because he had his "financial advisor, Jennifer Wilkov, handle that

proactively for [him]." Id. at 196-97.  Zaccaro also testified that he recommended Scott

Edvabsky "to [Wilkov] . . . to learn more about how he can invest and make a profit in the

California properties" having "no reason to believe, at that point, that there was any fraud." Id.

at 51-52.  Zaccaro had "confidence in [Wilkov] and . . . confidence in the fact that [Wilkov]

would only recommend [him] to something that would work." Id. at 52.  He "figured that [his]

financial advisor did all the due diligence for [him]," and felt that if he "had to do the due

diligence, [he] would not need an advisor." Id. at 52-53.  Zaccaro never brought up the topic of

"due diligence" with Edvabsky.  Id. at 53.

### 7.  Bruce Lichtenstein

Plaintiff Bruce Lichtenstein testified at his deposition that "[e]verything on [Wilkov's]

resume . . . impressed [him] . . . [and] gave [him] confidence that [he] was making a good

decision" by choosing to invest in the California properties.  Deposition of Bruce Lichtenstein,

date unavailable (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. S to Wilkov

Decl.), at 52.  He would have been "much more hesitant" to work with Wilkov had she not

"worked at American Express prior to when [he] met her and when Karen Fusco referred [him]

to her." Id. at 46.  Lichtenstein's friend, plaintiff Karen Fusco, had introduced him to the

California property investments and told him "she was very impressed with her financial

planner," Wilkov, and that "this was one of the investments that [Wilkov] was putting [Fusco]

in." Id. at 63.  Lichtenstein was aware that Fusco had been an American Express client before

she introduced him to Wilkov.  Id. at 43-44.  Lichtenstein was not "smart enough at that time" to

have asked Fusco about any due diligence she had done on the investments, "which is why [he]

wanted a financial planner that [he] would rely on that would be [his] expert to guide [him] and

do all of that for [him]."  Id. at 64-65.  Any questions he had about the investments were

presented to Wilkov, not Fusco.  Id. at 82.  When Lichtenstein received the transaction

documents for his investment, he did not believe Wilkov knew any of the information it

contained was false.  Id. at 95.  Wilkov told him the purpose of the investment was "to make

[him] money."  Id. at 96.  He did not show the investment documents to anyone other than

Wilkov, id. at 101, because Wilkov was his "conduit to ask any questions and get any answers"

regarding the investments, id. at 106.  Lichtenstein thought Wilkov had "done [her] homework

and checked everything out and . . . would not have considered exposing [him] to this possible

investment without doing . . . due diligence and knowing that it was a reputable investment."  Id.

at 108.

        8.  Robert Anarumo

      Plaintiff Robert Anarumo testified at his deposition that in 2005 he worked as a realtor

for Coldwell Banker, where he "provide[d] guidance in purchasing homes, selling homes and

some commercial real estate."  Deposition of Robert Anarumo, dated March 13, 2013 (annexed

as part of Ex. E to Brody Reply Decl. and as part of Ex. W to Wilkov Decl.), at 6.  He had

worked as a real estate agent since 2002 and had worked on the sale of approximately 150

properties during that time.  Id. at 6-7.  Anarumo's wife was also a realtor.  Id. at 46.  Anarumo

"would not have gone with" Wilkov had she not been working at AEFA.  Id. at 114.  The name

"American Express" to him meant that "Wilkov was well qualified for her position" because

"American Express [had] a very solid reputation in the financial industry and it gave [Wilkov] credibility." Id. at 94. Additionally, the fact that Wilkov carried the title "certified financial planner" increased his confidence in her. Id. at 119. Wilkov explained to Anarumo that she would "facilitate" the transaction for the California property investment and would "continue to do the due diligence." Id. at 120. She also "vouched for the project and said she would see it through the end." Id. What "got [Anarumo's] attention" about the potential investments was Wilkov telling him that she "knew the people, she worked with the people" and that they had "a past history of performance of cash flow and money to be made." Id. at 136. For Anarumo, Wilkov "made it sound very convincing that this was a very solid project and that it might be something [he] might be interested in." Id. Wilkov told Anarumo that she had personally met the investment promoters and that they "have a solid team." Id. at 138. She also told Anarumo that she had "done [her] due diligence on their setup and operation" and Anarumo "did not question her any further." Id. at 138-39. He did not question her because she was "very bright," "very articulate," and "came across as very confident." Id. at 139. As a result, she "had [Anarumo's] confidence" and he "took her every word." Id. When Anarumo received the transaction documents for his investment, he had no reason to believe any of the information it contained was false. Id. at 183.

9. Karen Fusco

Plaintiff Karen Fusco was an AEFA client who had invested in mutual funds "with the assistance of" Wilkov because Fusco "trusted [Wilkov's] recommendations." Deposition of Karen Fusco, date unavailable (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. D to Wilkov Decl.), at 18, 91-92. Amir Most, another AEFA advisor with whom Fusco had been working, recommended that Fusco work with Wilkov, telling Fusco that Wilkov was a real

estate expert.  Id. at 111-12.  When Fusco became Wilkov's client in 2004, she believed she "had a relationship" with both American Express and Wilkov because Wilkov "was American Express's agent."  Id. at 115.  In 2005, Fusco did not consider herself a sophisticated investor. Id. at 100.

Fusco first heard of the opportunity to invest in the California properties through Wilkov. Id. at 247.  Wilkov told her they were "wonderful investments" and that they were "six-month turnaround investments."  Id. at 249.  Wilkov also told Fusco that Fusco "couldn't lose [her] money because [she] was investing in hard real estate."  Id. at 249-50.  At the time Wilkov introduced Fusco to the California investments, Fusco asked her how she came in contact with Chanla and Zimbalist, and whether these were "safe" investments.  Id. at 252.  Wilkov told her "these were experienced people who had done this many times before" and that they "were successful in everything they had done," meaning "rehabbing" houses.  Id.  Fusco assumed AEFA "knew what [Wilkov was] doing and that somebody was watching [her]."  Id. at 259.  She believed that because Wilkov worked for American Express when she "gave [Fusco] these investments," American Express "was involved."  Id. at 257.  Wilkov told Fusco about what the "process entailed" to invest in the California properties, including what the financial commitment would be.  Id. at 259-60.  Fusco had "many, many discussions" with Wilkov about the California property investments, as "[i]t was part of a plan for [Fusco's] financial success and retirement."  Id. at 262-63.

Prior to investing, Fusco did not believe anything Wilkov said was false.  Id. at 264. Fusco reviewed the deal sheets for her investments but did no other due diligence, aside from asking Wilkov questions and possibly looking up one property online.  Id. at 267-68.  Fusco chose to invest in additional properties even though there were "mistakes" on the deal sheet for

her first investment because "every time [she] asked [Wilkov] . . . questions, [Wilkov] reassured [Fusco] that everything was fine and that these things were minor issues and that [Fusco] should continue to go forward." Id. at 286. She chose to invest in additional properties before having received a return on her investment in the first property. Id. at 337. Fusco "cared for [Wilkov] as a friend and mentor," and "[e]very time [Fusco] had a problem," Wilkov "reassured [her] that everything was fine and . . . [Wilkov's] brother was watching the properties . . . [and she] couldn't lose [her] money." Id. at 286-87. When the numbers on the first deal sheet "didn't make sense," Fusco "went over them with [Wilkov]" and Wilkov "had [Chanla and Zimbalist] redo the numbers to make them correct." Id. at 314-15. Fusco "got her advice from" Wilkov. Id. at 321. Fusco had also spoken with an attorney and an accountant about the California investments. Id. at 26.

Before she invested in the California properties, Fusco had purchased four investment homes in Las Vegas. Id. at 89-90. Fusco also met Chanla and Zimbalist in person in June 2005 in Las Vegas to "be introduced to them since [she] was investing with them a lot, and to possibly discuss an arrangement for properties in Las Vegas" and "to improve [her] relationship with them." Id. at 202-03, 210. Fusco had also spoken with them about rehabilitating properties in Las Vegas, but such a venture never came to fruition because they did not respond to Fusco when she "found houses," so Fusco "said this is not a good deal." Id. at 213-14. She had also attempted to make contact with them before making certain investments in the California properties, though she "failed most times," and it is not clear from her deposition when these attempts were made. Id. at 201. Fusco made additional investments in the California properties after meeting with Chanla and Zimbalist. Id. at 204.

33

### 10.  Wayne Vartabedian

Plaintiff Wayne Vartabedian testified at his deposition that his wife suggested he become an AEFA client.  Deposition of Wayne Vartabedian, dated March 19, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. H to Wilkov Decl.), at 79.  He recalled being invited to the function at the Garden City Hotel, either by his wife or by Wilkov, but he was "[n]ot aware if it was an Amex function."  Id. at 101, 104.  Wilkov told Vartabedian there would be "a 100 percent return within six months" on the potential real estate investments.  Id. at 170.  She also told him that her brother had met Chanla and Zimbalist in California and "had a good feel or vibe for them," and Wilkov said "they were sound, credible people to work with."  Id. at 171-72.  Vartabedian testified that the reason he invested in the California properties was that Wilkov "brought [him and his wife] into [her] personal life" and made them "friends more than just clients."  Id. at 177.  They had "confidence that [she] wouldn't have led the sheep to the slaughter" and they "trusted [her] as a person to follow [her] lead in an investment."  Id.  If Wilkov had not worked at AEFA, he would not have "trusted [her] with his money," because he and his wife "wanted to invest with a reputable company from the start, not an individual [certified financial planner]."  Id. at 86-87.  The only "due diligence" Vartabedian performed prior to wiring monies for his California property investment was looking up the property on Google Earth "to see if a house actually existed."  Id. at 239-40.  He expressed thanks to Wilkov for performing due diligence on the investment and did not believe he was "at risk of criminal fraud when [he] invested" in the property.  Id. at 244-45.

### 11.  Bonnie Kreuzburg-Vartabedian

Plaintiff Bonnie Kreuzberg-Vartabedian ("Kreuzburg") testified at her deposition that she held a real estate license for a short time some time prior to 2005, having sold two houses before

leaving the field.  Deposition of Bonnie Kreuzberg-Vartabedian, dated March 26, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. I to Wilkov Decl.), at 5-6.  In "2005 or before," Wilkov was her financial advisor at American Express, though Kreuzburg did not recall the specific period Wilkov served as her financial advisor.  Id. at 44.  At that time, and prior, she did not consider herself a sophisticated investor, but rather a "beginner."  Id. at 78.  She probably would not have trusted Wilkov with her money had Wilkov not worked for "one of the larger investment firms."  Id. at 85.  In relation to the investment, Wilkov told Kreuzburg that she had "met these wonderful women that owned a company that flipped homes" and that she "met these people through [her] brother."  Id. at 155.  She recommended the Garden City Hotel event to others based on her "relationship and trust and [Wilkov's] credentials."  Id. at 171.  Kreuzburg testified that Wilkov represented that Chanla and Zimbalist had "done these types of investments before and were successful at it" and that she "spoke with these women and . . . got a good vibe from them."  Id. at 189.  She believed Wilkov would "never let [Kreuzburg] invest in something that [Wilkov] didn't think would be a good investment."  Id.  Kreuzburg recalled that Wilkov told her the investment was "like taking candy from a baby," which she understood to mean "it was almost like a sure thing."  Id. at 190.  She felt that because she had paid Wilkov "$5,000 to do a service," Wilkov would have "scrutinized" the investments.  Id. at 193.

### 12.  Connie Simons

Plaintiff Connie Simons testified at her deposition that in 2005, she "delegate[d]" decision making to an advisor and "took that advice," though it is not clear from the transcript if Simons was referring to Wilkov.  Deposition of Connie Simons, dated Feb. 5, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. M to Wilkov Decl.), at 39.  Simons "began investing with [Wilkov] in 2001."  Id. at 50.  Simons would not have made an investment in the

California properties "if [Wilkov] were not an American Express financial advisor." Id. at 81.
Simons believe AEFA was an "organization with credibility . . . that hired advisors that had a
reputation in the market that understood and advised many, many consumers." Id. at 49.  She
believed that she "had a relationship" with both Wilkov and American Express after she began
investing with Wilkov in 2001.  Id. at 50.  She did not believe Wilkov recommended anything to
her that AEFA "was not somehow scrutinizing." Id. at 61.  Wilkov told Simons about the
investment "process" for the California properties.  Id. at 72.  Simons knew that the California
property investments were "outside of American Express" but she "look[ed] at [Wilkov] as
American Express." Id. at 74, 175.  Simons reviewed the deal sheet for her investment with
Wilkov, and Wilkov told her the "purpose" of the investment was to "have a profit." Id. at 103-
04.  She did not ask to speak to Chanla or Zimbalist about the investment because Wilkov was
"advising [her] along the way and gave [her] very positive information about prior investments
that they've had." Id. at 107.  Wilkov also showed her videos "of properties they had invested in
and were sold." Id.  Simons had no reason to believe the investments were part of a "scam." Id.
at 121.  At the time she invested, she had no reason to believe Wilkov "would show [her]
anything with false information in it." Id. at 108.

    13.  Laura Flax

    Plaintiff Laura Flax testified at her deposition that she was referred to Wilkov by her
friend, plaintiff Diva Goodfriend-Koven, in 2005.  Deposition of Laura Flax, dated April 4, 2013
and June 6, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. R to Wilkov
Decl.), at 30.  The purpose of the "introduction and referral" by Koven was to introduce Flax to a
"trusted financial advisor" and "life advisor" who had an investment opportunity Flax would be
interested in pursuing.  Id. at 33-34.  Koven told Flax she had a positive experience with Wilkov

and encouraged her to retain Wilkov as an "advisor for [her] own money." Id. at 34. Flax would

not have trusted Wilkov with her money had Wilkov not worked for AEFA because she liked the

"imprimatur of [a] large known corporation behind an individual." Id. at 37. At the time of the

referral, she was aware that Koven had invested in the California properties. Id. at 39. Flax

never met Wilkov prior to making her investment. Id. With respect to the California property

investment, Flax felt that she "entered into a contract with Jennifer Wilkov and Zimbalist and

Chanla were sidebar to that." Id. at 89. She felt that her "agreement was with . . . Wilkov who

brought [her] into this investment and that's who [she] entrusted [her] investment." Id. Flax did

not contact anyone else affiliated with the investment because she "didn't think there was any

reason to since [she] was getting directives or directed from . . . Wilkov, and trusted [her]

directions." Id. at 130. In other words, before signing the investment documents, it "never

occurred to [her] to do anything except trust the single person with whom [she] had contact

which was Jennifer Wilkov." Id. at 161.

       14.  Neil Blitz

     Plaintiff Neil Blitz testified at his deposition that he first heard about the California

property investments when Wilkov brought them to his attention in the beginning of 2005.

Deposition of Neil Blitz, dated Sept. 24, 2013 (annexed as part of Ex. E to Brody Reply Decl.

and as part of Ex. A to Wilkov Decl.), at 145. Wilkov "specifically assured" him that she

conducted "investigations of Zimbalist and Chanla." Id. at 175. She explained the deal sheet to

Blitz, including how the return of investment would work. Id. at 181. Blitz did not pose any

questions about the investment to Chanla or Zimbalist because Wilkov was his financial planner

and he had paid an annual fee to her. Id. at 192. Blitz decided to make an investment because he

was "assured by [Wilkov] that it was a sound investment" with a "good rate of return and the

time to get the money was not very long." Id. at 197. He had no reason to question the validity

or appropriateness of the investment and "didn't think about it" because Wilkov "was [his]

American Express financial analyst." Id. at 206-07. That is, he thought: "Why would I have to

worry about what she is giving me?" Id. at 207. His "due diligence" was "relying on [Wilkov]."

Id. at 243. When asked what due diligence he believed had "not been done by American

Express" at the time he wired his money for the investment, he responded "[Wilkov] was my

American Express financial advisor. She did the due diligence." Id. at 244. Blitz testified that

he would still have invested with Wilkov had she not been with AEFA because "[i]t was

[Wilkov], not American Express." Id. at 210-11.

            15.  <u>Marni Blitz</u>

       Plaintiff Marni Blitz testified at her deposition that she had regular meetings with Wilkov

concerning her financial position, and that there was "no reason [she and her husband] would

have believed that [Wilkov] was steering [them] into a fraud" because they had "built a

relationship of trust." Deposition of Marni Blitz, date unavailable (annexed as part of Ex. E to

Brody Reply Decl. and as part of Ex. B to Wilkov Decl.), at 83, 105. She had no reason to

suspect any information in the investment documents was false. Id. at 116. She also believed

Wilkov, as her financial advisor, would have pointed out any concerns regarding this

information. Id. at 118, 125. Blitz did not understand the numbers or terms, what they meant, or

what might have been missing from the documents. Id. at 130-31. She "understood [her] advice

from [her] financial advisor, [Wilkov]." Id. at 130. She testified that she was an unsophisticated

investor who did not "know the terminology" or "language" used in real estate, did not know

what questions to ask, and was "completely dependent on the advice of [her] trusted financial

advisor." Id. at 131. She trusted Wilkov and "didn't think [she] needed to speak to anyone else"

38

about the investment.  Id. at 134.  She also believed that Wilkov had "done her due diligence" and did not believe any of the investment information was false at the time she invested.  Id. at 138.  She testified that she probably would have made the investment even if Wilkov had not worked for AEFA and that "wherever [Wilkov] was at the time, [she] would have followed [Wilkov's] advice."  Id. at 150.  Blitz made the decision to invest because she "followed the advice of [her] financial advisor, [Wilkov]."  Id. at 157.  She did not do her own "due diligence" because she had a financial advisor, Wilkov, that she and her husband "paid to do this research," and because Wilkov "advised [them] to invest in this company."  Id. at 178.  Wilkov led them to believe she had "done all her due diligence and there was nothing that had been left out."  Id. at 179.

### 16.  Elizabeth Tymczyszyn

Plaintiff Elizabeth Tymczyszyn testified at her deposition that, in 2005 and beforehand, she was a "beginner" in terms of investing ability.  Deposition of Elizabeth Tymczyszyn, date unavailable (annexed as part of Ex E. to Brody Reply Decl. and as part of Ex. E to Wilkov Decl.), at 69.  She selected Wilkov as her advisor because the two of them had a meeting and Wilkov seemed "very knowledgeable and trustworthy, and [Tymczyszyn] had a good rapport with her."  Id. at 71.  She believed that a certified financial planner is "supposed to look out for your best interests."  Id. at 83.  When Tymczyszyn spoke with Wilkov in 2005 about the California property investments, Wilkov explained that she would "monitor" the investments.  Id. at 120.  Wilkov told her the investments "were very safe and that we would make a lot of money."  Id. at 135.  Wilkov also stated that she had met Chanla and Zimbalist, and that Wilkov's family had invested in the properties as well.  Id.  Tymczyszyn believed that, because Wilkov had herself invested in the properties, she had performed due diligence.  Id. at 136.  She

also believed that Wilkov had "gone out to see some of these properties" and that Wilkov "definitely had been out to visit with" Chanla and Zimbalist. Id. at 137. Wilkov told her this would not be a "long-term" investment. Id. at 144. She also said it would be a "great diversification technique for [Tymczyszyn's] portfolio." Id. at 173. Tymczyszyn did not believe any of the information Wilkov had provided her with was false. Id. at 173-74. She invested in multiple properties because she "didn't have any reason to think it wasn't a good investment." Id. at 229.

17. Edward Haran

Plaintiff Edward Haran testified at his deposition that in 2005 or prior, he did not "take the time to learn about" investing because he "had a financial planner, why should I?" Deposition of Edward Haran, dated June 27, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. G to Wilkov Decl.), at 56. He did not "go somewhere else to check . . . Wilkov's advice" because he "trusted [Wilkov]" and "had no reason to." Id. at 62. Haran "delegate[d] the decision-making to an advisor [he] chose and followed advice [he was] given." Id. at 62-63. He decided to become a client of Wilkov's based on her "presentation." Id. at 67-68. At the time he decided to invest in the California property investment, he worked with Wilkov because she was his financial advisor and "[w]ho else were we going to talk to?" Id. at 172. Haran did not believe nor have any reason to believe that the investment documents were false. Id. at 185. Although Haran did not "understand" the entities to whom he and his wife were wiring money, he "had a financial advisor [Wilkov] advise [them] on this stuff and [he and his wife] went with her advice. That was it." Id. at 239. Wilkov "never voiced any concerns about the operation or the transaction" and "[h]ad she, maybe [the Harans] would never have been in this mess." Id. They "had a financial advisor and she was the one that

40

recommended this venture to [them] and [they] followed her." Id. at 240. They "thought maybe she did the due diligence on it" and they "would have thought [Wilkov] would have done [her] job." Id. at 240-41. Furthermore, he "trusted [his] financial advisor" and there "wasn't any suspicion at the time." Id. at 248.

          18.  Anne Haran

Plaintiff Anne Haran testified at her deposition that in 2005, she "had a financial planner and . . . relied on [her] financial planner and that was it." Deposition of Anne Haran, dated April 11, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. F to Wilkov Decl.), at 74. She and her husband were clients of AEFA and Wilkov served as their financial advisor. Id. at 31. She did not consider herself a sophisticated investor and "went by [her] financial advisor's guidance." Id. at 82. Previously, she had invested in mutual funds because she had "confidence and trust with the advice [she] was given" by Wilkov. Id. at 76-77. Similarly, she decided to make a real estate investment in the California properties because she had "confidence and trust in [her] advisor." Id. at 77. The fact that Wilkov carried the title of "certified financial planner" increased her confidence in Wilkov. Id. at 102. Wilkov had explained to her and her husband that she would be "guiding [them] in [their] investments" and would "find and recommend investment opportunities" for them. Id. at 119-20. Regarding the California property investment, Wilkov told them she would be "coordinating everything and following up with progress reports." Id. at 142-43. Wilkov told the Harans she had "met the principals who were taking care of the whole operation" and that she was "very confident that everything was fine." Id. at 158. Wilkov was "really gung ho on it" and "thought it was a great investment, and that is why she was spreading the word and bringing everyone into it that she could." Id. At the time Haran invested, she "felt like [she] had a fiduciary relationship with

[her] advisor to do the best for [her and her husband]." Id. at 140. Wilkov was the one who first introduced her to the idea of investing in the California properties. Id. at 155. Wilkov said these investments were a "nice growth opportunity for [their] portfolio" and that "it was a good idea to diversify [their] investments." Id. at 157. Wilkov told Haran that she had gone to California to meet Chanla and Zimbalist and had "checked them out thoroughly," and that they had a "good history of doing this with other properties." Id. at 159. Haran "thought, for sure" that Wilkov had reviewed the investments. Id. at 160. She recalled a conversation with Wilkov where the investments "sounded like such a sure thing" and she "had no doubts in [her] mind about it." Id. at 167. She believed everything Wilkov told her and did not believe any of the information provided was false. Id. Haran had "complete confidence in [Wilkov] that she knew what she was doing and she had checked out everything thoroughly." Id. at 193. It "sounded like [Wilkov] did a thorough investigation of [Chanla and Zimbalist] and their past experiences." Id. at 160. Haran did not ask Wilkov about what due diligence Wilkov had performed because she "felt very confident that [Wilkov] already did everything." Id. at 161. Similarly, although she knew before she invested that she could have "asked someone" to contact Chanla or Zimbalist to discuss the investment and the related documents, Haran "didn't think it was necessary because [she] knew [Wilkov] did a thorough check with them." Id. at 177. She had no reason to believe any information related to the investment was false. Id. at 185.

19. Bruce Fuller

Plaintiff Bruce Fuller testified at his deposition that he became a client of Wilkov because she "seemed like she knew what she was doing." Deposition of Bruce Fuller, dated April 9, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. J to Wilkov Decl.), at 70. He believed he had a "relationship" with both American Express and Wilkov

when he became a client at American Express.  Id. at 70.  Fuller attended the event at the Garden City Hotel where Wilkov promoted the California investment opportunities.  Id. at 85.  Chanla and Zimbalist were present at the event via video feed.  Id. at 90.  He first heard of the possibility of investing in the California properties from Wilkov.  Id. at 137.  Fuller assumed that Wilkov, as his financial advisor, would perform due diligence and scrutinize the California property investments before introducing them to Fuller.  Id. at 142.  Wilkov told him Chanla and Zimbalist were "experienced real estate people and they have done this a number of times."  Id. at 140.  Fuller had no reason to believe that the information Wilkov provided to him was false.  Id. at 137, 151.  At the time he wired money for the investment, he believed Wilkov had "done a thorough and complete job" with respect to due diligence on the investment.  Id. at 228.

 20.  Joseph Levine

 Plaintiff Joseph Levine testified at his deposition that when he met Wilkov in 2005, she told him and his spouse that one of the areas of her expertise was real estate investing.  Deposition of Joseph Levine (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. K to Wilkov Decl.), at 99.  Prior to investing in the California properties, Wilkov was Levine's financial advisor "at American Express."  Id. at 56-57.  He believed he had a "relationship" with both American Express and Wilkov when he became Wilkov's client.  Id. at 79.  He testified that Wilkov and American Express were "connected to [him]" and he believed that if something was "suggested" by Wilkov, it was being "scrutinized" or was "part of American Express as well."  Id. at 100-01.  He was "relying on [her] professional expertise and professional position when [she was] recommending this investment."  Id. at 131.  Wilkov explained that she would "help [them] with [their] finances and investing and planning."  Id. at 99.  Levine believed Wilkov was going to "find and recommend investment opportunities."  Id.   Regarding the California

43

property investment, he did not ask Wilkov about "specific due diligence" because he and his spouse were "trusting [her] and relying on [her] opinion" that Chanla and Zimbalist "were a solid team that delivered." Id. at 127. That is, they were "relying on [Wilkov's] expertise." Id. Prior to Levine having made his investment in the California properties, Wilkov "reassured" him and his spouse that Chanla and Zimbalist were "a great team" and that Wilkov would be "monitoring" the investments. Id. at 134.

       21. <u>Nina Chaifetz</u>

     Plaintiff Nina Chaifetz testified at her deposition that Wilkov was her financial advisor at AEFA beginning in May or June 2005. Deposition of Nina Chaifetz, dated April 2, 2013 (annexed as part of Ex E. to Brody Reply Decl. and as part of Ex. L to Wilkov Decl.), at 43. At the time Wilkov contacted her about the California real estate investment opportunity in 2005, she had no reason to believe the information provided by Wilkov was false. Id. at 157. Chaifetz believed that the title "certified financial planner" meant that Wilkov was "trained, equipped, competent in providing financial advice and services." Id. at 90. The fact that Wilkov carried this title increased her confidence in Wilkov. Id. at 91. The first time she discussed the potential investments with Wilkov, Wilkov said she was "super excited" and said Chanla and Zimbalist were a "great team . . . with a great strategy," that they were an "enlightened team" and that they "kn[ew] what they were doing." Id. at 160-61. This conversation took place in Wilkov's office at American Express. Id. at 160. Chaifetz expressed some concern about the investment, but Wilkov told her the "market there is so strong," that real estate is "a hard asset" that is "not as volatile [as] something like stocks," that the investment would be a "quick turnover," and that the "market was booming." Id. at 161. After hearing how Wilkov spoke of Chanla and Zimbalist, Chaifetz "completely thought that [Wilkov] had already done these deals with them."

Id. at 162.  Wilkov "really stressed how good they were at doing this."  Id. at 163.  She received

information about the investments from Wilkov, not Chanla and Zimbalist.  Id. at 158.  She did

not consider whether the investments were something that American Express knew about, and

testified that Wilkov was "working for American Express.  I just figured it was part of what you

were doing there."  Id. at 219.  Chaifetz testified that, at the time she received the investment

documents, Chanla and Zimbalist were available to answer questions "slightly through e-mail,

maybe" and that she "definitely had some e-mail exchanges.  Not a lot."  Id. at 221.  Chaifetz,

along with her husband, Levine, had invested in two residential homes prior to investing in the

California properties with Wilkov.  Id. at 25-26.  Chaifetz "relied" on her best friend, who

worked in the real estate field for a living, with respect to the prior investments.  Id. at 29.

        22.  Kathy Pashuck

      Plaintiff Kathy Pashuck was a client of Wilkov, who served as her financial advisor at

American Express.  Deposition of Kathy Pashuck, dated July 9, 2013 (annexed as part of Ex. E

to Brody Reply Decl. and as part of Ex. N to Wilkov Decl.), at 30, 93.  Wilkov told her the

California property investments would allow her to "double [her] money back plus an extra 10 to

12 percent."  Id. at 97.  Wilkov explained to Pashuck how the investments worked.  Id.  Even if

she did not think that AEFA was scrutinizing the real estate investments, Pashuck believed that

Wilkov would be scrutinizing them.  Id. at 47.  At the time she made the investment, Pashuck

trusted Wilkov with her investments.  Id. at 53.  To Pashuck, Wilkov "seemed very

knowledgeable in all the areas" of investing, and she believed that Wilkov had completed an

analysis of her financial situation.  Id. at 92-93.  Wilkov told her she had met Chanla and

Zimbalist in California and had discussed the investments with them, and Wilkov "came back

convinced that it was foolproof."  Id. at 107.  Pashuck assumed that Wilkov had researched the

investments, as she was "highly sold" on them.  Id. at 108.  Pashuck did not ask if Wilkov had

done due diligence on the investments, but repeatedly asked Wilkov if the investments would

turn out the way Wilkov said they would because it was "hard to believe."  Id. at 109.  Wilkov

"repeatedly kept saying, yes, it is a good investment.  I want to see you make money.  I want to

see you come out ahead, Kathy."  Id.  Wilkov told Pashuck that Chanla and Zimbalist were "two

sharp women who did this type of investment in houses" who "knew what they were doing."  Id.

At the time she invested, Pashuck "trusted" Wilkov and believed that Wilkov "had her pulse on

the investment."  Id. at 124.  She had no reason to believe any of the information provided on the

deal sheet was false.  Id.  Pashuck testified that she was not sure if she would have invested in

the properties if Wilkov had not been an American Express financial advisor and stated that

Wilkov "seemed to have American Express behind [her]" and to her, that was "something that

was relatively safe and sound. [Wilkov] had a big company behind [her]."  Id. at 145.  She could

not recall if Wilkov personally continued to update her on her financial position, but testified

that she did receive American Express statements in the mail.  Id. at 93.  At the time she wired

funds for the investment, she believed due diligence had been done.  Id. at 176.  She testified

"[y]ou expect your financial advisor, Jennifer Wilkov, to do the due diligence" as she had

"trusted [Wilkov] for a couple of years in making the right moves with [her] money."  Id.  She

further testified that in such a situation "you, yourself do not expect that you have to do the due

diligence."  Id.

          23.  Jay Coon

      Plaintiff Jay Coon testified at his deposition that his friend Scott Charney had introduced

him to Wilkov for the purpose of carrying out an investment in the California properties.

Deposition of Jay Coon, dated Feb. 20, 2013 (annexed as part of Ex. E to Brody Reply Decl. and

as part of Ex. V to Wilkov Decl.), at 64-65.  Coon was not a client of AEFA.  Id. at 64.  Charney

told Coon he had invested with Wilkov and that he "had a trusted relationship with [her] as an

advisor."  Id. at 68-69.  Coon "may have investigated" the referral differently if Wilkov had not

been associated with AEFA.  Id. at 73-74.  To Coon, the name "American Express" meant a

"historical business group of financial professionals designed to instruct customers and clients

into their affairs."  Id. at 65.  He believed that he and Wilkov had "made an agreement to

invest . . . in the California property."  Id. at 97.  That is, he thought that Wilkov was "brokering

the investment in the California properties on [his] behalf."  Id.  Wilkov told him this would "be

a good opportunity" and she showed him "calculations of possible profit based on investment."

Id. at 110.  When Coon invested, he "thought [he] had enough information, trusted professional

partners, and made the decision."  Id. at 151.  At the time he invested, he did not believe that any

of the information Wilkov had told him or given him regarding the investment was false.  Id. at

138.  Prior to signing the investment documents, he did not contact anyone else about the

investment because he "trusted" Wilkov.  Id. at 148.

     C.  Analysis

        1.  Materiality

We begin by considering the materiality of Wilkov's false statements.  As already

described, Wilkov admitted in her plea allocution that she had repeated to the investors "all" the

statements that Chanla and Zimbalist had told her about the investments, Plea Tr. at 12, although

she did not admit that she knew such statements were false.  Included in these statements

repeated to the investors were the statements that "their business was purchasing residential real

estate, fixing up the homes and selling them for a profit," that "they would turn around the

properties in six months," that "each investor would double his or her money," and that they

"guaranteed that each investor would not lose his or her original investment." Plea Tr. at 10. We advert to these statements not for purposes of determining their materiality but because they are part of the "total mix" of information that was made available to plaintiffs regarding the investment opportunity. Basic Inc., 485 U.S. at 231-32. On the question of materiality, we consider only the false statements Wilkov knowingly made (i.e., the statements that Wilkov made to the investors that she knew were false): specifically (1) that she "had invested with Zimbalist and Chanla in the past and had been successful with them"; (2) that she "would monitor the properties [her]self"; and (3) that she had "done [her] due diligence on Zimbalist and Chanla and that they were a solid and reliable team." Plea Tr. at 12-13.

As noted above, a statement is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc., 485 U.S. at 231-32 (citation omitted); accord Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (materiality asks "whether the defendants' representations, taken together and in context, would have misled a reasonable investor") (citation omitted); RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 185 F. Supp. 2d 389, 399 (S.D.N.Y. 2002) ("In order to satisfy the materiality requirement of Rule 10b–5, there must exist a substantial likelihood that a reasonable investor would consider the information important in his decision-making process.") (citations omitted). A "misstatement is material so long as investors would consider the misstated facts significant in making investment decisions, even if investors would consider other information to be more important." United States v. Ferguson, 553 F. Supp. 2d 145, 155 n.13 (D. Conn. 2008). Materiality is an "inherently fact-specific finding." Basic Inc., 485 U.S. at 236. "The question of materiality, it is universally agreed, is an objective one, involving the significance of an

48

omitted or misrepresented fact to a reasonable investor." TSC Indus., Inc., 426 U.S. at 445.

Further, the question of materiality "necessarily depends on all relevant circumstances of the

particular case." Ganino, 228 F.3d at 162.

As the Supreme Court has noted, the materiality inquiry "requires delicate assessments of

the inferences a 'reasonable [investor]' would draw from a given set of facts and the significance

of those inferences to him, and these assessments are peculiarly ones for the trier of fact." TSC

Indus., 426 U.S. at 450; accord RMED Int'l, Inc., 185 F. Supp. 2d at 400 ("Because the

determination of materiality involves factual determinations, the Supreme Court has noted that

materiality is particularly well suited for jury determination."). As a result, "[o]nly if the

established omissions are so obviously important to an investor, that reasonable minds cannot

differ on the question of materiality is the ultimate issue of materiality appropriately resolved as

a matter of law by summary judgment." TSC Indus., Inc., 426 U.S. at 450; accord RMED Int'l,

Inc., 185 F. Supp. 2d at 400 ("[S]ummary judgment is only appropriate in a 10b–5 action on the

grounds of immateriality where the alleged misstatements or omissions are so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the question of

their importance.") (citations and internal quotation marks omitted).

This is one of those cases where "reasonable minds" could not differ on the question of

whether Wilkov's knowing false statements as to having investigated Chanla and Zimbalist and

found them to be reliable were material to the plaintiffs' decisions to invest. Importantly, the

test of "materiality" is an objective one, looking at the question from the perspective of the

"reasonable investor." Basic Inc., 426 U.S. at 445. Here, the real estate investment involved in

each case a significant amount of money—ranging from $16,667 to $75,000. See Damages

Exhibits (annexed as Ex. A to Brody Damages Decl.). There is no evidence that any of the

plaintiffs knew Chanla and Zimbalist independently of their investments.   Each of the plaintiffs

was introduced to the investments by Wilkov.  Dkt. 84, ¶ 10; Dkt. 88, ¶ 10; Dkt. 117, ¶ 10.

Wilkov told the plaintiffs that she would provide information to them that was provided to her

by Zimbalist and Chanla and keep plaintiffs informed about the investments.  Dkt. 117, ¶ 11.

Wilkov repeatedly assured her clients that the investments in California were sound.  Dkt. 84,

¶ 12; Dkt. 88, ¶ 12; Dkt. 117, ¶ 12.  As reflected in the deposition testimony described above,

Wilkov was known to plaintiffs either because she was acting—or had been acting—as their own

financial planner/advisor or because they had been referred by others to Wilkov for the purpose

of Wilkov facilitating the investment transactions.  When Wilkov made repeated representations

to plaintiffs regarding Zimbalist and Chanla's past performance, and Wilkov specifically assured

her clients that she had conducted a due diligence investigation of Zimbalist and Chanla, see

Dkt. 117, ¶ 12, a reasonable investor in the plaintiffs' position would obviously view Wilkov's

statements regarding the past performance of Chanla and Zimbalist to be a significant or

important piece of information in the total mix of information to be used regarding a decision to

invest.  Indeed, these were investments whose value was highly dependent on the bona fides of

Chanla and Zimbalist, who were the only persons who would be responsible for actually

undertaking the real estate transactions.  Their performance was critical to the success of the

investments.  Thus, the fact that the only statements in the record as to their past success came

from Wilkov made those statements of the highest significance.  Additionally, during her plea

allocution, Wilkov conceded that she made "material" misrepresentations in order to "induce

victims to purchase shares of residential real estate through Pam Chanla and Carla Zimbalist."

Plea Tr. at 8-9.  This admission also provides proof that Wilkov's statements were material to

each plaintiff's decision to invest.  There is no issue of fact regarding the materiality of Wilkov's

50

false statements that she had "done [her] due diligence on Zimbalist and Chanla and that they were a solid and reliable team" and that she "had invested with Zimbalist and Chanla in the past and had been successful with them."  Plea Tr. at 12-13.[16]

### 2. Reliance

As noted, reliance is judged by a "but for" test: whether the plaintiff would have engaged in the transaction "but for" the false statement made by the defendant.  As the Supreme Court has noted, "[t]he traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a . . . statement and engaged in a relevant transaction . . . based on that specific misrepresentation."  Erica P. John Fund, Inc., 131 S. Ct. at 2185.

Here, plaintiffs have marshaled evidence that each plaintiff invested after Wilkov had brought the deal to them and had recommended it to them, and in some instances have marshaled evidence that they were aware of the false statements Wilkov made regarding her own "due diligence" on Chanla and Zimbalist.  But they have offered no direct evidence that each plaintiff "engaged in" the real estate deal "based on that specific misrepresentation."  Id.  Certainly, as reflected in plaintiffs' brief, see Pl. Supp. Mem. at 5-34, plaintiffs frequently refer to the fact that they "relied" on Wilkov and that they believed she had engaged in due diligence in investigating.  However, plaintiffs' brief points to no evidence that had each plaintiff not heard Wilkov make the specific misrepresentations at issue, that plaintiff would not have entered into the transaction.[17]

---

[16]  Neither side has made specific arguments as to the materiality of Wilkov's remaining false statements and thus we do not consider them further.

[17]  As far as plaintiffs' briefs disclose, the only plaintiff who came close to testifying that the false statements regarding due diligence were a "but for" cause of the investment was Scott Edvabsky, who stated that he would not have invested in the California properties if he

This is not to say that a jury could not reasonably infer that Wilkov's statements were the "but for" causes of some or all of the plaintiffs' having entered into the investments: after all, Wilkov's false statements regarding her due diligence on Chanla and Zimbalist related to a highly important and material fact that had been presented to them by Wilkov, the main person from whom they learned about the details of the proposed investments.  It is certainly logical that without Wilkov's assurances that she had verified the past performance of Chanla and Zimbalist, the plaintiffs would not have entered into the investments.  But an inference might be reasonably made to the contrary: for example, that a plaintiff would have entered into the deal without having heard the false statements simply because the promised rate of return was so stunningly favorable, or because the plaintiff believed that inasmuch as American Express was associated with the deal, that relationship by itself would protect him or her from any loss, or because another investor's recommendation was sufficient.  In light of the potential for reasonable inferences favoring both sides, summary judgment cannot be granted on the point either to plaintiffs or to Wilkov.

For her part, Wilkov seeks to avoid summary judgment (or obtain it in her favor) on the ground that the plaintiffs "who were referred to the California property investments" by people they knew, "including friends and those they knew through their businesses, placed their detrimental reliance on the Plaintiffs who referred them, not Wilkov."  Def. Mem. at 190.  We

---

"believe[d]" that Wilkov had not investigated the "directors, managers, or executives of the investment vehicles."  Deposition of Scott Edvabsky, dated Oct. 15, 2013 (annexed as part of Ex. E to Brody Reply Decl. and as part of Ex. Q to Wilkov Decl.), at 196.  But Edvabsky does not state how he formed this "belief."  Notably, Edvabsky testified that Zaccaro introduced him to Wilkov and told Edvabsky that he had made numerous investments with her and had "got[ten] returns."  Id. at 65, 68, 115.  Edvabsky further testified that he "[a]bsolutely" relied on Zaccaro "100 percent."  Id. at 73-74.  Under these facts, summary judgment cannot be granted to Edvabsky on the issue of his reliance on Wilkov's false statements.

reject this argument as the reliance element of plaintiffs' claims requires only a showing of "but-for" causation — that is, a showing that but for the misrepresentations, no injury would have been suffered.  As case law recognizes, "there can be multiple 'but for' causes of varying degrees of directness that cause the plaintiff's damages."  Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 777 (S.D.N.Y. 2011) (quoting Zito v. Leasecomm Corp., 2003 WL 22251352, at *19 (S.D.N.Y. Sept. 30, 2003) (internal quotation marks omitted)).  Thus, even indulging Wilkov's argument that the "referring plaintiffs" are "but for" causes of the referred plaintiffs' losses, it does not change the fact that Wilkov was also a "but for" cause of plaintiffs' losses.  Thus, a jury could still find that, notwithstanding their contact with other individuals, plaintiffs would not have entered into the investments and suffered the resulting injuries "but for" Wilkov's false statements concerning the California investments.

Several times in her papers, Wilkov argues that "but for" AEFA, certain plaintiffs would never have met Wilkov or developed a relationship with her.  See, e.g., Def. Mem at 40, 46, 58, 71, 90, 100, 108, 113.  Wilkov thus argues that her motion for summary judgment should be granted with respect to any plaintiff who is shown to have "relied" on AEFA because this reliance "supersedes any argument that can be made that they relied on Wilkov on her own, separate and apart from [AEFA]."  See, e.g., id. at 41.  This argument must be rejected for the same reason — that is, there can be numerous but-for causes of a loss.  Thus, it is of no moment that certain plaintiffs never would have done business with Wilkov "but for" her association with AEFA.

### 3. Whether Any Reliance Was Reasonable

We next address whether either side is entitled to summary judgment on the question of whether any plaintiff's reliance (assuming it were found) was "reasonable" or "justifiable."  See,

e.g., Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C., 2013 WL 628533, at *12

(S.D.N.Y. Feb. 15, 2013) ("[A] plaintiff must show that its reliance was justifiable, both in the

sense that the party claiming to have been defrauded was justified in believing the representation

and that he was justified in acting upon it.") (internal citations and quotation marks omitted).[18]

In order to demonstrate that reliance was reasonable, an unsophisticated plaintiff need only show

"minimal diligence" and need only not act "reckless[ly]." Royal Am. Managers, Inc. v. IRC

Holding Corp., 885 F.2d 1011, 1016 (2d Cir. 1989); accord Brown v. E.F. Hutton Grp., Inc., 991

F.2d 1020, 1032 (2d Cir. 1993); Amusement Indus. Inc., 2013 WL 628533, at *12.  On the other

hand, "[a] plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable

reliance without making inquiry and investigation if he has the ability, through ordinary

intelligence, to ferret out the reliability or truth about an investment." Crigger v. Fahnestock &

Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006) (citation and quotation marks omitted).  Reasonable

reliance also entails a duty to investigate the legitimacy of an investment opportunity where

"plaintiff was placed on guard or practically faced with the facts." Mallis v. Bankers Trust Co.,

615 F.2d 68, 81 (2d Cir. 1980), abrogated in part on other grounds, Peltz v. SHB Commodities,

115 F.3d 1082, 1090 (2d Cir. 1997).  As the Second Circuit has explained:

> Circumstances may be so suspicious as to suggest to a reasonably prudent
> plaintiff that the defendants' representations may be false, and that the plaintiff

---

[18] "[T]he element of reasonable reliance is much the same in New York common law as in federal securities law." Ashland Inc. v. Morgan Stanley & Co., Inc., 700 F. Supp. 2d 453, 471 (S.D.N.Y. 2010), aff'd 652 F.3d 333 (2d Cir. 2001); see also Emergent Capital, 343 F.3d at 195 (for "plaintiff to prevail on" its causes of action under § 10(b) and Rule 10b-5 or common law fraud it "ha[d] to establish reasonable reliance on the alleged misrepresentations or omissions"). "[B]oth the Second Circuit and the New York courts appear to use standards of 'reasonable reliance' and 'justifiable reliance' interchangeably in adjudicating fraud claims." Computech Int'l, Inc. v. Compaq Computer Corp., 2004 WL 1126320, at *9 (S.D.N.Y. May 21, 2004) (collecting cases).  For convenience, we will refer exclusively to "reasonable" reliance.

> cannot reasonably rely on those representations, but rather must make additional
> inquiry to determine their accuracy . . . .  Put another way, if the plaintiff has the
> means of knowing, by the exercise of ordinary intelligence, the truth, or the real
> quality of the subject of the representation, he must make use of those means, or
> he will not be heard to complain that he was induced to enter into the transaction
> by misrepresentations.

Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d at 91, 98 (2d Cir. 1997) (citations and

internal quotation marks omitted); see also Keywell Corp. v. Weinstein, 33 F.3d 159, 164 (2d

Cir. 1994) ("When a party is aware of circumstances that indicate certain representations may be

false, that party cannot reasonably rely on those representations, but must make additional

inquiry to determine their accuracy."); In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F.

Supp. 2d 105, 118 (S.D.N.Y. 2008) ("A heightened degree of diligence is . . . required where

circumstances were such that plaintiff had hints of falsity.") (citation omitted); JP Morgan Chase

Bank v. Winnick, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) (heightened diligence required

"where the circumstances are so suspicious as to suggest to a reasonably prudent plaintiff that

the defendants' representations may be false; in such cases, a plaintiff cannot reasonably rely on

those representations, but rather must make additional inquiry to determine their accuracy")

(citation, internal quotation marks, and brackets omitted).

"The question of what constitutes reasonable reliance is always nettlesome because it is

so fact-intensive." Estate of Warhol, 119 F.3d at 98.  As already mentioned, courts assessing the

reasonableness of reliance "consider the entire context of the transaction."  Emergent Capital,

343 F.3d at 195.  Thus, an evaluation of reasonable reliance "involve[s] many factors to consider

and balance, no single one of which is dispositive."  STMicroelectronics, N.V. v. Credit Suisse

Sec. (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011) (citation, internal quotation marks, and brackets

omitted).  "Accordingly, reasonable reliance is often a question of fact for the jury rather than a

question of law for the court." Id.; accord Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc., 888 F. Supp. 2d 478, 484-85 (S.D.N.Y. 2012).

Wilkov argues that plaintiffs cannot show that their reliance on her false statements was "reasonable" inasmuch as "Plaintiffs in this matter had a duty to investigate these investments." Def. Reply at 38-39. But we do not think a reasonable jury could conclude on the facts presented that the plaintiffs reliance on Wilkov's statements—assuming the jury finds such reliance—regarding her due diligence amounted to "recklessness." Wilkov introduced plaintiffs to the investments and held herself out to them as either a financial advisor or a financial planner—even if not all plaintiffs were actual American Express customers. We do not see how a reasonable jury could conclude that an investor could be expected to do more than rely on the advice of a financial professional, particularly one who was associated with a well-known financial firm such as AEFA, as to the bona fides of two otherwise unknown individuals who were responsible for the investments. Critically, the relevant false statements pertain to Wilkov's own experience with and investigation of Chanla and Zimbalist. Such statements could reasonably be perceived by the investors as not readily investigatable since they were within Wilkov's personal knowledge. See Warner Theatre Assocs. Ltd. P'ship v. Met. Life Ins. Co., 149 F.3d 134, 136 (2d Cir. 1998) (information is "peculiarly" within the other party's knowledge "where a party would face high costs in determining the truth or falsity of an oral representation . . . and those costs are sufficiently great to render reliance upon the representation reasonable") (citation omitted). When information is "peculiarly" within the "defendant's knowledge," it is "said that the plaintiff may rely without prosecuting an investigation, as he had no independent means of ascertaining the truth." Crigger, 443 F.3d at 234 (citation, internal quotation marks, and brackets omitted).

56

Thus, examining the factors considered by the Second Circuit, see Ashland Inc., 652 F.3d at 338, plaintiffs were largely unsophisticated in real estate matters, did not have ready access to the information that would have allowed them to discover information about Chanla and Zimbalist's track record, and had no "opportunity to detect" that Wilkov was lying about her having done due diligence on them.

In discussing the factors relevant to this analysis, Wilkov cites to the deposition of a Detective Simeon Plyler of the Los Angeles County Sheriff's Department, taken by plaintiffs' counsel in September 2011. At his deposition, Plyler testified that the deal sheets, which "explained how much money people were being asked to put into the investment and how much money they would get out of the investment" contained false information, and that he "let the documents speak for themselves" rather than retaining an expert to determine the accuracy of the information on the documents, as "[m]any of [the deal sheets] would have numbers on them, and if you did the calculations on the numbers that were on there, they were just wrong." Def. Reply at 31-32. Wilkov contends that plaintiffs cannot demonstrate reasonable reliance in light of Plyler's testimony because the irregularities in the deal sheets provided plaintiffs an "opportunity to detect the fraud." Id. at 31. This argument is unpersuasive, however, as Plyler's testimony does not address Wilkov's false statements as to her investigation of and experience with Chanla and Zimbalist. Nor does it show that whatever irregularities existed in the "deal sheets" were so obvious and material as to place plaintiffs on notice that Wilkov herself might be lying about her investigation of or past dealings with Chanla and Zimbalist. This is particularly true in light of the fact that Wilkov herself, a certified financial planner, failed to discern anything suspicious about the figures on the deal sheets.

Wilkov also contends that "[a]ny insinuation . . . of blind reliance . . . on a non-custodial

57

financial advisor is not reasonable as a matter of law," citing <u>Crigger</u> in support.  <u>See</u>, <u>e.g.</u>, Def. Supp. Reply at 21.  But <u>Crigger</u> does not advance Wilkov's contention that plaintiffs reliance here was so "blind" as to be unjustified.  <u>Crigger</u> simply reiterates well-settled law that a "plaintiff cannot close his eyes to an obvious fraud."  443 F.3d at 234.  There is no evidence that would allow a jury to find an "obvious fraud" here with respect to Wilkov's statements about her due diligence.  To the extent that Wilkov relies on <u>Crigger</u> for the proposition that a plaintiff "cannot demonstrate reasonable reliance without making inquiry and investigation . . . to ferret out the reliability or truth about an investment," <u>id.</u>, for the reasons already explained, a reasonable jury could not find that any purported irregularities in the deal sheets meant that plaintiffs were on notice of the possibility that they should conduct an investigation of Wilkov's statement regarding the due diligence she conducted on Chanla and Zimbalist.  Notably, Wilkov continues to assert that she herself had no idea at the time that the investments were in any way fraudulent.  <u>See</u> Dkt. 88, ¶ 25; Dkt. 117, ¶ 25.

Wilkov argues that several plaintiffs cannot show reasonable reliance in light of their levels of education.  <u>See</u>, <u>e.g.</u>, Def. Mem. at 30, 55, 135.  She also points out that some of them had experience with real estate investments or sales, and that this also precludes a showing of reasonable reliance for those plaintiffs.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 49, 74, 83, 103, 118.

Under New York law, "a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it."  <u>Ventur Grp., LLC v. Finnerty</u>, 68 A.D.3d 638, 639 (1st Dep't 2009).  Yet, "[w]hile the sophistication of the parties is a factor when considering the reasonableness of one party's reliance on the other party's representations [under New York law], it does not . . . by itself impose a heightened standard for

58

'reasonable reliance' by a party." E*TRADE Fin. Corp. v. Deutsche Bank AG, 631 F. Supp. 2d

313, 383 (S.D.N.Y. 2009) (citations omitted).  Of course, a "sophisticated" businessperson who

engages in a "major transaction" and "enjoy[s] access to critical information" is expected to

"take advantage of that access." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531,

1541 (2d Cir. 1997) (citation and quotation marks omitted); see also Banque Franco–Hellenique

de Commerce Int'l, et Mar., S.A. v. Christophides, 106 F.3d 22, 26-27 (2d Cir. 1997) (analysis

of reasonable reliance in "fraud cases under New York law has taken account of the degree to

which the truth was accessible to the defrauded person").  Similarly, under the federal securities

laws, it is expected that sophisticated investors will "investigate the information available to

them with the care and prudence expected from people blessed with full access to information."

Hirsch v. du Pont, 553 F.2d 750, 763 (2d Cir. 1977).

      In this case, we do not believe a reasonable jury could find that the few plaintiffs whom

Wilkov describes as highly educated, or even those with real estate experience, were not justified

in relying on Wilkov's false statements.  There is no evidence that they had access to "critical

information" regarding Chanla and Zimbalist's track record.  Indeed, Wilkov has not pointed to

any information that these investors could have found that would have allowed them to verify or

disprove Wilkov's representations.  While the exceedingly high promised rate of return on the

investments might have raised concerns, we note that Wilkov herself, who was intimately

involved in the transactions and had a high level of financial training as a certified financial

planner, contends that she was unable to uncover anything suspicious in her own efforts to

research Chanla and Zimbalist's backgrounds.  See Dkt. 88, ¶ 14.  As Wilkov put it, every time

something would "happen" with Chanla and Zimbalist or their company, Wilkov "would vet it

with other real estate investors who had been doing this for several years." Id.  These other real

estate investors "would always objectively reassure her that each situation was viable in the flipping process and the real estate investing business." Id.[19]

In these circumstances, we do not think that even those plaintiffs with real estate investment experience could be found to have acted recklessly by relying on Wilkov's assurances regarding the track record of Chanla and Zimbalist.

Finally, Wilkov appears to argue that plaintiff Fusco cannot show reasonable reliance because she "did her own due diligence" and "spoke directly with Zimbalist and Chanla about the opportunities offered." Def. Mem. at 59. This assertion does nothing to undermine the reasonableness of Fusco's reliance, however, because Wilkov provides no evidence that Fusco's conversations with Chanla and Zimbalist put Fusco on notice in any way that Wilkov's statements regarding her investigation of their past track record were false. That is, there is no evidence that, having spoken with either of these women, Fusco was tipped off to anything that should have led her to conduct any further investigation of their legitimacy. This is not surprising given that Wilkov herself had the most contact with Chanla and Zimbalist and contends that she herself was unaware of any problem with the investments.

4. Loss Causation/Damages

Plaintiffs seek summary judgment on damages in the amount that each plaintiff invested in the fraudulent scheme. See Pl. Damages Mem. at 4; Damages Exhibits (annexed as Ex. A to Brody Damages Decl.). Wilkov argues, however, that she did not know the scheme was fraudulent and thus Chanla and Zimbalist's criminal acts were "superseding criminal acts," an

---

[19] Wilkov states that she made efforts to "monitor[] the LA County Assessors Office for a change of possession of the properties" but was unable to do so. See Dkt. 88, ¶ 15. Her "independent real estate advisors said that this could take up to 6 – 8 months to change due to the backlog in their office." Id.

argument we construe as asserting that this criminality cuts off the chain of causation as to damages with respect to Wilkov.  See Def. Damages Opp. at 8-9; see also Def. Supp. Mem. at 16-17.  Plaintiffs do not respond to this argument.

"Loss causation embodies notions of the common law tort concept of 'proximate causation.'" AUSA Life Ins. Co., 206 F.3d at 216 (citation and internal quotation marks omitted).  "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence." First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994) (citation omitted); accord Emergent Capital, 343 F.3d at 197 (explaining that loss causation is "often compared" to the "tort law concept of proximate cause" which means that "damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission") (citations and internal quotation marks omitted); Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990) (test for proximate cause is whether acts are a "substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.") (citations omitted).

Thus, "when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." First Nationwide Bank, 27 F.3d at 769 (citation omitted); accord In re Emex Corp. Sec. Litig., 2002 WL 31093612, at *9 (S.D.N.Y. Sept. 18, 2002).  "The purpose of the proximate cause requirement is to fix a legal limit on a person's responsibility, even for wrongful acts." First Nationwide, 27 F.3d at 769 (citations omitted).  Thus, "an intervening intentional or

61

criminal act will generally sever the liability of the original tort-feasor." Kush v. City of

Buffalo, 59 N.Y.2d 26, 33 (1983). This is not the case, however, if the "intentional or criminal

intervention of a third party is reasonably foreseeable" or if "the intervening act is a natural and

foreseeable consequence of a circumstance created by defendant." Id.; accord Baidu, Inc. v.

Register.com, Inc., 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) ("Intervening criminal action by a

third party does not cut off liability for gross negligence when that criminal action was

reasonably foreseeable.") (citations omitted) (applying New York law); In re Sept. 11 Litig., 280

F. Supp. 2d 279, 302 (S.D.N.Y. 2003) ("Generally, an intervening intentional or criminal act

severs the liability of the original tort-feasor" under New York law, "[b]ut that doctrine has no

application when the intentional or criminal intervention of a third party or parties is reasonably

foreseeable.") (citations and internal quotation marks omitted); Derdiarian v. Felix Contr. Corp.,

51 N.Y.2d 308, 309 (1980) ("[A]n intervening act may not serve as a superseding cause, and

relieve an actor of responsibility, where the risk of the intervening act occurring is the same risk

which renders the actor negligent.").

      Here, Wilkov has supplied evidence that she had no knowledge that Chanla and

Zimbalist were engaging in a fraudulent scheme or that they would abscond with the investors'

money. See, e.g., Def. Mem. at 11, 28. Thus, plaintiffs are not entitled to summary judgment on

the issue of whether Chanla and Zimbalist's criminal acts were reasonably foreseeable. Case

law is clear, however, that foreseeability is a necessary element of showing loss causation. See,

e.g., Lentell, 396 F.3d at 173 (case law "require[s] both that the loss be foreseeable and that the

loss be caused by the materialization of the concealed risk") (emphasis in original).

Accordingly, plaintiffs cannot be granted summary judgment on the issue of loss causation.

Rather, a jury should decide whether the chain of causation was broken by the intervening

criminal acts of Chanla and Zimbalist.  <u>See generally</u> <u>Woodling v. Garrett Corp.</u>, 813 F.2d 543,

556 (2d Cir. 1987) ("When, as is usually the case, circumstances permit varying inferences as to

the foreseeability of the intervening act, the proximate cause issue is a question of fact for the

jury.") (citation omitted); <u>accord</u> <u>Stanford v. Kuwait Airways Corp.</u>, 89 F.3d 117, 127 (2d Cir.

1996) ("Questions regarding what is normal or foreseeable, like other questions of proximate

cause, are generally issues for the trier of fact.").

     5.  <u>Other Damages Issues</u>

     Plaintiffs note that Wilkov is obligated to pay restitution to plaintiffs "up to $42,000."

Pl. Damages Mem. at 4.  Plaintiffs do not explain the source of this figure, but it appears that

payment of restitution in this amount was a part of Wilkov's plea agreement.  <u>See</u> Plea Tr. at 2-3.

Plaintiffs also note that they previously reached a settlement with Ameriprise and that Wilkov

"receives a dollar for dollar credit to the amount paid in the settlement."  Pl. Damages Reply at

4.  Obviously, plaintiffs may not collect twice for the same losses, and Wilkov's liability must be

reduced by any amount paid to them by Ameriprise.  <u>See</u>, <u>e.g.</u>, <u>United Stats v. Zan Mach. Co.,

Inc.</u>, 803 F. Supp. 620, 623 (E.D.N.Y. 1992) ("It is hornbook law that a plaintiff cannot recover

twice for the same injury . . . [W]hen a plaintiff settles with one defendant, a nonsettling

co-defendant is entitled to a credit of the settlement amount against any judgment the plaintiff

obtains against the nonsettling co-defendant as long as both the settlement and judgment

represent common damages.") (quoting <u>Singer v. Olympia Brewing Co.</u>, 878 F.2d 596, 600 (2d

Cir. 1989)).  Accordingly, in the event plaintiffs obtain an award of damages, plaintiffs should be

required to provide information regarding their settlement with Ameriprise and payments

received from Wilkov under her restitution obligation before final judgment is entered.  The final

judgment amount entered for each plaintiff should then be reduced by the amount that each

plaintiff has received as a share of the settlement reached with Ameriprise or any restitution payments.

## V.  WILKOV'S DEFENSES

Wilkov's submissions raise a number of arguments in opposition to plaintiffs' claims. Some are affirmative defenses and others are arguments pertaining to plaintiffs' ability to meet their burdens of proof that we have already discussed above.  Many are irrelevant to the subject matter of this motion or are of no legal significance.  We address those arguments that we have not already addressed and that appear to have sufficient substance to warrant discussion.

### A.  Guilty Plea and Collateral Estoppel in Relation to Certain Plaintiffs

Wilkov argues that she "did not plead guilty to Indictment #2765/07 . . . as it relates to Plaintiffs Haran, Lichtenstein, [or] Anarumo," and that summary judgment as to these plaintiffs must be granted in her favor.  Def. Supp. Mem. at 9.  This argument appears to be contrary to Judge Hellerstein's ruling that "the fact that Wilkov knowingly made false statements to plaintiffs is established."  See First SJ Ruling.  The ruling, by its terms, applied to all plaintiffs in the case.  Because we assume Judge Hellerstein's ruling to be binding, we do not reconsider it now.

### B.  N.Y. Gen. Oblig. Law § 15-108

Defendant raises N.Y. Gen. Oblig. Law § 15-108 in an effort to reduce her liability to plaintiffs because, in her view, plaintiffs' testimony demonstrates their "indisputable reliance on Ameriprise Financial [as] successor-in-interest to American Express Financial Advisors, Inc." Def. Mem. at 192.  Ameriprise was terminated as a party in 2009.  Section 15-108 provides, in relevant part:

When a release or a covenant not to sue or not to enforce a judgment is given to

64

> one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

N.Y. Gen. Oblig. Law § 15-108(a). Thus, "Section 15-108(a) provides that, when a plaintiff settles with a defendant in a tort action with multiple defendants, any eventual verdict against the nonsettling defendants shall be reduced by the greater of (1) the amount stipulated as consideration for the release, (2) the amount actually paid for the release, or (3) the settling defendant's equitable liability." Chubb & Son Inc. v. Kelleher, 2006 WL 2711543, at *3 (E.D.N.Y. Sept. 21, 2006). In other words, "[i]n tort actions involving multiple defendants where a plaintiff settles with one or more defendants before trial, and proceeds to trial against the remaining defendants, General Obligations Law § 15-108(a) permits nonsettling defendants a monetary offset against the amount of a verdict." Whalen v. Kawasaki Motors Corp., 92 N.Y.2d 288, 292 (1998). "[S]ection 15-108 is meant to be read in conjunction with the contribution rights set forth in article 14 [of the CPLR]," Riviello v. Waldron, 47 N.Y.2d 297, 306 (1979), and a setoff under § 15-108 is only available for claims under which the non-settling party could have sought contribution from the settling party, see Mead v. Bloom, 94 A.D.2d 423, 423-24 (4th Dep't 1983). "The basic requirement for contribution . . . codified in CPLR 1401, is that the culpable parties must be subject to liability for damages for the same personal injury, injury to property or wrongful death." Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp., 71

N.Y.2d 599, 602-03 (1988) (emphasis omitted) (citations omitted).[20]  "The goal of contribution . . . is fairness to tortfeasors who are <u>jointly</u> <u>liable</u>."  <u>Mowczan v. Bacon</u>, 92 N.Y.2d 281, 284 (1988) (citation omitted) (emphasis added).

It appears that Wilkov has invoked the § 15-108 setoff rule based on the theory that Ameriprise is vicariously liable for any damages she caused to plaintiffs.  But Wilkov may not avail herself of the setoff available under § 15-108 because "[c]ontribution will lie against one vicariously liable where the claim is asserted by a party <u>other than the active tort-feasor whose</u> <u>actions rendered the alleged joint tort-feasor vicariously liable</u>."  <u>Graphic Arts Mut. Ins. Co. v.</u> <u>Bakers Mut. Ins. Co. of N.Y.</u>, 58 A.D.2d 397, 401 (2d Dep't 1977) (emphasis added); <u>see</u> <u>also</u> <u>Kucinski v. Rish</u>, 108 Misc. 2d 188, 190 (N.Y. Sup. Ct. 1981) ("While contribution may be sought from one who is vicariously liable for the injury involved, it may not be sought on behalf of the tort-feasor whose conduct rendered the other tort-feasor vicariously liable.") (citation omitted).  As the Court noted in a previous order denying Wilkov's request for discovery on Ameriprise, "it is of no help to defendant to argue that Ameriprise failed to follow its policies in supervising defendant herself, as she could not seek contribution for such a claim and thus could not use section 15-108 to reduce her own liability for such a claim."  <u>See</u> Order, dated Feb. 6, 2013 (Docket # 199).  Accordingly, Wilkov's reliance on the set-off under § 15-108 must be rejected.

---

[20]  N.Y. C.P.L.R. § 1401 provides that "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."

C.   Effect of Plaintiffs' Reliance on Zimbalist and Chanla

Relatedly, defendant asserts that, because plaintiffs "relied on" the representations made by Chanla and Zimbalist, these two individuals "should bear the burden of any damages assessed to Wilkov." Def. Mem. at 197-98. As noted above, Chanla and Zimbalist were named as co-defendants in this suit, though both have defaulted. Any argument as to "but for" causation must be rejected for the reasons stated above in section IV.C.2. To the extent Wilkov is asserting an entitlement to contribution from Chanla and Zimbalist, this argument must be rejected inasmuch as Wilkov never filed any cross-claims for contribution against Chanla and Zimbalist and it is too late for her to do so now. See Memorandum Opinion, dated March 12, 2014 (Docket # 298), at 4.

Alternatively, construing Wilkov's argument as an assertion that her share of liability should be reduced by an amount corresponding to the equitable share of fault attributable to Chanla or Zimbalist, this argument must also be rejected. In the context of federal securities fraud, "[c]ourts may impose joint and several liability where two or more defendants have collaborated in the illegal conduct at issue." S.E.C. v. Tecumseh Holdings Corp., 2011 WL 2076466, at *1 (S.D.N.Y. May 24, 2011) (citations omitted); accord S.E.C. v. Calvo, 378 F.3d 1211, 1215 (11th Cir. 2004) ("It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct . . . . This holds true even where one defendant is more culpable than another.") (internal citations omitted). Indeed, the Supreme Court made clear that it regards those who violate Rule 10b-5 as "joint tortfeasors" subject to "joint liability" in a case addressing whether "federal courts may imply a private right to contribution in Section 10(b) of the Securities Exchange Act . . . and Rule 10b-5" against "other parties who have joint

67

responsibility for the violation." Musick, Peeler & Garrett v. Emp's Ins. of Wausau, 508 U.S. 286, 288, 289-90, 292, 298 (1993); accord In re Del-Val Fin. Corp. Sec. Litig., 868 F. Supp. 547, 558 (S.D.N.Y. 1994) ("The basic rule in securities actions is joint and several liability among defendants against whom judgment is entered.") (citing Musick, 508 U.S. at 291). New York law similarly provides that joint tortfeasors are generally subject to joint and several liability. See, e.g., Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 556 (1992) ("[T]ortfeasors generally are jointly and severally liable for a judgment, meaning that each is responsible for the full amount regardless of culpability."); Ravo v. Rogatnick, 70 N.Y.2d 305, 309 (1987) ("When two or more tort-feasors act concurrently or in concert to produce a single injury, they may be held jointly and severally liable.") (citations omitted). This rule applies to fraud claims under New York law. See, e.g., Sweeney, Cohn, Stahl & Vaccaro v. Kane, 6 A.D.3d 72, 79 (2d Dep't 2004) (imposing joint and several liability for fraud) (citations omitted).

If the jury rejects Wilkov's supervening cause argument and finds that she proximately caused plaintiffs' damages, it would not be a defense for Wilkov to claim that Chanla and Zimbalist were also at fault. Such an argument amounts to a claim that Wilkov is entitled to contribution against Chanla and Zimbalist, but a claim for contribution is not a defense to liability. The principle of joint and several liability holds that "each party is individually liable to plaintiff for the whole of the damage" and the plaintiff "may proceed against any or all defendants." Hecht v. City of N.Y., 60 N.Y.2d 57, 62 (1983) (citations omitted); accord Fubon Ins. v. China Express Co., 2004 WL 326193, at *6 (S.D.N.Y. Feb. 17, 2004); Cayuga Indian Nation of N.Y. v. Pataki, 79 F. Supp. 2d 66, 71 (N.D.N.Y. 1999). This means that, if Wilkov is found to have proximately caused plaintiffs' damages, plaintiffs may collect the full amount of their losses from Wilkov, regardless of any equitable share of fault attributable to Chanla or

68

Zimbalist.  Accordingly, Wilkov's argument that "Zimbalist and Chanla should bear the burden

of any damages assessed to Wilkov," Def. Mem. at 198, must be rejected.

     D.  <u>Estoppel Effect of FINRA Arbitration</u>

     Wilkov argues that plaintiffs are "estopped from making any claims" asserting "fraud,

withholding material facts, failure to disclose, and breach of franchise agreement" by virtue of a

FINRA arbitration that was allegedly resolved in her favor.  Def. Supp. Mem. at 10-11.

Construing this argument as an assertion of res judicata (<u>i.e.</u>, claim preclusion), it must be

rejected.  "Under res judicata, a final judgment on the merits of an action precludes the parties or

their privies from relitigating issues that were or could have been raised in that action."  <u>Allen v.</u>

<u>McCurry</u>, 449 U.S. 90, 94 (1980); <u>accord</u> <u>Ferris v. Cuevas</u>, 118 F.3d 122, 126 (2d Cir. 1997)

("Following a valid final judgment . . . <u>res judicata</u> bars future litigation between the same

parties, or those in privity with them, on the same cause of action.") (citations omitted).  It is true

that an arbitral decision may be entitled to preclusive effect in a federal court proceeding.  <u>See,</u>

<u>e.g.</u>, <u>Dean Witter Reynolds, Inc. v. Byrd</u>, 470 U.S. 213, 223 (1985) ("[C]ourts may directly and

effectively protect federal interests by determining the preclusive effect to be given to an

arbitration proceeding."); <u>Pike v. Freeman</u>, 266 F.3d 78, 90 (2d Cir. 2001) ("It is well settled that

[the doctrine of res judicata or claim preclusion] serves to bar certain claims in federal court

based on the binding effect of past determinations in arbitral proceedings.") (citations omitted).

However, to prove the affirmative defense of claim preclusion, a party must show "that (1) the

previous action involved an adjudication on the merits; (2) the previous action involved the

plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or

could have been, raised in the prior action."  <u>Monahan v. N.Y.C. Dep't of Corr.</u>, 214 F.3d 275,

285 (2d Cir. 2000).  Wilkov's assertion of claim preclusion must be rejected to the simple reason

that, as she herself concedes, the FINRA arbitration was "brought by Ameriprise Financial against Wilkov." Def. Supp. Mem. at 11. That is, the prior FINRA arbitration plainly did not "involve the plaintiffs" or anyone in privity with them. As a result, Wilkov's assertion of claim preclusion must be rejected.

    E.  <u>Failure to Supervise</u>

    In an argument that is difficult to follow, Wilkov contends that she placed "reasonable and justifiable reliance on the supervision covenanted to be provided to her" by AEFA and that her "supervisor's failure to provide proper supervision and guidance regarding [the relevant] investments [] proximately caused and contributed to any Plaintiffs' losses." Def. Supp. Mem. at 14-15. She asserts that her supervisor "knew exactly what was going on here and never asked what was going on, never really followed up, didn't do basic due diligence, not only in accord with the rules governing the security industry, but that he violated [AEFA's] own in-house rules over and over again." <u>Id.</u> at 15. Wilkov's position amounts to an assertion that, notwithstanding any finding that she committed fraud, she should not be held liable for losses resulting from her actions because her employer failed to adequately supervise her. We reject this argument, as it is not supported by any legal doctrine. [21]

---

[21] Wilkov also makes occasional reference to the existence of discovery disputes. <u>See</u>, e.g., Def. Reply at 14. The Court made clear that any disputes regarding discovery had to be brought to the Court's attention by September 7, 2012. <u>See</u> generally Order, dated Sept. 27, 2012 (Docket # 166), at 1. Thus, any effort to raise new discovery disputes now is untimely. <u>See also</u> <u>Lane v. Lucent Techs., Inc.</u>, 2007 WL 2079879, at *3 (M.D.N.C. July 13, 2007) ("Generally, a party must file a motion to compel before the close of discovery in order for that motion to be deemed timely."); <u>Days Inn Worldwide, Inc. v. Sonia Inv.</u>, 237 F.R.D. 395, 398-99 (N.D. Tex. 2006) (denying as untimely a motion to compel production of documents filed two weeks after deadline for completion of discovery).

## VI. CONCLUSION

For the foregoing reasons, plaintiffs' motions for summary judgment (Docket ## 248, 267) should be granted in part and denied in part. Wilkov's motion for summary judgment (Docket # 280) should be denied.

### PROCEDURE FOR FILING OBJECTIONS TO THIS
### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Alvin K. Hellerstein at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Hellerstein. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: September 29, 2014
         New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Jennifer S. Wilkov
8225 5th Avenue, Suite 416
Brooklyn, NY 11209

Counsel by ECF

71